**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**LLOYD MCKINNEY,**                                                                          **PLAINTIFF,**

**v.**

                                                                        **CASE NO.: 4:24-CV-00880-KGB**

**AMMUNITION OPERATIONS, LLC
D/B/A REMINGTON,**
                                                                        **DEFENDANT.**

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(a), Defendant Ammunition Operations, LLC d/b/a Remington

("Remington") submits the following Statement of Undisputed Material Facts in support of its

Motion for Summary Judgment.

The following exhibits support Defendant's Statement of Undisputed Material Facts:

Exhibit 1:    Declaration of Earnest Terry

Exhibit 2:    Excerpts from Plaintiff's Deposition

**I.    Plaintiff's Employment**

1.    Remington produces a wide array of sporting and hunting ammunition at its facility

in Lonoke, Arkansas. Terry Decl. ¶ 4.

2.    Plaintiff was hired at Remington's Lonoke facility in February of 2012. Pl. Dep. Tr

7:7.

3.    Plaintiff remains employed at Remington's Lonoke facility, and his job title is

Manufacturing Support Associate – 2. Pl. Dep. Tr. 8:22-25.

4.      Plaintiff works in the Shells Division of the Centerfire Department at the Lonoke facility. His job duties include ensuring machines in production lines remain fully supplied with metal cups, a component used to manufacture bullet casings. Pl. Dep. Tr. 8:3-21; 80:15-17.

5.      During the first half of 2024, Plaintiff reported to Production Specialists Earnest Terry and Yolanda Solee and Supervisors Ryan Jenkins and Alex VanPelt. Pl. Dep. Tr. 11:3-12; 51:12-17. Like Plaintiff, Mr. Terry, Ms. Solee, and Mr. Jenkins are African American. Pl. Dep. Tr. 40:4-7; 129:5-10.

## II.     The "Bathroom Incident"

6.      Plaintiff's complaints in this lawsuit center around a single, race-neutral interaction with a supervisor after the supervisor allegedly told Plaintiff not to use a bathroom near the facility's administrative personnel.

7.      Specifically, on March 29, 2024, Plaintiff used a bathroom at the Lonoke facility that shares a wall with the area where certain of Remington's administrative  personnel work. Pl. Dep. Tr. 25:7-9.

8.      Plaintiff acknowledges he regularly took breaks in this bathroom while he was on the clock and that he would often call his wife and read the newspaper during these breaks. Pl. Dep. Tr. 25:20-22; 26:9-11,18-20; 27:11-21.

9.      While Plaintiff was using this bathroom on March 29, 2024, an individual, whose identity Plaintiff did not know at the time, entered the bathroom and called out to Plaintiff. Pl. Dep. Tr. 27:24-25; 28:1-5.

10.     Plaintiff testified that, during their brief exchange, the individual used commonplace, non-aggressive, racially neutral language:

```
Q    What did -- what was said?

A    What you doing?  What you doing?  Are you all right?
```

Pl. Dep. Tr. 28:6-7.

11.    Plaintiff did not respond. The individual left the bathroom and Plaintiff left shortly thereafter. Pl. Dep. Tr. 28:8-9; 23-25; 29:1-3.

12.    After he left the bathroom, Plaintiff walked to the breakroom and sat down. Then, Plaintiff alleges Coy Snider, a supervisor in a different department at the Lonoke facility, approached Plaintiff and asked to speak with him. Pl. Dep. Tr. 30:16-18; 31:5-7,15-17; 42:9-15.

13.    Plaintiff testified that Snider told Plaintiff an administrative employee had complained that Plaintiff was being loud in the bathroom:

```
Q    Okay.  Well, what did he say, as best -- as best you can
remember?

A    He was -- he was so aggressive.  I can remember that he
were real aggressive, moving around with hand movement.  And he
told me Lisa Leberuw told me you was in that bath -- you was in
the bathroom playing loud music.
```

```
A    He told me she -- she reported me as being loud -- loud or
doing something in there, and I --

Q    That you were loud in the bathroom?

A    Yeah.  So I --

Q    And who is Lisa Leberuw?

A    She worked in the office area.
```

Pl. Dep. Tr. 31:18-23; 32:16-21.

14.    Plaintiff alleges Snider then told him that, in the future, he should not use the bathroom near where the administrative personnel worked. Pl. Dep. Tr. 33:25; 34:1-2.

15.     Plaintiff testified this interaction lasted about sixty seconds and that Snider did not say anything to Plaintiff other than as recounted above. Pl. Dep. Tr. 34:19-22; 35:1-3; 36:2-7.

16.     Plaintiff alleges Snider used aggressive hand motions during this interaction but testified that Snider did not touch him. Pl. Dep. Tr. 33:11-19, 36:9-10.

17.     Hours later, Plaintiff reported his interaction with Snider to Craig Thomas, the Plant Manager at the Lonoke facility. Pl. Dep. Tr. 36:23-25; 37:1, 4-5.

18.     Plaintiff testified that Thomas responded by advising Plaintiff he could use any bathroom he wanted other than those designated for women:

```
Q    Okay.  And Mr. Thomas told you, you can use any bathroom
that you want to other than the women's restroom; correct?
A    Yes.
Q    Okay.  But you -- I think you were satisfied with that
response?
A    Yes.
```

Pl. Dep. Tr. 37:11-16.

19.     Plaintiff also discussed his interaction with Snider in meetings with the facility's management and Human Resources personnel on March 29, 2024, and during the following week. Pl. Dep. Tr. 48:3-20. Plaintiff told Human Resources personnel that he believed Snider's interactions with him and Snider's initial instruction not to use the bathroom near the administrative offices had something to do with Plaintiff's race. Pl. Dep. Tr. 112:1-4.

## III.    Plaintiff's Discrimination Claim

20.     Plaintiff complains that he was discriminated and/or retaliated against when, shortly after the Bathroom Incident, Remington implemented policy changes that applied to Plaintiff and his coworkers.

**A.      Plaintiff's Allegations Regarding Overtime Opportunities**

21.     Plaintiff asserts in his Complaint that, following his complaints about the Bathroom Incident, he was no longer permitted to work overtime. Compl. ¶ 39.

22.      Prior to April of 2024, Plaintiff generally worked overtime at his discretion and preference. Pl. Dep. Tr. 14:14-17; 23:21-25; 24:1-10.  He typically worked two hours of overtime from 5:00 am to 7:00 am before his regular shift began at 7:00 am. Pl. Dep. Tr. 23:21-25; 24:1-10.

23.     Around this time, Remington laid off the employee who performed Plaintiff's job duties on the overnight shift. This left Remington without coverage for the overnight shift. Terry Decl. ¶ 6.

24.     As a result, Remington needed to ensure there was regularly scheduled overtime to cover the overnight shift and that either Plaintiff or Mike Hawkins, a caucasian male on Plaintiff's shift who had the same job functions as Plaintiff, could work a full four hours of overtime to help cover work on the overnight shift. Terry Decl. ¶¶ 6-7.

25.     Accordingly, on or about April 16, 2024, the Production Specialists to whom Plaintiff reported began requiring Plaintiff and Hawkins to sign up in advance for overtime. Terry Decl. ¶ 8.   This ensured there was adequate staffing as to the roles performed by Plaintiff and Hawkins and allowed the supervisors on Plaintiff's team advanced notice of who would be covering the overtime hours. Terry Decl. ¶ 8.

26.     Plaintiff and Hawkins were both subject to this requirement. Terry Decl. ¶ 8; Pl. Dep. Tr. 57:20-25, 58:1-4.

27.     Contrary to the assertions in his Complaint that he was not allowed to work overtime and that white employees were, Plaintiff testified that he could have signed up to work overtime but chose not to:

```
Q    Okay.  So you could have signed up for the overtime;
right?

A    Yeah.
```

Pl. Dep. Tr. 53:24-25; 54:1.

28.    Plaintiff also testified that the sign-up sheet was implemented on only a temporary basis: since his return from medical leave in December of 2024, Plaintiff's overtime has been scheduled based on informal conversations with his supervisor.  Pl. Dep. Tr. 17:19-25; 18:1-2.

**B.    Plaintiff's Allegations Regarding Changes to his Work Shift and Scheduling**

29.    In his Complaint, Plaintiff alleges, following his complaints about the Bathroom Incident, that Remington reduced his schedule from ten to eight-hour days and moved Plaintiff to the night shift.[1] Compl. ¶¶ 31-32, 34.

30.    On or about August 13, 2024, the shift structure for the Centerfire department was modified from three eight-hour shifts five days per week to two ten-hour shifts four days per week. Pl. Dep. Tr. 80:7-25; 81:1-4.

31.    Plaintiff acknowledged that this scheduling change impacted his entire department:

---

[1] Plaintiff erroneously asserts in Paragraph 34 of his Complaint that he was moved from the night shift to the day shift. In Paragraph 38, he asserts he was moved "back to the day shift."

> Q    And it was also during that time when they changed the
> schedule from five days to four days; correct?
> A    Yes.
> Q    And that was a plant-wide change; right?
> A    No.  It happened -- it happened in the center fire --
> center fire.  That's one --
> Q    Okay.  In the center fire group?
> A    Yeah.  Yeah.
> Q    And the center fire group includes -- hold on a second --
> it includes the shells which you were in?
> A    Yeah.
> Q    It, also, includes bullets?
> A    Yeah.
> Q    Packaging?
> A    Yeah.
> Q    Loading?
> A    Yes.
> Q    Okay.
>      So all the employees who worked in the center fire group
> and those subgroups went from working a five-day a week
> schedule to a four-day a week schedule working 10 hours per
> day?
> A    Yes.

Pl. Dep. Tr. 80:7-25; 81:1-4.

32.    Moreover, contrary to his allegation that Remington changed his shift from the day shift to the night shift, Plaintiff testified that he in fact never worked the night shift:

>      At any point between March 29th and May 13th, did you --
> were you assigned to the night shift; did you work the night
> shift?
> A    No.  I -- I -- I did not.
> A    I never had to do it.

Pl. Dep. Tr. 63:10-13; 65:10.

### C.   Plaintiff's Allegations Regarding Discriminatory Animus and Other Discriminatory Treatment

33.   Plaintiff asserts that Snider, the supervisor involved in the Bathroom Incident, prevented him from working overtime, that he was told he would have to switch from the day shift to the night shift, and that his schedule changed from five eight-hour days to four ten-hour days because he complained about Snider and the Bathroom Incident. Pl. Dep. Tr. 127:14-15, 22:13-15, 21-23.

34.   When asked why he believed Snider prevented him from working overtime, Plaintiff testified only that another employee told Plaintiff he overheard Snider asking a third employee about Plaintiff's schedule. Pl. Dep. Tr. 127:18-25; 128:1-4, 22-25; 129:1-2.

35.   Plaintiff further testified that he felt Snider discriminated against him because Plaintiff's schedule changed after the Bathroom Incident, but Plaintiff did not point to evidence to connect his race or the report of the Bathroom Incident to any proposed or actual change to his schedule, testifying instead that the schedule change impacted his entire department and, as discussed above, that he was never required to work the night shift. Pl. Dep. Tr. 63:10-13; 65:10; 80:7-25; 81:1-4.

36.   Plaintiff also asserts in his Complaint that he was told his position was being eliminated, but he admits that his position was never eliminated – just that his title was changed. Pl. Dep. Tr. 10:9-16. Plaintiff further testified that he has been doing the same job for about fourteen years and that he even received additional responsibilities after the Bathroom Incident. Pl. Dep. Tr. 7:7; 10:12-19.

37.    Plaintiff also testified that "points" were added to his attendance record for missing work, but he acknowledged that he was never written up for attendance issues:

```
Q    Were you ever written up for any attendance issues?
A    No.  But I did -- I did ask why -- why did that happen?
```

Plaintiff testified the only consequence of receiving additional attendance points was that the points were noted in his performance evaluation. Pl. Dep. Tr. 86:4-10; 98:12-13; 99:21-25; 100:1-8.

38.    Plaintiff also asserts he was denied two internal transfers. Pl. Dep. Tr. 89:5-14, 21-23. However, he testified that a Human Resources representative informed him the positions were unavailable to him because he took an extended leave of absence when the company was seeking to fill the positions. Pl. Dep. Tr. 91:22-24.

## IV.    Plaintiff's Hostile Work Environment Claim

39.    As discussed fully in Section II, *supra*, the thrust of Plaintiff's hostile work environment claim is that Snider allegedly called out to Plaintiff while he was using the administrative bathroom then later allegedly yelled at him and told him not to use that bathroom.

40.    When asked why he believed the Bathroom Incident was connected to his race, Plaintiff testified that Snider had called another employee the n-word prior to 2023 and previously had been "aggressive" with two other black employees. Pl. Dep. Tr. 39:22-25; 40:1-11,13-19, 25; 41:1-11; 42:3-8, 16-21.

41.    Upon further examination, however, Plaintiff revealed he had no firsthand knowledge to support these assertions:

        a.    Plaintiff testified that he did not hear Snider call another employee the n-word but that Plaintiff learned through "hearsay" that the employee reported the interaction to human resources:

> Did you actually see Tyrone and Mr. Snider going into Ms.
> Dunn's office?
>
> A    No.  Just -- just the hearsay of it –

Pl. Dep. Tr. 40:13-25; 41:13-15, 21-25; 42:1-2.

    b. Plaintiff further testified that he did not witness Snider acting aggressively toward another black employee (Plaintiff's supervisor) and stated that his supervisor did not tell Plaintiff Snider had been aggressive toward him, only that the two had "had words:"

> Q    Okay.  Did you witness him being aggressive towards Mr.
> Jenkins?
>
> A    I didn't.

Pl. Dep. Tr. 43:1-11.

    c. Plaintiff likewise testified he did not witness Snider acting aggressively toward a second black employee and that his belief that this occurred was based on "hearsay:"

> Q    Okay.  And you -- did you witness that?
>
> A    No.  I didn't witness it.  I just -- the hearsay.

Pl. Dep. Tr. 42:16-21, 24-25.

    42.    As for the Bathroom Incident, Plaintiff testified that it was isolated and promptly remedied to his satisfaction:

> Q    Okay.  Is that -- is that the only time anyone at the
> company's told you not to use that restroom?
>
> A    Yes.

> Q    Okay.  And Mr. Thomas told you, you can use any bathroom
> that you want to other than the women's restroom; correct?
>
> A    Yes.
>
> Q    Okay.  But you -- I think you were satisfied with that
> response?
>
> A    Yes.

Pl. Dep. Tr. 117:11-13; Pl. Dep. Tr. 37:11-16.

43.    Plaintiff further testified that there were no meaningful problems between himself and Snider prior to the Bathroom Incident:

> Prior to that heated conversation, did you have any
> problems with Mr. Snider or prior to that time?
>
> A    Well, he told -- he told me one time to lower my voice
> when I talked to him, yes.
>
> Q    When was that?
>
> A    It was prior years.
>
> Q    Okay.  Anything other than that in terms of disagreements
> or confrontations you had with Mr. Snider prior to this
> incident that we've talked -- we're talking about?
>
> A    No.  Not that I can recall.

Pl. Dep. Tr. 39:3-12.

Respectfully submitted,

**REED SMITH LLP**
2850 N. Harwood Street
Suite 1500
Dallas, Texas 75201
Phone: 469-680-4200
Facsimile: 469-680-4299
pmckeeby@reedsmith.com
hpool@reedsmith.com

By /s/ *Paulo B. McKeeby*
  Paulo B. McKeeby (Tex. Bar No. 00784571)
  *Admitted Pro Hac Vice*

By: */s/ Hannah B. Pool*
  Hannah B. Pool (AR Bar No. 2020237)

**ATTORNEYS FOR DEFENDANT
AMMUNITION OPERATIONS LLC, d/b/a
REMINGTON AMMUNITION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served via the Court's electronic filing system, on the 18th day of July 2025, upon the following attorney of record:

Johnson D. Ogles
Ogles Law Firm, P.A.
Post Office Box 891
Jacksonville, AR 72078
501-982-8339
Fax: 501-985-1403
Email: jogles@aol.com


/s/ *Hannah  B. Pool*
Hannah B. Pool

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

LLOYD MCKINNEY,                                                   PLAINTIFF,


v.

                                            CASE NO.: 4:24-CV-00880-KEB

AMMUNITION OPERATIONS, LLC
D/B/A REMINGTON,                                                  DEFENDANT.


## DECLARATION OF EARNEST TERRY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Earnest Terry, being of legal age, declare and affirm as follows:

1.      I am under no mental or physical incapacity, and I am competent to testify to the facts set forth in this declaration.

2.      The facts in this declaration are known to me to be true based on my personal knowledge of the facts and circumstances set forth herein.

3.      I am a Production Specialist employed with Remington Ammunition ("Remington") in the Shell Division of the Centerfire Department at its facility in Lonoke, Arkansas.

4.      Employees at Remington's Lonoke facility work with heavy machinery to produce a wide array of ammunition, including sporting and hunting ammunition.

5.      I am a supervisor in Lloyd McKinney's reporting chain and supervised McKinney's employment in March and April of 2024.  At that time, McKinney and Mike Hawkins, a caucasian male, had the same job functions on the day shift in the Centerfire Department's Shell Division.

6.      Around or before April of 2024, Remington laid off the employee who carried out McKinney's job duties on the overnight shift.  This left the Shell Division without coverage for that employee's previous eight-hour shift. This staffing issue required that we change the overtime practice within the Shell Division as described below.

7.      Specifically, to ensure the job functions were adequately maintained across the shifts, we needed to ensure that either McKinney or Hawkins could work four hours of overtime before their shift to help cover the work on the overnight shift.

8.      Accordingly, on or about April 16, 2024, Production Specialist Yolande Solee and I began requiring both McKinney and Hawkins to sign up in advance for overtime rather than working overtime at their own discretion and preference, as was the previous practice.  We did not single out McKinney, as Hawkins also was subject to this requirement.  The overtime sign up requirement allowed us to confirm which employee intended to work overtime, ensure that there was adequate coverage on all shifts, and assess if we needed to look to other employees to address any staffing needs.

9.      In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this __8__ day of July, 2025 at Lonoke, Arkansas.

_Earnest Terry_

Earnest Terry

**DECLARATION OF EARNEST TERRY**                                                                                     **PAGE 2**

# EXHIBIT 2

1       IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                   CENTRAL DIVISION

3

4

    LLOYD MCKINNEY                               PLAINTIFF

5

6       VS.                    NO. 4:24-CV-880

7

    AMMUNITION OPERATIONS, LLC
8   D/B/A REMINGTON                              DEFENDANT

9
                      ORAL DEPOSITION

10
                            OF

11
                      LLOYD MCKINNEY

12

13         TAKEN MARCH 28TH, 2025, AT 9:30 A:M.

14

15
                  A P P E A R A N C E S

16

17      ON BEHALF OF THE PLAINTIFF:

18      MR. BEN BROCKERT
        ATTORNEY AT LAW

19      1 RIVERFRONT PLACE
        SUITE 745

20      LITTLE ROCK, ARKANSAS 72114

21

        ON BEHALF OF THE DEFENDANT:

22

        MR. PAULO MCKEEBY

23      ATTORNEY AT LAW
        2850 NORTH HARWOOD STREET

24      SUITE 1500

25      DALLAS, TEXAS 75201

                                            Page 1

```
 1                    THE WITNESS:   Okay.  All right.
 2    MR. McKEEBY CONTINUING:
 3    Q    What's your current position at Remington?
 4    A    I -- I'm really undetermined, because of the turn of
 5    events.  Like every week they done change my position and
 6    telling me after the event that my job got terminated, but
 7    I'm -- I've been doing the same job for the last 14 years, and
 8    it's cup dumping, floor coordinator, support, assistance, watch
 9    operator.  These are all of the jobs that reported to -- to
10    perform the only person on that floor.
11    Q    Okay.  Do you have a job title?  Is it manufacturing
12    support associate; does that sound right?
13    A    Yes.  But that ain't the job that I -- I -- I do.  Well,
14    they -- after this event, they gave me that.  That make me
15    perform every job, everybody's job on the floor, so I don't
16    really know, but I know that my paperwork that I do and turn
17    in, I'm a cup dumper.
18    Q    Okay.
19    A    And all those got paperwork that we turn in with what
20    position that you have to turn in every day, and I turn in as a
21    cup dump.
22    Q    What paperwork are you talking about?
23    A    The paperwork that you turn in every day from doing your
24    job.
25    Q    What is -- what is that called, just paperwork?
```

Page 7

| | | |
|---|---|---|
| 1 | A | Yeah.  Your paperwork. |
| 2 | Q | What does cup dumping mean? |
| 3 | A | Okay.  There we make bullets. |
| 4 | Q | Right. |
| 5 | A | Nine millimeters, you know, 25, 38s.  And I'm the one that |

5    A    Nine millimeters, you know, 25, 38s.  And I'm the one that
6    start the foundation.  The cups are different sizes that make
7    different bullets.  So my job, is to do that, is to do that job
8    for each shift, day and night.
9    Q    So what do you do with the cups?  You do -- do you align
10   the cups?
11   A    I dump them in the machine to make sure --
12   Q    I see.
13   A    -- everybody got work in them to work to make nine
14   millimeters, to make 38s, to make rifles.  So like a -- a line,
15   I go through every day.
16   Q    Okay.
17   A    And that's the first thing I have to do to get everybody
18   to work.
19   Q    Am I correct that you're in the -- you work in the shell
20   division?
21   A    Yes, sir.
22   Q    Okay.  And do you agree with me, even though you have
23   these varied job functions that your job title is manufacturing
24   support associate?
25   A    Now it is, after the event, yes.  I was --

Page  8

1    that you saw after you filed your EEOC charge, did that say cup

2    dumper or manufacturing support associate?

3    A    Yes.  Manufacturing.

4    Q    Okay.  It said manufacturing support associate?

5    A    Yes, sir.

6    Q    Okay.  And was that the first time you saw that

7    designation?

8    A    Yes, sir.

9    Q    But would you agree with me that you're -- and before that

10    you think your title was floor coordinator?

11    A    Yes.

12    Q    Okay.  Did you -- did you -- are -- were your duties as

13    floor coordinator the same as when you saw the title change to

14    manufacturing support associate?

15    A    No.  It was added to -- that -- when it got to support

16    that made me be responsible for every job on the floor.

17    Q    Not just cup dumping?

18    A    Yes.  Everything on the floor.  They came up there and

19    said do his job.  Or that's my responsibility after the event.

20    Q    Did you -- did you -- in terms of who you reported to, did

21    that change?

22    A    Yes.

23    Q    Who did you report to when you were a floor coordinator

24    in -- at the beginning of 2024; was that Mr. Jenkins?

25    A    No.  Back -- see, they had a problem with him.  They moved

Page 10

```
1    him, and it was like almost in the same situation I'm in, but

2    he wouldn't report it.

3    Q    Okay.  But I'm just asking you, who was your -- who was

4    your immediate supervisor in January of 2024?

5    A    Probably, Alex --

6    Q    Alex Van Pelt?

7    A    -- Van Pelt.  Yeah.

8    Q    And before that, your supervisor was --

9    A    Right.

10   Q    -- Mr. Jenkins?

11   A    Yes.

12   Q    Ryan Jenkins?

13   A    Yeah.  And I briefly spent time with Alex before they

14   moved him, not even a couple of months.

15   Q    Okay.  And was Alex Van Pelt your supervisor after you saw

16   the title change to manufacturing support associate?

17   A    Yes.

18   Q    And today, Mr. Jenkins is again your supervisor; correct?

19   A    Yes, sir.

20   Q    Okay.  When did Mr. Jenkins return to becoming your

21   supervisor?

22   A    Back -- I -- I went on leave and when -- as I got back,

23   probably, in December of last year.

24   Q    My understanding is you -- in 2024, you took two leaves of

25   absence; correct?
```

Page 11

1    Q    And you currently work the day shift?

2    A    Yes, sir.

3    Q    And what is the time of work currently for that shift,

4    that's 4:45 to 3:00?

5    A    4:30.

6    Q    4:30 a.m.?

7    A    Yeah.

8    Q    To what time?

9    A    3:00.

10   Q    And does Mr. Jackson work on the night shift?

11   A    Yes.

12   Q    Okay.  And you work four days a week on that shift?

13   A    Most of the time I work overtime because I'm just used to

14   working overtime all my life.  So I just try to, you know, work

15   anything that can be done that -- they usually let me

16   come -- they used to let me come in until the -- that -- the

17   event happened.

18   Q    Okay.  And so, currently, your normal shift is 4:30 a.m.

19   to three o'clock four days a week; correct?

20   A    Yes.  Yes.

21   Q    But you're saying that you also work some overtime?

22   A    Yeah.

23   Q    And is the overtime that you work typically on days that

24   you're not scheduled to work -- on your --

25   A    Yeah.  They -- they -- most of the time on the -- on the

Page 14

1    A    He'll post how many people working, and before everybody

2    leave on that day, he'll ask and get an accurate, you know,

3    count of who -- who going to be there.

4    Q    And if he determines that overtime is needed or additional

5    help is needed, he might come to you and ask if you could work?

6    A    Yes.

7    Q    Okay.  And I take it, it's been that way since December,

8    when you started reporting to Ryan?

9    A    Yeah.  It stopped.  They moved Ryan, and then that problem

10   happened with me and I was informed by the team lead that my

11   schedule is being discussed.

12   Q    Okay.  But I'm just talking about since December, you have

13   worked with Ryan and --

14   A    Oh, since then, no.  Yes.  Since then, everything been

15   like -- like --

16   Q    Like we talked about?

17   A    -- yeah -- like we talked about.

18   Q    So -- and just to be clear for the record, what we've

19   talked about is that you are working overtime, and that your

20   overtime is scheduled based on this kind of informal discussion

21   that Ryan would have with you about, hey, we need some help --

22   more help -

23   A    Yeah.

24   Q    -- can you work?  And --

25   A    Yeah.

1   Q    -- you, typically, say yes.

2   A    Yes, sir.

3   Q    Okay.  What is your current hourly rate?

4   A    I think it's 21 -- it might be 21.48.

5   Q    And you're paid by the hour?

6   A    Yes, sir.

7   Q    And for overtime, you get time and a half?

8   A    Yes, sir.

9   Q    Now, prior to December, when -- well, I guess you were out

10  on leave through December.

11       When you came back in December, Ryan was your supervisor?

12  A    Yeah.

13  Q    Okay.  We covered that.

14       It looks like you worked between -- it looked like you

15  worked in August of 2024, through the middle of September of

16  2024; does that sound right?

17  A    Yes.

18  Q    And during that period of time, you reported to Mr. Van

19  Pelt?

20  A    Yes.

21  Q    And what was the procedure for working overtime during

22  that month and a half?

23  A    Well, after that incident, I wasn't allowed.

24  Q    So you did not work overtime during that, roughly, 45

25  days?

Page 18

1    A    Because it's everybody knowing that they in a buddy-like-

2    clique.  If you white and you wanted a friend, you can just get

3    hired off the street, and they'll put you over one of us.

4    Q    All right.

5        Did Alex Van Pelt say something to you that made you think

6    he was discriminating against you on the basis of your race?

7    A    He never did.  Like I say, I didn't get a chance to know

8    him.

9    Q    Okay.

10   A    He wasn't never -- we didn't never get a chance -- it just

11   was a little few conversations, because I didn't never get a

12   chance to.

13   Q    But who do you contend in this lawsuit at Remington did

14   discriminate against you, Mr. Snider, I take it?

15   A    Yes.  And, probably, Craig Thomas.  I don't think he was

16   there.  It was just like what was going on, it wasn't right,

17   and they was all going along with it.  So I had to include them

18   because then it was like nobody wants to say, hey, this -- this

19   -- this is wrong, you know.

20   Q    And what was it that was wrong?

21   A    For them to -- after this event, my whole life changed.

22   You changed my schedule.  You put me on nights.  I come back

23   another week and you change my schedule again.  I come back

24   another day -- another week, and you put me on night shift and

25   take my seniority.  You tell me my job has been eliminated, but

Page 22

1   you can't eliminate that job, unless that business change.  If

2   you eliminate that -- that -- that job, you cannot make a

3   bullet on there.  So why would you tell me a job that I've been

4   performing for 14 years getting eliminated?

5   Q    Who told you that the job was going to be eliminated?

6   A    Alex Van Pelt.

7   Q    What job did he tell you was going to be eliminated cup

8   dumping?

9   A    Yes.

10  Q    When did they tell you that?

11  A    When I -- when I asked -- I asked him something about the

12  job.

13  Q    What period of time are we talking about?

14  A    It was probably in -- after that event.

15  Q    And the event occurred on March 29th; correct?

16  A    Yes.

17  Q    Okay.  So let's talk about March 29th.

18       So at that point your immediate supervisor is Mr. Jenkins

19  still?

20  A    Yeah.

21  Q    Okay.  And you were working day shift?

22  A    Yes.

23  Q    And at that point it was five days a week; correct?

24  A    Yes.

25  Q    And the normal shift during that period of time was 5:45

Page 23

```
 1   to 3:00?
 2   A    I think I was coming in -- it might have been 5:00,
 3   because that -- at -- at -- before the event, I think I was
 4   working five and I was doing 10 hours.
 5   Q    Ten hours a day?
 6   A    Yeah.
 7   Q    Okay.  But the normal shift was --
 8   A    I think.
 9   Q    -- an eight hour shift; correct?
10   A    Yeah.  Yeah.  Eight hour.  Yeah.
11   Q    So, yeah.  I think I have the day -- the times wrong, but
12   you had an arrangement with Mr. Jenkins where you would come in
13   a couple of hours early every day; correct?
14   A    Yes.
15   Q    To get started on the day and do extra work?
16   A    No.  I was doing -- I was performing a job of a -- of
17   absent person.
18   Q    Okay.  But in any event, whatever you were doing, you were
19   coming in two hours -- two hours --
20   A    Yeah.
21   Q    -- prior to your scheduled shift?
22   A    Yeah.
23   Q    And working 10 hours a day?
24   A    Yeah.
25   Q    Five days a week?
```

Page 24

1   A    Yeah.

2   Q    Okay.  And so your arrival time at work would be what time

3   during that period?

4   A    Like I say, I think about 5:00.

5   Q    5:00 a.m.  Okay.

6   A    Till 3:15 or something like that.  Yeah.  I think that --

7   Q    Okay.  So on the -- on the 29th, you were in the bathroom

8   near the office; correct?

9   A    Yes.  But now these offices that they -- that we fixing to

10  talk about, are offices that don't nobody coming in to -- they

11  all do salary.  So you probably say they come in at 9:00.

12  Q    Okay.  And --

13  A    It's upstairs, too.

14  Q    Second floor?

15  A    Yeah.  Second floor.

16  Q    The -- this office -- this bathroom near the office is on

17  the second floor?

18  A    Yes.

19  Q    Okay.  Okay.

20       So was it your regular practice during that period of time

21  to use that bathroom in the morning?

22  A    Yeah.  I would -- I -- I perform with a walking stacker,

23  and that's like a -- a forklift that pick up crates and pick up

24  pallets and stuff.  And I had emergency bathroom, and it's the

25  bathroom that I go by.  And it's close -- close to where I, you

                                                    Page 25

```
1   know, I go by it every time I'm doing something.  It's right
2   there.  It's right across the hall.
3   Q    Do you have to go up the stairs from where you work?
4   A    No.  No.  I'm already upstairs working.
5   Q    Okay.  So -- all right.
6        So on the 29th, you went to use the bathroom is your
7   testimony?
8   A    Yes.
9   Q    Okay.  Did you make a phone call while you were in there?
10  A    I probably -- I don't think I -- I probably did because
11  sometime I call my -- call my wife.
12  Q    Okay.
13  A    And I, you know, ask if she up.
14  Q    Ask her what?  I'm sorry.
15  A    Ask her if she up to get her --
16  Q    Oh, if she's up.
17  A    -- to go to work.
18  Q    Do you call to wake her up?
19  A    Sometime, I call her and -- and wake her up, and she'll
20  call me and -- and that -- that --
21  Q    Okay.  Do you have a recollection of on the 29th whether
22  or not you had a phone conversation with your wife while you
23  were in the bathroom?
24  A    I -- I don't remember.
25  Q    Okay.
```

Page 26

1    A    But sometime I do call her and -- and wake her up.

2    Q    Right.  Do you still use that bathroom today?

3    A    No.  Because it kind of got bad memories.  It kind of

4    like I don't want no more trouble.

5    Q    Got it.  Okay.

6         So on the 29th, you were in the bathroom.  Not sure if you

7    were calling your wife or not.  Were you listening to music?

8    A    No.

9    Q    Did you ever listen to music in the bathroom?

10   A    No.

11   Q    Okay.  Did you ever read the newspaper while you were in

12   the bathroom?

13   A    Yeah.  I -- I probably went in the bathroom on break with

14   my phone on or something like that, but --

15   Q    Okay.  And this was during your shift; correct, on the

16   29th?

17   A    Yeah.

18   Q    Okay.  And you were just taking a bathroom break?

19   A    Yeah.

20   Q    And you don't have to clock out to do that?

21   A    No.  I just went in there and used the bathroom.

22   Q    Okay.

23   A    And that was it.

24   Q    Okay.  And then on the 29th, someone came into the

25   bathroom; correct?

                                                    Page 27

```
1    A    Yes.

2    Q    And what did that -- at the time, did you know who it was?

3    A    No.

4    Q    Okay.  Did the person say anything to you?

5    A    Yes.

6    Q    What did -- what was said?

7    A    What you doing?  What you doing?  Are you all right?

8    Q    Did you respond?

9    A    No.

10   Q    Were you in one of the stalls?

11   A    Yes.

12   Q    Had you finished using the bathroom?

13   A    Nope.

14   Q    Okay.

15   A    When he came in there, I was after that.

16   Q    I'm sorry.  Say that again.

17   A    When he -- after he came in there, I -- I had got -- I

18   didn't know.  I got out of there then, I didn't know what he

19   meant.

20   Q    Were you taking a shit?

21   A    Yes.

22   Q    Okay.  All right.

23        So someone comes in and asks you if you're all right.  You

24   don't respond.  And then I take it that person leaves?

25   A    Yes.
```

Page 28

1    Q    Okay.  And then you finish up and leave?

2    A    Yep.  When he left, I got out of there, because it was

3    kind of weird to me.

4    Q    And this -- and you didn't recognize the voice?

5    A    Yes.

6    Q    You did recognize the voice?

7    A    Yes.

8    Q    Whose voice was it?

9    A    It was Coy's.

10    Q    Okay.  But you didn't see him.  You just recognized the

11    voice.

12    A    Yeah.  I recognized the -- the voice.

13    Q    But you did not see him.

14    A    I didn't see him.

15    Q    Okay.  And Coy was the night shift supervisor; correct?

16    A    Yes.

17    Q    And so when you -- when you finished up in the bathroom --

18    let me ask you this.

19         Were you on the phone with your wife when the person came

20    into the bathroom and asked you how you were?

21    A    No.

22    Q    Okay.

23    A    No.  I didn't -- I wasn't never on the phone.  That's why

24    I don't remember.  I -- I don't -- I don't remember.  I know I

25    wasn't on the phone.  I was just using the bathroom when he

Page 29

1    came in.

2    Q    Okay.

3    A    I wasn't saying a word.  I wasn't playing no music.  I

4    wasn't -- I wasn't reading the newspaper.  Just was trying to

5    get in and out.

6    Q    Did you ever play music, while you were in that bathroom?

7    A    No.

8    Q    And when you came out of the bathroom, did you see anyone?

9    A    I went to the break room.

10   Q    Well, right after the bathroom, you walked to the

11   break room?

12   A    Yes.

13   Q    Okay.

14   A    This was 6:00, in between 6:30 and 6:15 in the morning

15   before -- right before the shift started.

16   Q    Okay.  So you went from the bathroom and went to the

17   break room.

18   A    Yep.  To get ready to --

19   Q    What --

20   A    -- go to the meeting and start a regular shift.

21   Q    So you got a shift meeting?

22   A    Yeah.

23   Q    Okay.  At 6:30.

24   A    I think so, yeah.

25   Q    Okay.  And did you sit down when you went to the

Page 30

1    break room?

2    A    Yes.

3    Q    And were there other employees in the break room?

4    A    Yes.

5    Q    And while you were in the break room, Mr. Snider came into

6    the room; correct?

7    A    Yes.

8    Q    And he asked you a question about the cups; correct?

9    A    No.  He didn't ask no questions about the cups.  He told

10   me, you come here.

11   Q    Okay.  So he didn't say anything to you about there being

12   -- were cups -- cups that were in the main elevator for you to

13   retrieve?

14   A    No.  I never heard that.

15   Q    Okay.  So your recollection is that he told you to come

16   talk to him?

17   A    Yeah.

18   Q    Okay.  Well, what did he say, as best -- as best you can

19   remember?

20   A    He was -- he was so aggressive.  I can remember that he

21   were real aggressive, moving around with hand movement.  And he

22   told me Lisa Leberuw told me you was in that bath -- you was in

23   the bathroom playing loud music.

24   Q    Okay.  So -- and Lisa Leberuw?

25   A    Yeah.  Leberuw.  Let me see.

Page 31

```
1    Q    Do you want to look at your notes to refresh your

2    recollection on that name?  That's fine.

3    A    You can go ahead, and I'll -- I'll find it in one of these

4    -- the correct spelling and everything.  And I can --

5    Q    Is that it right there?

6    A    Yeah.  Yeah.

7    Q    Yeah.

8    A    Yeah.

9    Q    So --

10   A    Yeah.  That's it.

11   Q    -- so you -- so it's Lisa Leberuw.

12   A    Yeah.

13   Q    L-E-B-E-R-U-W?

14   A    Yeah.  Yeah.

15   Q    Okay.  So --

16   A    He told me she -- she reported me as being loud -- loud or

17   doing something in there, and I --

18   Q    That you were loud in the bathroom?

19   A    Yeah.  So I --

20   Q    And who is Lisa Leberuw?

21   A    She worked in the office area.

22   Q    Okay.

23   A    But not upstairs.  Downstairs.

24   Q    Where did she work?

25   A    She worked in -- worked in the HR downstairs, not up where
```

Page 32

1    I work.

2    Q    Okay.  So she didn't work next to the bathroom?

3    A    No.

4    Q    Okay.  So his -- he -- when you say he was aggressive,

5    what was he doing that made him aggressive to you?

6    A    Well, when he came in that break room, it got everybody

7    attention, like what is wrong with him to approach you like

8    that.  So they advised me to -- to do something about it.

9    Q    Well, you're not answering my question.

10    A    Oh, okay.

11    Q    My question is, what did he do that was aggressive in your

12    eyes?  What did he do?

13    A    A demonstration come in there.

14    Q    Sure.

15    A    Open the door.  Open the door, come in, and you -- you

16    come here.

17    Q    Okay.  He motioned with his hand for you --

18    A    Yes.

19    Q    -- to come here?

20    A    You -- you come here, so after that, we left the break

21    room and went on the floor.  And he got me over and was almost

22    like he was trying to provoke physical altercations by moving

23    his hand and the way he talked to me.  I can't remember exact

24    everything that he said.

25    Q    Okay.  What did he -- what do you remember that he did

Page 33

1   say?  It sounds like you can remember something.

2   A    Don't use that -- don't you use that bathroom no more.

3   Q    Did he say that there had been complaints?

4   A    He said, Lisa said it --

5   Q    Okay.

6   A    -- but I went to Lisa right after that incident, and she

7   denied it.

8   Q    Okay.  What else did he say, other than just the words

9   that he said, as opposed to how he said them?  We'll get to

10  that, but --

11  A    I -- I --

12  Q    -- you said he -

13  A    -- I kind of got away from him.

14  Q    How long was this exchange on the floor?

15  A    Well, after he came in that -- after he came in the break

16  room and got me and took me out there, I just kind of got away

17  from him and tried to go get some -- go to HR and get some

18  help, because I would like this to --

19  Q    You're -- I'm just asking you, how long on the -- was the

20  conversation in the --

21  A    I don't --

22  Q    -- on the floor?  Sixty seconds?

23  A    Something like that.

24  Q    Okay.

25  A    I just walked off and left him.

```
 1   Q    Okay.  And what he said to you was, not to use that
 2   bathroom near the office?
 3   A    No more.
 4   Q    Okay.  Anything else that you recall him saying during
 5   that conversation by the -- or on the floor?
 6   A    Yeah.  I -- I recall him telling Earnest Terry that he
 7   told me not to, and he --
 8   Q    Earnest Terry was there, too?
 9   A    Yeah.  He -- he was -- he was there in the office.  And
10   after the incident, he went to Earnest that --
11   Q    Okay.
12   A    -- he told me -- okay.
13   Q    I'm talking about you had a conversation with Mr.
14   Snider -
15   A    Yeah.
16   Q    -- right?
17   A    Yeah.
18   Q    On the floor?
19   A    Yeah.
20   Q    And you're telling me about that; right?
21   A    Yeah.
22   Q    I want to know what you guys said or what he said to you.
23   A    I didn't say nothing.
24   Q    You didn't say anything.  He told you, don't use that
25   bathroom anymore?
```

Page 35

```
1    A    Yeah.

2    Q    What else did he say just during that conversation?

3    A    About Lisa that's all I can remember.

4    Q    All right.  Nothing else that you can remember?

5    A    Huh-uh.

6    Q    Is that correct?

7    A    But he -- yeah.  I can't --

8    Q    All right.  Got it.  Okay.

9         So did he make physical contact with you?

10   A    No.  I kind of got away from him.

11   Q    Okay.  Did -- are you aware of anyone else who was able to

12   hear the conversation between you and Mr. Snider?

13   A    There wasn't nobody close to us.

14   Q    Okay.  And you left, and then went about -- you went back

15   to work?

16   A    I went straight to Lisa.  No.

17   Q    Straight to Lisa?

18   A    I went to Lisa to -- to ask her why did she do that.

19   Q    And what did she tell you?

20   A    She didn't do it.  She said, let's go to the office

21   because my name is involved with this, and I did not do it.

22   And I want to go -- she wanted to go to the office immediately.

23   Q    And so did you go to the office?

24   A    Yes.

25   Q    And what office are you talking about?
```

                                                          Page 36

1    A    We went talk to the plant manager, Craig Thomas.

2    Q    You and Lisa Leberuw?

3    A    Yes.

4    Q    Okay.  And you told Mr. Thomas what had happened?

5    A    Yes.

6    Q    And was there anyone else in the room, just you, Lisa, and

7    Mr. Thomas?

8    A    I think so.

9    Q    And this was in his office?

10   A    Yes.

11   Q    Okay.  And Mr. Thomas told you, you can use any bathroom

12   that you want to other than the women's restroom; correct?

13   A    Yes.

14   Q    Okay.  But you -- I think you were satisfied with that

15   response?

16   A    Yes.

17   Q    Okay.

18   A    I was satisfied with it, but I wasn't satisfied with the

19   -- the way it -- it -- it -- it happened.

20   Q    You were still upset with how Mr. Snider treated you?

21   A    Yeah.

22   Q    Okay.  Did you guys -- did he talk about, you know, next

23   steps with respect to that?

24   A    No.  He didn't -- he didn't -- he did -- he -- he did not.

25

Page 37

```
 1   Q    So when you had the heated conversation with Mr.
 2   Snider -- let me ask you this.
 3        Prior to that heated conversation, did you have any
 4   problems with Mr. Snider or prior to that time?
 5   A    Well, he told -- he told me one time to lower my voice
 6   when I talked to him, yes.
 7   Q    When was that?
 8   A    It was prior years.
 9   Q    Okay.  Anything other than that in terms of disagreements
10   or confrontations you had with Mr. Snider prior to this
11   incident that we've talked -- we're talking about?
12   A    No.  Not that I can recall.
13   Q    Okay.  So at the time that he had that conversation with
14   you when you say he was heated or it was heated and he was
15   aggressive towards you and you were fearful, that's all true;
16   right?
17   A    Yes.
18   Q    Okay.  Did you feel like it was because you're black?
19   A    Yes.
20   Q    At the time you felt that way?
21   A    Yes.
22   Q    Okay.  Why?
23   A    Because he done did just about all us up there like that,
24   and won't nobody report him.
25   Q    So he had treated others the same way?
```

Page 39

```
1    A    He used the N word, and was in HR for -- for that -- for

2    calling Tyron Walker a n██████.   And he also attacked Ryan on

3    the floor, but Ryan wouldn't report it.   He also --

4    Q    Ryan -- Ryan's African American?

5    A    Ryan Jenkins, the supervisor.

6    Q    He's African American?

7    A    Yes.

8    Q    Okay.

9    A    And he also did Gary.   I think it's -- he got -- I forget

10   his last name, but he did him aggressive the same -- the same

11   way.

12   Q    Okay.   Let me talk about those things.

13        So he called -- he -- did he call Tyrone Walker a n██████?

14   A    Yes.

15   Q    Did he -- were you there?

16   A    I wasn't there.   I just remembered him going to the office

17   about it.

18   Q    You remember who?

19   A    Tyrone and him and -- and Ms. Norma Dunn, used to be HR.

20   Q    Nora Dunn?

21   A    Norma.

22   Q    Norma Dunn.

23   A    Dunn.   Yeah.

24   Q    Uh-huh.

25   A    I just remembered that they was in that discussing it.
```

Page 40

```
1    Q    Okay.  When was that?

2    A    Years.

3    Q    Approximately?

4    A    I -- I don't know approximately, but I just know it

5    occurred.  That's -- that's -- that's --

6    Q    But not in 2024.

7    A    No.  Not in --

8    Q    Not in 2023, either?

9    A    No.

10   Q    Before that?

11   A    Yes.

12   Q    Okay.

13        Did you actually see Tyrone and Mr. Snider going into Ms.

14   Dunn's office?

15   A    No.  Just -- just the hearsay of it -

16   Q    Uh-huh.

17   A    -- and knowing that they've been in -- him -- me and him

18   kind of close friends, and we work beside each other every day.

19   Q    You and Tyrone?

20   A    Yeah.  Yeah.

21   Q    Okay.  Did Tyrone talk to you about being called a n███

22   by --

23   A    Yeah.

24   Q    -- Mr. Snider?

25   A    Yeah.
```

                                                    Page 41

```
1    Q     He told you that?

2    A     Yeah.

3    Q     Okay.  So when you say, he attacked Ryan Jenkins, what

4    does that mean?

5    A     The same way.

6    Q     Spoke to him aggressively?

7    A     Aggressively, moving, and -- and -- and, you know, in that

8    kind of way.

9    Q     And am I correct that Mr. Snider was never your direct

10   supervisor?

11   A     No.

12   Q     Because he worked on -- that's true?

13   A     Yes.

14   Q     -- because he worked on the night shift?

15   A     Yes.

16   Q     Okay.  And then you said that he was with, I guess,

17   aggressive with the gentleman named Gary.  That's another

18   African --

19   A     Yeah.

20   Q     -- American employee?

21   A     Yeah.  Yes.

22   Q     What was his job?

23   A     Furnace operator.

24   Q     Okay.  And you -- did you witness that?

25   A     No.  I didn't witness it.  I just -- the hearsay.
```

Page 42

```
 1   Q    Okay.  Did you witness him being aggressive towards Mr.
 2   Jenkins?
 3   A    I didn't.
 4   Q    You did not?  Okay.
 5        Did Mr. Jenkins tell you he was -- had been aggressive
 6   towards him?
 7   A    No.  Just the people -- I asked him, and he told me kind
 8   of what went down, but I don't think he wanted to push it, you
 9   know, further.  So we --
10   Q    What did Mr. Jenkins tell you?
11   A    He just said they -- they had words.
12   Q    Did you later come to find out that, in fact, it was
13   Heather Jones who had made a complaint about you?
14   A    Well, I kind of thought that because of a situation that
15   she approached me, and it was unappropriate (sic).  And I kind
16   of stayed away from her.  I learned about the rumors that was
17   going out on her, and we didn't -- we didn't touch -- it just
18   was a person that you knew not to, you know, to -- to associate
19   yourself with.
20   Q    Okay.  What was her job?
21   A    I don't -- she might have been a -- let me see.
22   Q    Was she an office employee?
23   A    Yeah.
24   Q    Okay.
25   A    Downstairs.  She probably didn't -- somebody like come out
```

Page 43

```
 1    Q    Okay.  You left at the normal time?

 2    A    Yes.

 3    Q    Okay.  And then on Monday, which I think would have been

 4    April 1st, you had some meetings about the incident; correct?

 5    A    Uh-huh.

 6    Q    Is that a yes?

 7    A    Yes, sir.

 8    Q    Okay.

 9    A    It -- it -- it had to be -- it could have -- it might have

10    not been Monday.  It might have been some time after that week.

11    I know we did have plenty of meetings.

12    Q    Okay.  And Mr. Van Pelt was present, as well as Ms.

13    Ellis –

14    A    Uh-huh.

15    Q    -- and also Mr. Center?

16    A    Yes.

17    Q    Johnny Center?

18    A    Yes.

19    Q    And he's a senior manager?

20    A    Yes.

21    Q    Okay.  Tell me what you remember about that meeting.

22    A    Well, when we had that meeting, it was -- I was just

23    trying to get my overtime back.  And we talked about that

24    meeting because I was just trying to do my regular schedule,

25    because I had been doing it for like a year or two years
```

Page 48

1   Q    Okay.  When was that?

2   A    I'm not sure, but it was after the -- the incident, weeks

3   after.

4   Q    How many weeks?

5   A    Probably, about a month.

6   Q    Okay.  And who told you not to -- that you could no longer

7   work overtime?

8   A    It would have probably been Yolanda and it came from Coy.

9   Q    Who told you?

10  A    It would have probably been Earnest and Yolanda.  They

11  like the team leaders that get information to pass it on.

12  Q    Okay.  So you think that Yolanda Solee and Earnest Terry

13  told you that you were no longer allowed to work overtime?

14  A    No.  Yolanda told me not to come in no more, and Earnest

15  told me that they was going to change my schedule.  They were

16  going to do something, because they was in the office talking

17  about it prior.

18  Q    When you say Yolanda said, don't come in no more, do you

19  mean that she said don't come in to work overtime?

20  A    Yes.

21  Q    Just work your regular shift?

22  A    Yes.

23  Q    Okay.  So that's a conversation that you had with Yolanda

24  Solee?

25  A    Yeah.

Page 51

```
 1   A    Johnny told me in that meeting, he said I could work

 2   overtime, but I couldn't work it on -- on Coy's shift.

 3   Q    Didn't he, in fact, tell you that you -- if you wanted to

 4   work overtime, you had to sign up for it beforehand?

 5   A    No.  It never was like that until the incident.

 6   Q    Okay.  But this was after the incident.

 7   A    After the incident –

 8   Q    Right.

 9   A    -- you couldn't do it.  There -- he came up with the way

10   he -- the -- answer -- I'm gonna -- do the question again.

11   Q    All right.  Sure.

12        Isn't it true that it's something -- well, I'll ask you a

13   different question.  Isn't it true that at some point the

14   overtime procedure changed such that you had to sign up for

15   overtime?

16   A    Yeah.  After the incident.  Yeah.

17   Q    Okay.  That was about a month after the incident?

18   A    Yeah.

19   Q    Okay.  How did you find out about that process, who

20   explained that to you, if you can remember?

21   A    I don't know if it was Earnest or Yolanda.

22   Q    One of them?

23   A    Yes.

24   Q    Okay.  So you could have signed up for the overtime;

25   right?
```

Page 53

1    A    Yeah.  But I couldn't -- I -- on -- on the way they --

2    they had changed my schedule, I couldn't -- I couldn't do it on

3    what he wanted me doing.  And he knew I couldn't do it, because

4    I got the grandkids and stuff to pick up.

5    Q    So what couldn't you do?

6    A    I couldn't change my schedule and -- and do it the way he

7    wanted me to do it.

8    Q    How did -- how did he want you to do it?

9    A    To do it where it can be inconvenience for me.

10   Q    Well, what -- did he want you to work particular hours?

11   A    Yeah.

12   Q    What hours did he want you to work?

13   A    They just didn't want -- Coy just didn't want me to work

14   on his shift.

15   Q    Did he say that to you?

16   A    Johnny said it.  Johnny -- Johnny said you don't -- you

17   don't -- you can work somewhere else, but you can't -- he don't

18   want you on his shift.

19   Q    So that meant you would have had to work the overtime

20   prior to or after your --

21   A    And -- yeah.

22   Q    -- shift into the afternoon?

23   A    Yeah.  Something like that.  Yeah.

24   Q    And you couldn't do that?

25   A    No.

Page 54

```
1    MR. McKEEBY CONTINUING:

2    Q    This is a document that your lawyer provided to us, and

3    I'm going to mark it as Exhibit 1.

4                  (WHEREUPON, Deposition Exhibit Number 1, Sign Up

5            Sheet, was introduced and is attached hereto.)

6    MR. MCKEEBY CONTINUING:

7    Q    Is this what you're talking about, the overtime sheet?

8    A    Yeah.

9    Q    That's what you have?

10   A    Yeah.

11   Q    Okay.  Well, this is a -- it looks like a -- it says, Wash

12   Operator Overtime for 4-23 through 4-26; correct?

13   A    Yes.

14   Q    And this is the sheet that was -- was it -- was this sheet

15   posted somewhere at the facility?

16   A    Yes.

17   Q    Where was it posted, the break room?

18   A    Office.

19   Q    The office.  Okay.

20        And this looks like it's someone named Michael Hawkins has

21   signed up for overtime on Wednesday -- on every day, Tuesday,

22   Wednesday, Thursday, and Friday; correct?

23   A    Yes.

24   Q    And Mr. Hawkins was -- did your job, too?

25   A    Yes.  No.  He -- he -- he just a wash operator.  I do his
```

Page 57

1    job for him.

2    Q    Okay.  But I guess this is the document that you were

3    supposed to sign if you wanted to work overtime; correct?

4    A    Yeah.

5    Q    And do you recognize the signature at -- on the top of his

6    name for Wednesday?

7    A    No.  I -- I -- what -- I can't read that.

8    Q    I can't either.  That's why I asked you.

9        So is this -- this is an example of the overtime sheet;

10   correct?

11   A    Yes.  That I never saw that came out after.  This never,

12   never -- this is the first time I seen it.  That's why I took

13   the picture of it.

14   Q    Okay.  Did you ever see -- is this the only example of

15   this that you ever saw?

16   A    It never came out until this -- this -- this -- it's all I

17   know about it.  I just took the picture of it.

18   Q    Right.

19       But is -- did it come out after this time -- this kind of

20   sheet?  Was it used after this -- these four days?

21   A    No.

22   Q    Is this just the first time?

23   A    No.  Like now, it ain't being used -- it ain't -- it just

24   was used until -- and he -- he -- he -- it was never used after

25   this.

Veritext Legal Solutions
800-336-4000

```
 1    A    I'd been doing it for two -- two years.

 2    Q    Okay.

 3    A    Two and a half years that I've been doing it.

 4    Q    Got it.  Okay.

 5         So you said about a month after the incident, that's when

 6    you found out that you're -- that you weren't supposed to work

 7    though -- that overtime schedule?

 8    A    Yes.

 9    Q    Okay.

10         At any point between March 29th and May 13th, did you --

11    were you assigned to the night shift; did you work the night

12    shift?

13    A    No.  I -- I -- I did not.

14    Q    Okay.  And the document that I've marked as Exhibit 2,

15    what is a -- is a -- let me give that to you -- where did you

16    see this?

17                    (WHEREUPON, Deposition Exhibit Number 2, Work

18              Schedule, was introduced and is attached hereto.)

19    MR. MCKEEBY CONTINUING:

20    A    It was in our office.

21    Q    Was it up on the -- on the -- on the -- it looks like it

22    was on the wall?

23    A    Yeah.

24    Q    It looks like it was a thumbtack below it.

25    A    Yeah.
```

Page 63

```
1    A    The highest.

2    Q    Okay.  But you were never told you had to work this shift?

3    A    I -- I went on leave and that's when -- when they changed

4    it back.

5    Q    Okay.

6    A    I couldn't do --

7    Q    Well, when you --

8    A    -- it.

9    Q    -- when you came back from leave?

10   A    I never had to do it.

11   Q    Okay.  When you went out on leave, you filled out some

12   paperwork, I take it?

13   A    Yes.  I -- I went for help to the EEOC.

14   Q    But in terms of your leave of absence from the company

15   between May and September, you filled out some paperwork?

16   A    What kind of paperwork?

17   Q    A Family Medical Leave paperwork?

18   A    Yeah.  Mental health.

19   Q    Okay.  And who did you work with at the company in

20   connection with that paperwork, if anyone?

21   A    Nobody.

22   Q    Okay.  Did you turn it in?

23   A    Yes.  I had to turn it in to Matrix.

24   Q    To Ms. Ellis?

25   A    Matrix.
```

Page 65

1    Q    Now, during that time, did you report to Mr. Van Pelt?

2    A    I think so.

3    Q    Okay.  And you worked day shift during that time?

4    A    Uh-huh.

5    Q    Is that a yes?

6    A    Yes.

7    Q    And it was also during that time when they changed the

8    schedule from five days to four days; correct?

9    A    Yes.

10   Q    And that was a plant-wide change; right?

11   A    No.  It happened -- it happened in the center fire --

12   center fire.  That's one --

13   Q    Okay.  In the center fire group?

14   A    Yeah.  Yeah.

15   Q    And the center fire group includes -- hold on a second --

16   it includes the shells which you were in?

17   A    Yeah.

18   Q    It, also, includes bullets?

19   A    Yeah.

20   Q    Packaging?

21   A    Yeah.

22   Q    Loading?

23   A    Yes.

24   Q    Okay.

25        So all the employees who worked in the center fire group

Page 80

1    and those subgroups went from working a five-day a week

2    schedule to a four-day a week schedule working 10 hours per

3    day?

4    A    Yes.

5    Q    Okay.  Do you remember how you were told about that

6    change?

7    A    Yes.  I think they had a meeting and called us in there

8    and let us know.

9    Q    Okay.  I don't think I asked this question, but if I did,

10   I apologize.

11        During that period of time in between your leaves of

12   absences in August and September, did you work overtime?

13   A    No.  I -- every -- no, I didn't work no overtime.

14   Q    Okay.

15   A    I did when I came back, when they changed in December.

16   Q    Okay.  But now I'm just talking about that one period of

17   time between the leave of absences.  And so, you know,

18   approximately early August through September, mid-September,

19   did you work overtime during that time period?  You don't think

20   so?

21   A    No.  Huh-uh.  Huh-uh.  I was at -- no, I didn't do it.

22   Q    Did you have any discussions with any of your supervisors

23   about working overtime?

24   A    It was already did, and I -- and it was already discussed,

25   and I know that they would -- I wasn't going to get what I was

                                                      Page 81

1    were working, i.e. August and early September, you weren't

2    being treated right, because they were monitoring your breaks?

3    A    And --

4    Q    What else?

5    A    -- they -- when I got back, my record was perfect with

6    attendance and my evaluations.  I was the only one that had a

7    perfect score.  And all that diminished when I came back.  I

8    was already on the urge of being called in office for

9    attendance, and somebody went in my file and put extra points

10   on my file -- on -- on -- add them to me.

11   Q    Okay.

12   A    Getting me in trouble, where I can be when I never had a

13   attendance problem.

14   Q    Okay.  So I'm going to talk about each one of these, but

15   what else was done that was, you know, not right, during that

16   approximately six-week period?  You were monitored when you

17   were going on breaks, and your attendance records were changed

18   such that extra points were added.

19   A    Yeah.

20   Q    Okay.  What –

21   A    Points was added.  I've never had none.

22   Q    Okay.  What else?

23   A    I just couldn't get back where I wanted to be with him

24   being over there.  I couldn't do none of the -- I -- my

25   seniority was tooken where I couldn't use it and get treated

Page 86

```
 1    I've seen this.  So this is back in May, though; right?

 2    A    Yes.

 3    Q    Okay.  So we'll get your lawyer to make a copy of this,

 4    and we'll introduce it as an exhibit in a minute.  But let me

 5    ask you, so in May -- prior to May -- and this is while you're

 6    on leave of absence; right?

 7    A    Yes.

 8    Q    Okay.  So you had previously applied for a shell making

 9    position?

10    A    Yes.

11    Q    A shell making technician job?

12    A    Yeah.

13    Q    Okay.  And an AIM operator job?

14    A    Yes.

15    Q    Those are separate jobs?

16    A    Yes.

17    Q    Okay.  When had you applied for those jobs?

18    A    It was prior -- it had to be prior to these dates.

19    Q    Okay.  And those were separate job requisitions that you

20    completed?

21    A    Yes.  And I was -- I was the only one eligible on my

22    seniority to get these jobs and wasn't -- I wasn't able to get

23    neither one.

24    Q    Were these jobs posted --

25    A    Yes.
```

```
1    A    Yes, sir.

2    Q    Okay.  And they said -- you said that they were told you

3    had to wait 30 days before you could move into the new job?

4    A    Yes.

5    Q    Okay.

6    A    And I -- I think I -- I know I followed up, and for some

7    reason I knew that they didn't want -- that they -- they always

8    -- I was always told that I'm where I need to be.

9    Q    You didn't interview for those jobs?

10   A    I didn't -- I didn't have to.

11   Q    You were automatically entitled to them?

12   A    Yeah.  Just like the cup dumping job.  I was automatic

13   entitled to them.  If your apply for them, and your seniority

14   is there --

15   Q    So what did -- what did HR tell you during this call, that

16   you had to wait 30 days?

17   A    Yeah.

18   Q    Before what?

19   A    Before I can move to it.

20   Q    But they said that within 30 days you could move to one of

21   those positions?

22   A    Yeah.  And I went back -- when I went back, I think Beth

23   said, well, under the circumstances, we would -- we would have

24   put you there, but the jobs were gone.

25   Q    By the time you got back?
```

Page 91

1    A    I think I did both of them, because I was trying to get

2    the old one, and they got that -- that new one.  So I kind of

3    did –

4    Q    Did you provide that to your attorney?

5    A    Yes.  I think I did.

6    Q    And you don't remember the date on that?

7    A    No.

8    Q    Okay.  And what's the -- what's the significance of

9    points?  That's the -- is that a term in the connection with

10   the attendance policy?

11   A    Yes.

12   Q    Were you ever written up for any attendance issues?

13   A    No.  But I did -- I did ask why -- why did that happen?

14   Q    Why what happened?

15   A    Why I got points on -- why did these points -- where

16   did -- where did they come from?

17   Q    Who did you ask that?

18   A    I think I asked Ryan and I asked Beth.

19   Q    Ryan who?

20   A    Jenkins.

21   Q    Okay.

22   A    And he didn't know because he wasn't -- I don't think he

23   was over me then.  So I asked Beth, and she told me that Rick

24   was in -- in, and he had something to do with it.  And I kind

25   of left it alone after that because he's kind of up high, and I

Page 98

1    just didn't want no --

2    Q     Who?  That's Rick Cox?

3    A     Yeah.

4    Q     So what's your testimony about Mr. Cox, that he had

5    something to do with it?

6    A     I asked Beth where did these points come up on my record.

7    Q     Right.

8    Q     And she told me it had something to do with Rick, and I

9    kind of -- I -- I just left it alone at that point.

10   Q     Okay.  And he's the manager over Coy Snider and over Alex

11   Van Pelt?

12   A     Not no more.

13   Q     But he was at the time?

14   A     Yes.

15   Q     Okay.  What happened that he's no longer in that role, did

16   he leave?

17   A     All of them got devote -- they -- they got dropped down

18   out of their positions to -- they moved them all.

19   Q     Okay.

20   A     He -- he -- he no longer over us no more.

21   Q     Do you -- so the attendance points, that was something

22   that you saw on the evaluation as well?

23   A     Yes.

24   Q     Okay.  And they showed days that you supposedly were

25   absent from work or tardy or both or do you know?

Page 99

```
 1    A    I don't -- I don't know.  I don't know exactly.  Probably,
 2    one tardy -- I don't -- I don't know.  Probably, something like
 3    a whole day or something just popped up, like I missed the
 4    whole day, which I never did out of the whole 14 years.
 5    Q    Okay.
 6    A    I never had a problem with being on work.  I always worked
 7    overtime.  So I -- I don't know -- that -- I was real
 8    disappointed in that evaluation.
 9    Q    Okay.  And you talked to that -- about that evaluation
10    with Beth Ellis?
11    A    No.  Beth was -- by the time I got that, Beth -- I think
12    Beth was -- I -- I think she might have been gone, but I
13    probably wouldn't have anyway --
14    Q    Okay.
15    A    -- because she wasn't there -- she wasn't help -- she
16    wasn't --
17    Q    Oh, that's what you said by that time, you didn't feel
18    like it was productive?
19    A    Yeah.  Yeah.
20    Q    So you didn't --
21    A    It wasn't.
22    Q    -- talk to anybody about the evaluation?
23    A    I just started asking people, when did they get evaluated
24    to see if it --
25    Q    Other coworkers?
```

Page 100

1    Q    When you first called Ms. Ellis on the 29th of March, did

2    you mention to her that you believe that Mr. Snider's actions

3    had something to do with your race?

4    A    Yeah.

5    Q    You said that from the beginning?

6    A    Yeah.  I know it did.  Yeah.

7    Q    Okay.  And who's Pat Holder?

8    A    He's -- he's like a friend, and know about the --

9    everything that's going on.  Somebody that be up there and just

10   kind of –

11   Q    Does he work at Remington?

12   A    Yeah.

13   Q    All right.  What is it that he knows?

14   A    He know about those times that they -- they -- they cut my

15   overtime out.

16   Q    What's his job?

17   A    I think he worked on taper line downstairs.

18   Q    I mean, how does he know that they cut you overtime,

19   because you told him?

20   A    Really everything that's -- everybody know everything.

21   It's like everybody -- you know, he say and state and come up

22   to you and ask you what's going on.  And you just know what's

23   going on because we in the same department and we interact with

24   work and everything.

25   Q    Well, what about Larry Hightower, who was that?

Page 112

1    about that?

2    A    No.

3    Q    I take it Mr. Snider on this one occasion, when he told

4    you not to use that restroom, did -- and did he tell you not to

5    use the restroom or that he'd prefer for you to use the

6    restroom closer to your workstation?

7    A    He was aggressive.

8    Q    And what did he say?

9    A    Don't you use that bathroom no more, with body movement

10   and the hands.

11   Q    Okay.  Is that -- is that the only time anyone at the

12   company's told you not to use that restroom?

13   A    Yes.

14   Q    Okay.  Was Kevin Davis -- was he like Mike Pickens, was he

15   in -

16   A    Kevin Davis and Addie, they was in the break room, like we

17   sitting in the break room now --

18   Q    Okay.

19   A    -- all four of us.  There were four of us in there, and he

20   just popped up in the bathroom, and you come here.  And we went

21   out on the floor.  That's when Mike Pickens seen us.

22   Q    Yeah.  So -- and -- but Kevin Davis and Addie, they were

23   in the break room?

24   A    And Chris Watson.

25   Q    And Chris Watson were all in the break room?

1    those more of your handwritten notes?

2    A    Yeah.

3    Q    Okay.  Do you remember why you prepared these?

4    A    Just probably to give to the attorneys.

5    Q    Okay.  I'm just going to read through here and see what

6    we've talked about and what we -- anything we haven't.

7        On the -- on the second page, it says, so we went to the

8    plant manager, Craig T.  That's Craig Thomas?

9    A    Yeah.

10   Q    And the, we, there is you and Lisa Leberuw?

11   A    Yeah.

12   Q    Okay.  Entry Number 6 says, I had been working 5:00 a.m.

13   to -- well, I had been working 5:00 to 3:15 over the last two

14   years.  Coy Snider stopped me from coming in early on his

15   shift.

16       Do you see that?

17   A    Yeah.

18   Q    How do you know that Coy Snider stopped you from coming in

19   early on your -- on his shift?

20   A    I was warned by Ernest that he was gonna do it.

21   Q    Going to do what?

22   A    I think I got it on one of these notes.  I gotta find it.

23   I came to work on one occasion, and Earnest told me to be

24   careful, because they -- he overheard Yolanda and Coy talking

25   about changing my schedule.

                                                    Page 127

1    Q    Okay.  What did -- Earnest told you that?

2    A    Yeah.

3    Q    Earnest Terry?

4    A    Yeah.  Earnest Terry.

5    Q    When did he tell you that?

6    A    It was weeks after the incident.  I got it somewhere, too.

7    I wrote it down.

8    Q    Yeah.  It's on -- it's on the next one.

9    A    Okay.

10   Q    Number 7.  Yeah.

11   A    Okay.  Okay.  Okay.

12   Q    Earnest Terry, Team Lead, informed me that --

13   A    Yeah.

14   Q    -- Coy was asking questions about my schedule.  The next

15   week, my schedule changed.

16   A    Yes.

17   Q    I was no longer allowed to do my schedule.  Is that 3:00

18   a.m. or 5:00 --

19   A    Yeah.

20   Q    -- a.m. to 3:15?

21   A    Yes.  That's right.

22   Q    Okay.  Is that what -- that's what Earnest Terry told you?

23   A    Yes.

24   Q    Did she say -- did he say what Coy was asking about?

25   A    He just said they was going to do something to affect me,

Page 128

1    like be careful, because they going to -- they going to --

2    ,they going to try to do something to your schedule.  And you

3    might get pointed up or anything.  He was just giving me heads

4    up.

5    Q    Is Earnest Terry still employed there?

6    A    Yes, sir.

7    Q    And is he African American?

8    A    Yes, sir.

9    Q    And what about Yolanda Solee, is she African American?

10   A    She mixed.

11   Q    Mixed.  Okay.

12        The next page, the first one, Number 9, says Coy and Mitch

13   Wood are being untruthful about who entered the bathroom on me.

14        Do you see that?

15   A    Yes.

16   Q    Have you ever talked to Mitch Wood -- is it Mitch Wood?

17   A    I wouldn't doubt -- yeah -- I would never say nothing to

18   him.

19   Q    Why is that?

20   A    I -- I feel if I say anything to him, sure enough, it

21   would not seem something like that that he did that's not true,

22   I wouldn't -- no.  I just -- that's why I -- I feel some type

23   of way that I want to get -- if I said something to him, I

24   think he would have did just like Chris and said something

25   untrue about me.

139

# C E R T I F I C A T E

STATE OF ARKANSAS    )

                     )ss

COUNTY OF YELL       )


    I, Shawna K. Shepherd, Certified Court Reporter #751, does hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability and understanding, taken at the time and place set out on the caption hereto.

    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

140

WITNESS MY HAND AND SEAL this 4th day of April, 2025.

SHAWNA K. SHEPHERD, CCR

Certified Court Reporter #751