**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**LLOYD MCKINNEY**                                                    **PLAINTIFF**

**VS.**                          **NO. 4:24-cv-00880 KGB**

**AMMUNITION OPERATIONS, LLC**                                        **DEFENDANT**

**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

Comes the Plaintiff, Lloyd McKinney, and for his response to motion for summary

judgment, states:

1.      That Defendant's motion for summary judgment should be denied. That there is a

question of fact in dispute and credibility is an issue.

2.      Plaintiff attaches his deposition as Exhibit 1 and his Affidavit as Exhibit 2.


                              Respectfully submitted,


                              John Ogles
                              Arkansas Bar No. 89003
                              Texas Bar No. 00797922
                              OGLES LAW FIRM, P.A.
                              200 S. Jeff Davis
                              P.O. Box 891
                              Jacksonville, AR 72078
                              (501) 982-8339
                              jogles@aol.com

1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF ARKANSAS
2                          CENTRAL DIVISION
3
4
     LLOYD MCKINNEY                                    PLAINTIFF
5
6    VS.                       NO. 4:24-CV-880
7
     AMMUNITION OPERATIONS, LLC
8    D/B/A REMINGTON                                   DEFENDANT
9
                          ORAL DEPOSITION
10
                               OF
11
                         LLOYD MCKINNEY
12
13          TAKEN MARCH 28TH, 2025, AT 9:30 A:M.
14
15
                    A P P E A R A N C E S
16
17   ON BEHALF OF THE PLAINTIFF:
18   MR. BEN BROCKERT
     ATTORNEY AT LAW
19   1 RIVERFRONT PLACE
     SUITE 745
20   LITTLE ROCK, ARKANSAS 72114
21
     ON BEHALF OF THE DEFENDANT:
22
     MR. PAULO MCKEEBY
23   ATTORNEY AT LAW
     2850 NORTH HARWOOD STREET
24   SUITE 1500
25   DALLAS, TEXAS 75201

                                             Page 1

EXHIBIT 1

TABLE OF CONTENTS

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . 1

CAPTION PAGE . . . . . . . . . . . . . . . . . . . . 4

WITNESS:  LLOYD MCKINNEY

     Examination by Mr. McKeeby . . . . . . . . . . . . . . 5

          Introduction of Deposition Exhibit Number 1 . . .  57

          Introduction of Deposition Exhibit Number 2 . . .  63

          Introduction of Deposition Exhibit Number 3 . . .  67

          Introduction of Deposition Exhibit Number 4 . . . 110

          Introduction of Deposition Exhibit Number 5 . . . 126

          Introduction of Deposition Exhibit Number 6 . . . 131

          Introduction of Deposition Exhibit Number 7 . . . 133

          Introduction of Deposition Exhibit Number 8 . . . 138

     Deposition Concluded   . . . . . . . . . . . . . . 138

     COURT REPORTER'S CERTIFICATE   . . . . . . . . . . . 140

Veritext Legal Solutions
800-336-4000

```
1                           E X H I B I T S
2
3
4
5        Ex. 1.    Overtime Sign Up Sheet.
6
7        Ex. 2.    Schedule.
8
9        Ex. 3.    EEOC Charge.
10
11       Ex. 4.    Notes from Mr. McKinney.
12
13       Ex. 5.    Notes from Mr. McKinney.
14
15       Ex. 6.    Statements from Break room People.
16
17       Ex. 7.    Notice from EEOC.
18
19       Ex. 8.    Notes from Mr. McKinney.
20
21
22
23
24
25
                                              Page  3
```

```
1                          CAPTION
2          ANSWERS AND ORAL DEPOSITION OF Mr. Lloyd McKinney, a
3     witness produced at the request of the Defendant, taken in the
4     above-styled and numbered cause on the 28th day of March, 2025,
5     at 9:30 a.m., at the law office of Punchwork Law, 1 Riverfront
6     Place, Suite 745, Little Rock, Arkansas, 72114.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  4

```
 1                    P R O C E E D I N G S

 2                      LLOYD McKINNEY

 3             Having first been duly sworn to tell the truth,

 4          the whole truth, and nothing but the truth, testified

 5          on his oath as follows.

 6                        EXAMINATION

 7   BY MR. McKEEBY:

 8   Q    Mr. McKinney, we were introduced briefly before we got on

 9   the record, but my name is Paulo McKeeby.  And I'm a lawyer

10   representing Remington Arms; do you understand that?

11   A    Yes, sir.

12   Q    And I'm going to ask you some questions today about the

13   lawsuit that you filed against Remington Arms; is that -- do

14   you understand that?

15   A    Yes, sir.

16   Q    If I -- you -- can I just -- for the purpose of the

17   deposition, can I just call them -- call it -- your employer

18   Remington, and you'll know who I'm talking about?

19   A    Yes.  Yes.

20   Q    You're still employed with Remington; correct?

21   A    Yes, sir.

22   Q    Okay.  Have you ever been deposed before, like in this

23   setting?

24   A    No.  No, sir.

25   Q    Okay.  Just so that we have a couple of ground rules, I'm
```

Page 5

1    going to, as I said, be asking you questions.  If you could do

2    the best you can to answer me audibly with yes or nos instead

3    of shakes of the head and that kind of thing, just so that the

4    court reporter can transcribe what you're saying; is that

5    agreeable?

6    A    Yes, sir.

7    Q    And if you -- if you don't, I'll try to remind you or

8    maybe your council will.

9         Another thing is, if you can wait, because there's going

10   to be times when you're going to anticipate what I'm asking

11   you, if you could wait till I'm finished with my question

12   before you answer, so that we're not talking over one another

13   so –

14   A    Okay.

15   Q    -- so that the court reporter can take a clean transcript;

16   is that agreeable?

17   A    That's agreeable.

18   Q    And I'll try to do the same.  I mean, if I don't -- if

19   you're -- if you're -- I mean, I may think you're finished with

20   an answer, and I might ask another question.  If you're not

21   finished, just let me know, and I'll do my best to not talk

22   over you; understood?

23   A    Yes, sir.

24              MR. BROCKERT:  Speak up.  Speak loud so she can

25         hear you.

                                                      Page 6

1              THE WITNESS:  Okay.  All right.

2    MR. McKEEBY CONTINUING:

3    Q    What's your current position at Remington?

4    A    I -- I'm really undetermined, because of the turn of

5    events.  Like every week they done change my position and

6    telling me after the event that my job got terminated, but

7    I'm -- I've been doing the same job for the last 14 years, and

8    it's cup dumping, floor coordinator, support, assistance, watch

9    operator.  These are all of the jobs that reported to -- to

10   perform the only person on that floor.

11   Q    Okay.  Do you have a job title?  Is it manufacturing

12   support associate; does that sound right?

13   A    Yes.  But that ain't the job that I -- I -- I do.  Well,

14   they -- after this event, they gave me that.  That make me

15   perform every job, everybody's job on the floor, so I don't

16   really know, but I know that my paperwork that I do and turn

17   in, I'm a cup dumper.

18   Q    Okay.

19   A    And all those got paperwork that we turn in with what

20   position that you have to turn in every day, and I turn in as a

21   cup dump.

22   Q    What paperwork are you talking about?

23   A    The paperwork that you turn in every day from doing your

24   job.

25   Q    What is -- what is that called, just paperwork?

```
1    A    Yeah.  Your paperwork.

2    Q    What does cup dumping mean?

3    A    Okay.  There we make bullets.

4    Q    Right.

5    A    Nine millimeters, you know, 25, 38s.  And I'm the one that

6    start the foundation.  The cups are different sizes that make

7    different bullets.  So my job, is to do that, is to do that job

8    for each shift, day and night.

9    Q    So what do you do with the cups?  You do -- do you align

10   the cups?

11   A    I dump them in the machine to make sure --

12   Q    I see.

13   A    -- everybody got work in them to work to make nine

14   millimeters, to make 38s, to make rifles.  So like a -- a line,

15   I go through every day.

16   Q    Okay.

17   A    And that's the first thing I have to do to get everybody

18   to work.

19   Q    Am I correct that you're in the -- you work in the shell

20   division?

21   A    Yes, sir.

22   Q    Okay.  And do you agree with me, even though you have

23   these varied job functions that your job title is manufacturing

24   support associate?

25   A    Now it is, after the event, yes.  I was --
```

Page 8

```
 1   Q    How long have you been in -- how long have you had that
 2   title?
 3   A    Probably, about -- probably, months after I got in touch
 4   with CEE -
 5   Q    The --
 6   A    -- the EEOC.  They started changing the titles of the job.
 7   Q    So around May or June of last year?
 8   A    Yes.  Exactly.  And I do have paperwork to prove that.
 9   Q    To prove what?
10   A    That when they changed it after event -- after the event
11   happened.
12   Q    What paperwork are you talking about?
13   A    The paperwork with the schedule that they changed at the
14   time -- after the -- months after that event happened, that job
15   title came on.
16   Q    And when you -- so when you're using the term, event,
17   you're talking about the incident in the bathroom?
18   A    Yes.
19   Q    Okay.  We'll get to that in a bit.
20        What -- did you have a job title prior to seeing this
21   designation of manufacturing support associate?
22   A    Floor coordinator.  I -- I -- they -- they called me a
23   floor coordinator, but like I said, the paperwork that I turn
24   in say I'm a cup dump.
25   Q    Okay.  Does it say -- the paperwork that you referred to
```

Veritext Legal Solutions
800-336-4000

1    that you saw after you filed your EEOC charge, did that say cup

2    dumper or manufacturing support associate?

3    A    Yes.  Manufacturing.

4    Q    Okay.  It said manufacturing support associate?

5    A    Yes, sir.

6    Q    Okay.  And was that the first time you saw that

7    designation?

8    A    Yes, sir.

9    Q    But would you agree with me that you're -- and before that

10   you think your title was floor coordinator?

11   A    Yes.

12   Q    Okay.  Did you -- did you -- are -- were your duties as

13   floor coordinator the same as when you saw the title change to

14   manufacturing support associate?

15   A    No.  It was added to -- that -- when it got to support

16   that made me be responsible for every job on the floor.

17   Q    Not just cup dumping?

18   A    Yes.  Everything on the floor.  They came up there and

19   said do his job.  Or that's my responsibility after the event.

20   Q    Did you -- did you -- in terms of who you reported to, did

21   that change?

22   A    Yes.

23   Q    Who did you report to when you were a floor coordinator

24   in -- at the beginning of 2024; was that Mr. Jenkins?

25   A    No.  Back -- see, they had a problem with him.  They moved

Page 10

1    him, and it was like almost in the same situation I'm in, but

2    he wouldn't report it.

3    Q    Okay.  But I'm just asking you, who was your -- who was

4    your immediate supervisor in January of 2024?

5    A    Probably, Alex --

6    Q    Alex Van Pelt?

7    A    -- Van Pelt.  Yeah.

8    Q    And before that, your supervisor was --

9    A    Right.

10   Q    -- Mr. Jenkins?

11   A    Yes.

12   Q    Ryan Jenkins?

13   A    Yeah.  And I briefly spent time with Alex before they

14   moved him, not even a couple of months.

15   Q    Okay.  And was Alex Van Pelt your supervisor after you saw

16   the title change to manufacturing support associate?

17   A    Yes.

18   Q    And today, Mr. Jenkins is again your supervisor; correct?

19   A    Yes, sir.

20   Q    Okay.  When did Mr. Jenkins return to becoming your

21   supervisor?

22   A    Back -- I -- I went on leave and when -- as I got back,

23   probably, in December of last year.

24   Q    My understanding is you -- in 2024, you took two leaves of

25   absence; correct?

                                                    Page 11

```
1    A    Yes.

2    Q    From May 13th through August 2nd, was your first leave;

3   does that sound right?

4    A    Yes.

5    Q    And the second leave of absence was from September 16th

6   through December 15th?

7    A    Yes.

8    Q    Does that sound right?

9    A    Yes.

10    Q    And that's both in 2024?

11    A    Yes, sir.

12    Q    And when you came back from the second leave of absence in

13   December, you began reporting again to Ryan Jenkins?

14    A    Yes, sir.

15    Q    Okay.  And when you came back in December, is it your

16   understanding that your job is still the manufacturing support

17   associate?

18    A    Yes, sir.

19    Q    Where you're in charge of doing all the duties on the

20   floor?

21    A    Yes, sir.

22    Q    Are there any other employees at the facility who have

23   those responsibilities?

24    A    Nobody know how to do the cup dumping job, but Tony

25   Jackson, he is my backup when I'm off from work.
```

Page 12

```
1    Q    So he can do the other jobs?

2    A    Yeah.  He also listed as a floor coordinator, too, before

3    they changed it to support.

4    Q    So --

5              COURT REPORTER:  Mr. McKinney, could you take

6          your hand off your mouth?  Thank you.

7              THE WITNESS:  Okay.

8    MR. McKEEBY CONTINUING:

9    A    Before -- before they turned into the support, Tony was

10   doing the same -- same.  When I'm off, he backed me up.

11   Q    Okay.  Is he -- is his title, as far as you know,

12   manufacturing support --

13   A    Yeah.

14   Q    -- associate?

15   A    Yes.

16   Q    Okay.  So he does everything, but he doesn't know how to

17   do the cup dumping?

18   A    Yeah.  He know how to do the cup dump.

19   Q    Oh, he does.

20   A    He's my backup.  He the --

21   Q    Okay.

22   A    -- only one that, me and him is the only one that can do

23   everything up there.

24   Q    Okay.  And then he reports to Mr. Jenkins as well or to --

25   A    Yes.
```

Page 13

1    Q    And you currently work the day shift?

2    A    Yes, sir.

3    Q    And what is the time of work currently for that shift,

4    that's 4:45 to 3:00?

5    A    4:30.

6    Q    4:30 a.m.?

7    A    Yeah.

8    Q    To what time?

9    A    3:00.

10   Q    And does Mr. Jackson work on the night shift?

11   A    Yes.

12   Q    Okay.  And you work four days a week on that shift?

13   A    Most of the time I work overtime because I'm just used to

14   working overtime all my life.  So I just try to, you know, work

15   anything that can be done that -- they usually let me

16   come -- they used to let me come in until the -- that -- the

17   event happened.

18   Q    Okay.  And so, currently, your normal shift is 4:30 a.m.

19   to three o'clock four days a week; correct?

20   A    Yes.  Yes.

21   Q    But you're saying that you also work some overtime?

22   A    Yeah.

23   Q    And is the overtime that you work typically on days that

24   you're not scheduled to work -- on your --

25   A    Yeah.  They -- they -- most of the time on the -- on the

Page 14

1    department that I work, they -- they try to stay ahead, and

2    they always ask if you want to come in, you come in.  And

3    I -- I'll take that.

4    Q    Okay.  What is this?  So I was going to ask you.  I think

5    you sort of answered my question, but the process for working

6    overtime, you're just told, hey, we have some overtime

7    available, do you want to work it?  And you say, yes.

8    A    Yes.  If anybody in there know how to do them jobs like me

9    and Tony -

10   Q    Right.

11   A    -- they'll let us -- they'll let us come in and -- and

12   perform.

13   Q    Who is the one that talks to you about overtime, is that

14   Alex, I mean, Ryan currently?

15   A    Yeah.  Well, right now, it is.

16   Q    So you don't right now have to request overtime or do you?

17   A    Well, he'll come -- they'll -- Wednesday or Thursday

18   they'll -- they'll -- they'll announce that the draw line will

19   be working, and we'll have a certain amount of people working.

20   And most of the time, I -- I can always fit in, because I'm

21   flexible to do any one of them and I want to -- and I -- and I

22   agree to do it.

23   Q    What's the draw line?

24   A    It's the -- the first -- like the cup dumping, it draws

25   the cups out to make the shells.  That's why they -- it's the

                                                        Page 15

```
1    draw -- that's the draw line.
2    Q    Okay.  So you can just -- so is that like a -- something
3    that comes,  when you say it comes out, is it like a document
4    or something that you can see or what do you --
5    A    No.
6    Q    -- call -- what are you talking about?
7    A    The -- the -- the cups -- the cups -- and the cups, they
8    brass cups that go down in the machine.  And once it goes down
9    in the machine, it draw them out to be the nine millimeter, or
10   38, or a rifle, any like that.
11   Q    Okay.  But in terms of working overtime, is the process
12   just that Ryan will come to you and say, hey, we need some more
13   help or can you work overtime on this day?  And you --
14   A    Yeah.
15   Q    -- tell him whether you can or not.
16   A    He come by and say, are you working tomorrow or
17   work -- yeah.  That's --
18   Q    Okay.  So he'll just tell you about an overtime
19   opportunity and then you can respond to that?
20   A    Yeah.
21   Q    And --
22   A    Or he'll post it up on a board.
23   Q    Okay.  What does he -- or he'll post it on the board?
24   A    Yes.
25   Q    What is it that he posts on the board?
```

Page 16

1    A    He'll post how many people working, and before everybody

2    leave on that day, he'll ask and get an accurate, you know,

3    count of who -- who going to be there.

4    Q    And if he determines that overtime is needed or additional

5    help is needed, he might come to you and ask if you could work?

6    A    Yes.

7    Q    Okay.  And I take it, it's been that way since December,

8    when you started reporting to Ryan?

9    A    Yeah.  It stopped.  They moved Ryan, and then that problem

10   happened with me and I was informed by the team lead that my

11   schedule is being discussed.

12   Q    Okay.  But I'm just talking about since December, you have

13   worked with Ryan and --

14   A    Oh, since then, no.  Yes.  Since then, everything been

15   like -- like --

16   Q    Like we talked about?

17   A    -- yeah -- like we talked about.

18   Q    So -- and just to be clear for the record, what we've

19   talked about is that you are working overtime, and that your

20   overtime is scheduled based on this kind of informal discussion

21   that Ryan would have with you about, hey, we need some help --

22   more help -

23   A    Yeah.

24   Q    -- can you work?  And --

25   A    Yeah.

1    Q     -- you, typically, say yes.

2    A     Yes, sir.

3    Q     Okay.  What is your current hourly rate?

4    A     I think it's 21 -- it might be 21.48.

5    Q     And you're paid by the hour?

6    A     Yes, sir.

7    Q     And for overtime, you get time and a half?

8    A     Yes, sir.

9    Q     Now, prior to December, when -- well, I guess you were out

10   on leave through December.

11         When you came back in December, Ryan was your supervisor?

12   A     Yeah.

13   Q     Okay.  We covered that.

14         It looks like you worked between -- it looked like you

15   worked in August of 2024, through the middle of September of

16   2024; does that sound right?

17   A     Yes.

18   Q     And during that period of time, you reported to Mr. Van

19   Pelt?

20   A     Yes.

21   Q     And what was the procedure for working overtime during

22   that month and a half?

23   A     Well, after that incident, I wasn't allowed.

24   Q     So you did not work overtime during that, roughly, 45

25   days?

Page 18

1    A    Being accurate, I'm not accurate with that exactly.  It

2    was probably in between somewhere -- if I were back, I was

3    trying to work it.

4    Q    Well, let me ask you this.

5         Did you work any overtime between August and September

6    15th, when you came back from your first leave of absence?

7    A    I don't -- I don't --

8    Q    Or do you know?

9    A    -- think so.

10   Q    Okay.  And was there a particular process during that

11   period for requesting overtime?

12   A    Yeah.  Everybody was still allowed and coming in, but they

13   just -- they just told me that I wasn't.  I had to -- it just

14   changed.  Extra stuff came in, and I just end up -- I had

15   meetings in HR about having overtime with Beth Ellis and Johnny

16   Center.  And -- and it was a person missing that I was

17   replacing, and it made me feel bad for them to say, well, you

18   just don't come in.  We'll just hire somebody.

19   Q    Okay.  Well, let me -- I just want to ask you about that

20   period of time, if you can remember, between August when you

21   came back from your leave of absence and September 15th, right

22   before you went on your next leave of absence, during that

23   again, approximately, 45 days -

24   A    I don't think I worked none.

25   Q    Okay.  Was there a procedure that you had to follow to be

Page 19

```
1    able to work overtime during that period when you were
2    reporting to Mr?
3    A    It was -- it was Coy, the guy that -- the guy that -- that
4    ordered me not to -- to work.  Van Pelt I never had a
5    conversation about him, and I was just told by team leads not
6    to -- not to come in and work overtime no more.
7    Q    Okay.  And what team leads are you referring to?
8    A    Ernest Terry and Yolanda Solee.  And I think Ernest said,
9    just leave it alone.  Don't -- just work your regular hours,
10   because it was too much.
11   Q    Okay.  But during just this period between -- in August of
12   2024, and the first couple of weeks of September of 2024, did
13   anyone tell you during that period of time that you couldn't
14   work overtime, just for that long of time?
15   A    It -- yeah.
16   Q    Who told you that?
17   A    We -- Beth Ellis when we had that meeting in HR, they told
18   me that don't -- don't work it no more.  They were gonna hire
19   somebody.
20   Q    Okay.  And when was that meeting with Ms. Ellis?
21   A    It's Beth Ellis.  It's a female.
22   Q    Right.
23   A    I know I got it somewhere in my notes.
24   Q    Okay.  And is that what you have with you today?
25   A    Yeah.  I got -- I got notes.  It's somewhere in here,
```

Page 20

1    because I reported everything --

2    Q    Okay.

3    A    -- that -- that -- that went down.

4    Q    And have you provided those notes to your attorney?

5    A    Yes.

6    Q    Okay.  All right.

7         Well, let me just ask you based on your memory as best I

8    can.  Did you ever have any discussions with Mr. Van Pelt about

9    whether or not you could work overtime?

10   A    I don't think I did.  It was just Beth and -- I had a

11   meeting in HR.  I don't think me and him -- I don't -- I don't

12   recall.

13   Q    Okay.  Do you have any problems with the way Mr. Van Pelt

14   treated you?

15   A    Yes.  Well, it just was -- he got put in a position where

16   he really didn't know what he was doing.

17   Q    Okay.

18   A    And I had a problem with -- with that, because he couldn't

19   tell me to do my job.

20   Q    All right.

21        Do you think that Mr. Van Pelt discriminated against you

22   on the basis of your race?

23   A    With him, I think that he was in with the other guys that

24   was doing it.

25   Q    Okay.  Why do you think that?

                                                    Page 21

1    A    Because it's everybody knowing that they in a buddy-like-

2    clique.  If you white and you wanted a friend, you can just get

3    hired off the street, and they'll put you over one of us.

4    Q    All right.

5         Did Alex Van Pelt say something to you that made you think

6    he was discriminating against you on the basis of your race?

7    A    He never did.  Like I say, I didn't get a chance to know

8    him.

9    Q    Okay.

10   A    He wasn't never -- we didn't never get a chance -- it just

11   was a little few conversations, because I didn't never get a

12   chance to.

13   Q    But who do you contend in this lawsuit at Remington did

14   discriminate against you, Mr. Snider, I take it?

15   A    Yes.  And, probably, Craig Thomas.  I don't think he was

16   there.  It was just like what was going on, it wasn't right,

17   and they was all going along with it.  So I had to include them

18   because then it was like nobody wants to say, hey, this -- this

19   -- this is wrong, you know.

20   Q    And what was it that was wrong?

21   A    For them to -- after this event, my whole life changed.

22   You changed my schedule.  You put me on nights.  I come back

23   another week and you change my schedule again.  I come back

24   another day -- another week, and you put me on night shift and

25   take my seniority.  You tell me my job has been eliminated, but

Page 22

1    you can't eliminate that job, unless that business change.  If

2    you eliminate that -- that -- that job, you cannot make a

3    bullet on there.  So why would you tell me a job that I've been

4    performing for 14 years getting eliminated?

5    Q    Who told you that the job was going to be eliminated?

6    A    Alex Van Pelt.

7    Q    What job did he tell you was going to be eliminated cup

8    dumping?

9    A    Yes.

10   Q    When did they tell you that?

11   A    When I -- when I asked -- I asked him something about the

12   job.

13   Q    What period of time are we talking about?

14   A    It was probably in -- after that event.

15   Q    And the event occurred on March 29th; correct?

16   A    Yes.

17   Q    Okay.  So let's talk about March 29th.

18        So at that point your immediate supervisor is Mr. Jenkins

19   still?

20   A    Yeah.

21   Q    Okay.  And you were working day shift?

22   A    Yes.

23   Q    And at that point it was five days a week; correct?

24   A    Yes.

25   Q    And the normal shift during that period of time was 5:45

Page 23

1  to 3:00?

2  A    I think I was coming in -- it might have been 5:00,

3  because that -- at -- at -- before the event, I think I was

4  working five and I was doing 10 hours.

5  Q    Ten hours a day?

6  A    Yeah.

7  Q    Okay.  But the normal shift was --

8  A    I think.

9  Q    -- an eight hour shift; correct?

10 A    Yeah.  Yeah.  Eight hour.  Yeah.

11 Q    So, yeah.  I think I have the day -- the times wrong, but

12 you had an arrangement with Mr. Jenkins where you would come in

13 a couple of hours early every day; correct?

14 A    Yes.

15 Q    To get started on the day and do extra work?

16 A    No.  I was doing -- I was performing a job of a -- of

17 absent person.

18 Q    Okay.  But in any event, whatever you were doing, you were

19 coming in two hours -- two hours --

20 A    Yeah.

21 Q    -- prior to your scheduled shift?

22 A    Yeah.

23 Q    And working 10 hours a day?

24 A    Yeah.

25 Q    Five days a week?

Page 24

1    A    Yeah.

2    Q    Okay.  And so your arrival time at work would be what time

3    during that period?

4    A    Like I say, I think about 5:00.

5    Q    5:00 a.m.  Okay.

6    A    Till 3:15 or something like that.  Yeah.  I think that --

7    Q    Okay.  So on the -- on the 29th, you were in the bathroom

8    near the office; correct?

9    A    Yes.  But now these offices that they -- that we fixing to

10   talk about, are offices that don't nobody coming in to -- they

11   all do salary.  So you probably say they come in at 9:00.

12   Q    Okay.  And --

13   A    It's upstairs, too.

14   Q    Second floor?

15   A    Yeah.  Second floor.

16   Q    The -- this office -- this bathroom near the office is on

17   the second floor?

18   A    Yes.

19   Q    Okay.  Okay.

20        So was it your regular practice during that period of time

21   to use that bathroom in the morning?

22   A    Yeah.  I would -- I -- I perform with a walking stacker,

23   and that's like a -- a forklift that pick up crates and pick up

24   pallets and stuff.  And I had emergency bathroom, and it's the

25   bathroom that I go by.  And it's close -- close to where I, you

```
 1    know, I go by it every time I'm doing something.  It's right
 2    there.  It's right across the hall.
 3    Q    Do you have to go up the stairs from where you work?
 4    A    No.  No.  I'm already upstairs working.
 5    Q    Okay.  So -- all right.
 6         So on the 29th, you went to use the bathroom is your
 7    testimony?
 8    A    Yes.
 9    Q    Okay.  Did you make a phone call while you were in there?
10    A    I probably -- I don't think I -- I probably did because
11    sometime I call my -- call my wife.
12    Q    Okay.
13    A    And I, you know, ask if she up.
14    Q    Ask her what?  I'm sorry.
15    A    Ask her if she up to get her --
16    Q    Oh, if she's up.
17    A    -- to go to work.
18    Q    Do you call to wake her up?
19    A    Sometime, I call her and -- and wake her up, and she'll
20    call me and -- and that -- that --
21    Q    Okay.  Do you have a recollection of on the 29th whether
22    or not you had a phone conversation with your wife while you
23    were in the bathroom?
24    A    I -- I don't remember.
25    Q    Okay.
```

Page 26

1    A    But sometime I do call her and -- and wake her up.

2    Q    Right.  Do you still use that bathroom today?

3    A    No.  Because it kind of got bad memories.  It kind of

4    like I don't want no more trouble.

5    Q    Got it.  Okay.

6         So on the 29th, you were in the bathroom.  Not sure if you

7    were calling your wife or not.  Were you listening to music?

8    A    No.

9    Q    Did you ever listen to music in the bathroom?

10   A    No.

11   Q    Okay.  Did you ever read the newspaper while you were in

12   the bathroom?

13   A    Yeah.  I -- I probably went in the bathroom on break with

14   my phone on or something like that, but --

15   Q    Okay.  And this was during your shift; correct, on the

16   29th?

17   A    Yeah.

18   Q    Okay.  And you were just taking a bathroom break?

19   A    Yeah.

20   Q    And you don't have to clock out to do that?

21   A    No.  I just went in there and used the bathroom.

22   Q    Okay.

23   A    And that was it.

24   Q    Okay.  And then on the 29th, someone came into the

25   bathroom; correct?

Page 27

```
 1   A    Yes.

 2   Q    And what did that -- at the time, did you know who it was?

 3   A    No.

 4   Q    Okay.  Did the person say anything to you?

 5   A    Yes.

 6   Q    What did -- what was said?

 7   A    What you doing?  What you doing?  Are you all right?

 8   Q    Did you respond?

 9   A    No.

10   Q    Were you in one of the stalls?

11   A    Yes.

12   Q    Had you finished using the bathroom?

13   A    Nope.

14   Q    Okay.

15   A    When he came in there, I was after that.

16   Q    I'm sorry.  Say that again.

17   A    When he -- after he came in there, I -- I had got -- I

18   didn't know.  I got out of there then, I didn't know what he

19   meant.

20   Q    Were you taking a shit?

21   A    Yes.

22   Q    Okay.  All right.

23        So someone comes in and asks you if you're all right.  You

24   don't respond.  And then I take it that person leaves?

25   A    Yes.
```

Page 28

1    Q    Okay.  And then you finish up and leave?

2    A    Yep.  When he left, I got out of there, because it was

3    kind of weird to me.

4    Q    And this -- and you didn't recognize the voice?

5    A    Yes.

6    Q    You did recognize the voice?

7    A    Yes.

8    Q    Whose voice was it?

9    A    It was Coy's.

10   Q    Okay.  But you didn't see him.  You just recognized the

11   voice.

12   A    Yeah.  I recognized the -- the voice.

13   Q    But you did not see him.

14   A    I didn't see him.

15   Q    Okay.  And Coy was the night shift supervisor; correct?

16   A    Yes.

17   Q    And so when you -- when you finished up in the bathroom --

18   let me ask you this.

19        Were you on the phone with your wife when the person came

20   into the bathroom and asked you how you were?

21   A    No.

22   Q    Okay.

23   A    No.  I didn't -- I wasn't never on the phone.  That's why

24   I don't remember.  I -- I don't -- I don't remember.  I know I

25   wasn't on the phone.  I was just using the bathroom when he

Page 29

1    came in.

2    Q    Okay.

3    A    I wasn't saying a word.  I wasn't playing no music.  I

4    wasn't -- I wasn't reading the newspaper.  Just was trying to

5    get in and out.

6    Q    Did you ever play music, while you were in that bathroom?

7    A    No.

8    Q    And when you came out of the bathroom, did you see anyone?

9    A    I went to the break room.

10   Q    Well, right after the bathroom, you walked to the

11   break room?

12   A    Yes.

13   Q    Okay.

14   A    This was 6:00, in between 6:30 and 6:15 in the morning

15   before -- right before the shift started.

16   Q    Okay.  So you went from the bathroom and went to the

17   break room.

18   A    Yep.  To get ready to --

19   Q    What --

20   A    -- go to the meeting and start a regular shift.

21   Q    So you got a shift meeting?

22   A    Yeah.

23   Q    Okay.  At 6:30.

24   A    I think so, yeah.

25   Q    Okay.  And did you sit down when you went to the

Veritext Legal Solutions
800-336-4000

1    break room?

2    A    Yes.

3    Q    And were there other employees in the break room?

4    A    Yes.

5    Q    And while you were in the break room, Mr. Snider came into

6    the room; correct?

7    A    Yes.

8    Q    And he asked you a question about the cups; correct?

9    A    No.  He didn't ask no questions about the cups.  He told

10   me, you come here.

11   Q    Okay.  So he didn't say anything to you about there being

12   -- were cups -- cups that were in the main elevator for you to

13   retrieve?

14   A    No.  I never heard that.

15   Q    Okay.  So your recollection is that he told you to come

16   talk to him?

17   A    Yeah.

18   Q    Okay.  Well, what did he say, as best -- as best you can

19   remember?

20   A    He was -- he was so aggressive.  I can remember that he

21   were real aggressive, moving around with hand movement.  And he

22   told me Lisa Leberuw told me you was in that bath -- you was in

23   the bathroom playing loud music.

24   Q    Okay.  So -- and Lisa Leberuw?

25   A    Yeah.  Leberuw.  Let me see.

Veritext Legal Solutions
800-336-4000

```
1   Q    Do you want to look at your notes to refresh your
2   recollection on that name?  That's fine.
3   A    You can go ahead, and I'll -- I'll find it in one of these
4   -- the correct spelling and everything.  And I can --
5   Q    Is that it right there?
6   A    Yeah.  Yeah.
7   Q    Yeah.
8   A    Yeah.
9   Q    So --
10  A    Yeah.  That's it.
11  Q    -- so you -- so it's Lisa Leberuw.
12  A    Yeah.
13  Q    L-E-B-E-R-U-W?
14  A    Yeah.  Yeah.
15  Q    Okay.  So --
16  A    He told me she -- she reported me as being loud -- loud or
17  doing something in there, and I --
18  Q    That you were loud in the bathroom?
19  A    Yeah.  So I --
20  Q    And who is Lisa Leberuw?
21  A    She worked in the office area.
22  Q    Okay.
23  A    But not upstairs.  Downstairs.
24  Q    Where did she work?
25  A    She worked in -- worked in the HR downstairs, not up where
```

Page 32

```
1   I work.

2   Q    Okay.  So she didn't work next to the bathroom?

3   A    No.

4   Q    Okay.  So his -- he -- when you say he was aggressive,

5   what was he doing that made him aggressive to you?

6   A    Well, when he came in that break room, it got everybody

7   attention, like what is wrong with him to approach you like

8   that.  So they advised me to -- to do something about it.

9   Q    Well, you're not answering my question.

10  A    Oh, okay.

11  Q    My question is, what did he do that was aggressive in your

12  eyes?  What did he do?

13  A    A demonstration come in there.

14  Q    Sure.

15  A    Open the door.  Open the door, come in, and you -- you

16  come here.

17  Q    Okay.  He motioned with his hand for you --

18  A    Yes.

19  Q    -- to come here?

20  A    You -- you come here, so after that, we left the break

21  room and went on the floor.  And he got me over and was almost

22  like he was trying to provoke physical altercations by moving

23  his hand and the way he talked to me.  I can't remember exact

24  everything that he said.

25  Q    Okay.  What did he -- what do you remember that he did
```

Page 33

```
 1   say?  It sounds like you can remember something.

 2   A     Don't use that -- don't you use that bathroom no more.

 3   Q     Did he say that there had been complaints?

 4   A     He said, Lisa said it --

 5   Q     Okay.

 6   A     -- but I went to Lisa right after that incident, and she

 7   denied it.

 8   Q     Okay.  What else did he say, other than just the words

 9   that he said, as opposed to how he said them?  We'll get to

10   that, but --

11   A     I -- I --

12   Q     -- you said he -

13   A     -- I kind of got away from him.

14   Q     How long was this exchange on the floor?

15   A     Well, after he came in that -- after he came in the break

16   room and got me and took me out there, I just kind of got away

17   from him and tried to go get some -- go to HR and get some

18   help, because I would like this to --

19   Q     You're -- I'm just asking you, how long on the -- was the

20   conversation in the --

21   A     I don't --

22   Q     -- on the floor?  Sixty seconds?

23   A     Something like that.

24   Q     Okay.

25   A     I just walked off and left him.
```

Page 34

```
1    Q    Okay.  And what he said to you was, not to use that

2    bathroom near the office?

3    A    No more.

4    Q    Okay.  Anything else that you recall him saying during

5    that conversation by the -- or on the floor?

6    A    Yeah.  I -- I recall him telling Earnest Terry that he

7    told me not to, and he --

8    Q    Earnest Terry was there, too?

9    A    Yeah.  He -- he was -- he was there in the office.  And

10   after the incident, he went to Earnest that --

11   Q    Okay.

12   A    -- he told me -- okay.

13   Q    I'm talking about you had a conversation with Mr.

14   Snider -

15   A    Yeah.

16   Q    -- right?

17   A    Yeah.

18   Q    On the floor?

19   A    Yeah.

20   Q    And you're telling me about that; right?

21   A    Yeah.

22   Q    I want to know what you guys said or what he said to you.

23   A    I didn't say nothing.

24   Q    You didn't say anything.  He told you, don't use that

25   bathroom anymore?
```

Page 35

1    A    Yeah.

2    Q    What else did he say just during that conversation?

3    A    About Lisa that's all I can remember.

4    Q    All right.  Nothing else that you can remember?

5    A    Huh-uh.

6    Q    Is that correct?

7    A    But he -- yeah.  I can't --

8    Q    All right.  Got it.  Okay.

9         So did he make physical contact with you?

10   A    No.  I kind of got away from him.

11   Q    Okay.  Did -- are you aware of anyone else who was able to

12   hear the conversation between you and Mr. Snider?

13   A    There wasn't nobody close to us.

14   Q    Okay.  And you left, and then went about -- you went back

15   to work?

16   A    I went straight to Lisa.  No.

17   Q    Straight to Lisa?

18   A    I went to Lisa to -- to ask her why did she do that.

19   Q    And what did she tell you?

20   A    She didn't do it.  She said, let's go to the office

21   because my name is involved with this, and I did not do it.

22   And I want to go -- she wanted to go to the office immediately.

23   Q    And so did you go to the office?

24   A    Yes.

25   Q    And what office are you talking about?

Page 36

1    A    We went talk to the plant manager, Craig Thomas.

2    Q    You and Lisa Leberuw?

3    A    Yes.

4    Q    Okay.  And you told Mr. Thomas what had happened?

5    A    Yes.

6    Q    And was there anyone else in the room, just you, Lisa, and

7    Mr. Thomas?

8    A    I think so.

9    Q    And this was in his office?

10   A    Yes.

11   Q    Okay.  And Mr. Thomas told you, you can use any bathroom

12   that you want to other than the women's restroom; correct?

13   A    Yes.

14   Q    Okay.  But you -- I think you were satisfied with that

15   response?

16   A    Yes.

17   Q    Okay.

18   A    I was satisfied with it, but I wasn't satisfied with the

19   -- the way it -- it -- it -- it happened.

20   Q    You were still upset with how Mr. Snider treated you?

21   A    Yeah.

22   Q    Okay.  Did you guys -- did he talk about, you know, next

23   steps with respect to that?

24   A    No.  He didn't -- he didn't -- he did -- he -- he did not.

25

                                                        Page 37

1  Q    Did you tell him you were going to talk to Human Resources

2  about it?

3  A    No.  I was scared of him.  I -- he --

4  Q    You were scared of Craig Thomas?

5  A    No.  Of Coy because I thought we might have a physical,

6  you know, it -- it was heated.

7  Q    It was what?

8  A    Heated.  So I just didn't.

9  Q    Okay.  But at some point you did talk to HR?

10 A    Yeah.  I went to HR and talked to him.

11 Q    Right.  In fact, you talked to HR that very day; right?

12 A    Yeah.

13 Q    Okay.

14 A    Yeah.

15 Q    And you talked to Ms. Ellis?

16 A    I probably talked to all -- I talked to all of them about

17 it.

18 Q    Right.  Right.  Right.  But that day you called Ms. Ellis

19 that --

20 A    Yes.

21 Q    -- she was at home?

22 A    Yeah.

23 Q    Okay.

24 A    I called her.  I -- yeah.  Look, I can't -- couldn't

25 remember it.  I know I talked to all of them, but I --

Page 38

```
1    Q    So when you had the heated conversation with Mr.
2    Snider -- let me ask you this.
3        Prior to that heated conversation, did you have any
4    problems with Mr. Snider or prior to that time?
5    A    Well, he told -- he told me one time to lower my voice
6    when I talked to him, yes.
7    Q    When was that?
8    A    It was prior years.
9    Q    Okay.  Anything other than that in terms of disagreements
10   or confrontations you had with Mr. Snider prior to this
11   incident that we've talked -- we're talking about?
12   A    No.  Not that I can recall.
13   Q    Okay.  So at the time that he had that conversation with
14   you when you say he was heated or it was heated and he was
15   aggressive towards you and you were fearful, that's all true;
16   right?
17   A    Yes.
18   Q    Okay.  Did you feel like it was because you're black?
19   A    Yes.
20   Q    At the time you felt that way?
21   A    Yes.
22   Q    Okay.  Why?
23   A    Because he done did just about all us up there like that,
24   and won't nobody report him.
25   Q    So he had treated others the same way?
```

Page 39

```
1    A    He used the N word, and was in HR for -- for that -- for

2    calling Tyron Walker a nigger.  And he also attacked Ryan on

3    the floor, but Ryan wouldn't report it.  He also --

4    Q    Ryan -- Ryan's African American?

5    A    Ryan Jenkins, the supervisor.

6    Q    He's African American?

7    A    Yes.

8    Q    Okay.

9    A    And he also did Gary.  I think it's -- he got -- I forget

10   his last name, but he did him aggressive the same -- the same

11   way.

12   Q    Okay.  Let me talk about those things.

13        So he called -- he -- did he call Tyrone Walker a nigger?

14   A    Yes.

15   Q    Did he -- were you there?

16   A    I wasn't there.  I just remembered him going to the office

17   about it.

18   Q    You remember who?

19   A    Tyrone and him and -- and Ms. Norma Dunn, used to be HR.

20   Q    Nora Dunn?

21   A    Norma.

22   Q    Norma Dunn.

23   A    Dunn.  Yeah.

24   Q    Uh-huh.

25   A    I just remembered that they was in that discussing it.
```

Page 40

1    Q    Okay.  When was that?

2    A    Years.

3    Q    Approximately?

4    A    I -- I don't know approximately, but I just know it

5    occurred.  That's -- that's -- that's --

6    Q    But not in 2024.

7    A    No.  Not in --

8    Q    Not in 2023, either?

9    A    No.

10   Q    Before that?

11   A    Yes.

12   Q    Okay.

13        Did you actually see Tyrone and Mr. Snider going into Ms.

14   Dunn's office?

15   A    No.  Just -- just the hearsay of it -

16   Q    Uh-huh.

17   A    -- and knowing that they've been in -- him -- me and him

18   kind of close friends, and we work beside each other every day.

19   Q    You and Tyrone?

20   A    Yeah.  Yeah.

21   Q    Okay.  Did Tyrone talk to you about being called a nigger

22   by --

23   A    Yeah.

24   Q    -- Mr. Snider?

25   A    Yeah.

                                                    Page 41

```
1    Q    He told you that?

2    A    Yeah.

3    Q    Okay.  So when you say, he attacked Ryan Jenkins, what

4    does that mean?

5    A    The same way.

6    Q    Spoke to him aggressively?

7    A    Aggressively, moving, and -- and -- and, you know, in that

8    kind of way.

9    Q    And am I correct that Mr. Snider was never your direct

10   supervisor?

11   A    No.

12   Q    Because he worked on -- that's true?

13   A    Yes.

14   Q    -- because he worked on the night shift?

15   A    Yes.

16   Q    Okay.  And then you said that he was with, I guess,

17   aggressive with the gentleman named Gary.  That's another

18   African --

19   A    Yeah.

20   Q    -- American employee?

21   A    Yeah.  Yes.

22   Q    What was his job?

23   A    Furnace operator.

24   Q    Okay.  And you -- did you witness that?

25   A    No.  I didn't witness it.  I just -- the hearsay.
```

Page 42

1    Q    Okay.  Did you witness him being aggressive towards Mr.

2    Jenkins?

3    A    I didn't.

4    Q    You did not?  Okay.

5         Did Mr. Jenkins tell you he was -- had been aggressive

6    towards him?

7    A    No.  Just the people -- I asked him, and he told me kind

8    of what went down, but I don't think he wanted to push it, you

9    know, further.  So we --

10   Q    What did Mr. Jenkins tell you?

11   A    He just said they -- they had words.

12   Q    Did you later come to find out that, in fact, it was

13   Heather Jones who had made a complaint about you?

14   A    Well, I kind of thought that because of a situation that

15   she approached me, and it was unappropriate (sic).  And I kind

16   of stayed away from her.  I learned about the rumors that was

17   going out on her, and we didn't -- we didn't touch -- it just

18   was a person that you knew not to, you know, to -- to associate

19   yourself with.

20   Q    Okay.  What was her job?

21   A    I don't -- she might have been a -- let me see.

22   Q    Was she an office employee?

23   A    Yeah.

24   Q    Okay.

25   A    Downstairs.  She probably didn't -- somebody like come out

Page 43

```
 1    and count or count stuff on the floor.  So I don't know what
 2    her job title was.
 3    Q    Okay.  But she was an administrative employee, an office
 4    employee?
 5    A    Yeah.
 6    Q    And she worked in the office near the bathroom that you
 7    were using?
 8    A    Yeah.  And she came -- she'll come in at -- they could all
 9    come in at 8:00 or 9:00 when we get there.  And that incident
10    happened at 6:00 -- between 6:15 and 6:30.
11    Q    Was there anyone in the office?
12    A    No.
13    Q    Between that time?
14    A    No.
15    Q    Okay.  So you -- is it your --
16    A    I don't know if anybody was in there.  I don't -
17    Q    You're not sure one way or the other?
18    A    No.  There wasn't nobody in there when I went in there to
19    use it.
20    Q    That you could see?
21    A    I couldn't see nobody.  All the lights -- the lights don't
22    even -- don't nobody even be in there.
23    Q    The lights were off or do you -- are you sure?
24    A    Not in -- in -- in her office.  I didn't see nobody.
25    Q    Okay.
```

Veritext Legal Solutions
800-336-4000

1    A    I don't remember seeing no lights on.

2    Q    Do you --

3    A    And I don't remember seeing anybody in that whole office,

4    because nobody in there working.

5    Q    Yeah.  You said there was a situation between you and Ms.

6    Jones, that she approached you.  What does that mean?

7    A    Well, every year I -- I would get that -- that blood

8    screen, and you know, after work, they'll put a piece of cotton

9    on your arm --

10    Q    Right.

11    A    -- and everything.  And she approached me with a -- I felt

12    that I was sexually violated.

13    Q    What did she do to sexually violate you?

14    A    She asked me what happened to you, and I said, well, they

15    drew blood.  And she said, I wish you would poke me like that.

16    Q    Did you ever report that?

17    A    I talked to Ryan about it, and he told me to just, you

18    know, stay away from her.  And then after I started staying

19    away from her, she started, you know, it was like -- it

20    was, you know, if -- if somebody told you that somebody sent

21    somebody to prison for rape or something, and I just took

22    her -- every time I seen her, I would go the other way.

23    Q    Well, no, I don't know that.  Is that --

24    A    Well, I'm just saying that's --

25    Q    Is that -- is that something that actually happened, she

Page 45

```
 1   sent someone to prison?

 2   A    Yeah.

 3   Q    Oh.  Okay.

 4   A    Out at the job.

 5   Q    Someone asked -- at Remington?

 6   A    Yeah.  The first time when I started working there, they

 7   said, stay away from her because she'll get you in trouble.

 8   Q    Well, who did she send the prison?

 9   A    A black --

10   Q    According to the rumors?

11   A    -- a black guy.  I don't know his name.

12   Q    All right.

13        Is Ms. Jones white or black, Heather Jones?

14   A    She white.

15   Q    Okay.  All right.

16        So had you -- had you heard before I mentioned it that, in

17   fact, Ms. Jones is the one who -- Heather Jones is the one who

18   made the complaint about you being in the bathroom?

19   A    No.  I -- no.  Yeah.  It -- it -- it came up some kind of

20   way, but I don't know who act -- oh, yeah.  I think Ms. --

21   Q    Ellis?

22   A    -- Beth Ellis.  Yeah.  Yeah.

23   Q    Told you that Heather Jones had made the complaint?

24   A    Yeah.

25   Q    Okay.
```

Page 46

```
1   A    I mean they all -- and yeah.  She told me that.

2   Q    Okay.  When -- you told me earlier that after speaking to

3   Mr. Thomas, you called Ms. Ellis on the phone, because she was

4   off that day; correct?

5   A    Yes.

6   Q    And you explained to her what happened?

7   A    Yeah.

8   Q    And she asked you if you were okay to continue your shift;

9   correct?

10  A    Yeah.

11  Q    And you told her you were?

12  A    Yeah.

13  Q    And you did continue your shift?  Is that a yes?

14  A    Yes.

15  Q    Okay.

16  A    Yes.

17  Q    So did anything else happen with regard to the incident on

18  that day, the 29th, because I understand you had some meetings?

19  A    Yeah.

20  Q    I think those were the next week.  This was a Friday;

21  right?

22  A    Yes.

23  Q    Did anything else happen in terms of your communications

24  about the meeting?

25  A    No.
```

Page 47

```
 1   Q    Okay.  You left at the normal time?

 2   A    Yes.

 3   Q    Okay.  And then on Monday, which I think would have been

 4   April 1st, you had some meetings about the incident; correct?

 5   A    Uh-huh.

 6   Q    Is that a yes?

 7   A    Yes, sir.

 8   Q    Okay.

 9   A    It -- it -- it had to be -- it could have -- it might have

10   not been Monday.  It might have been some time after that week.

11   I know we did have plenty of meetings.

12   Q    Okay.  And Mr. Van Pelt was present, as well as Ms.

13   Ellis -

14   A    Uh-huh.

15   Q    -- and also Mr. Center?

16   A    Yes.

17   Q    Johnny Center?

18   A    Yes.

19   Q    And he's a senior manager?

20   A    Yes.

21   Q    Okay.  Tell me what you remember about that meeting.

22   A    Well, when we had that meeting, it was -- I was just

23   trying to get my overtime back.  And we talked about that

24   meeting because I was just trying to do my regular schedule,

25   because I had been doing it for like a year or two years
```

Page 48

1    and -- a year or two.

2    Q    Is it your testimony that your overtime procedure had

3    changed prior to going to that meeting?

4    A    No.  He -- I had the meeting to get the overtime.  I

5    remember talking to them about getting my overtime back, and I

6    remember them telling me that's me and -- I remember Beth

7    saying that we gonna -- you don't have to come in and do that

8    job no more.  We just gonna hire somebody -- instead of letting

9    me come in and continue.

10   Q    When was that conversation compared to the March 29th,

11   bathroom incident, was that the next week or several weeks

12   after that?

13   A    Yeah.  It was -- it was weeks after.

14   Q    Okay.

15   A    Because after reporting it, stuff started changing.

16   Q    All right.

17        So when did -- when you say, stuff started changing, you

18   mean your overtime?

19   A    Yeah.

20   Q    Okay.  And when did that -- how -- when did that start

21   changing, your overtime?

22   A    Weeks after the incident, Earnest Terry, which would be

23   the team lead –

24   Q    Right.

25   A    -- told me that Coy and Yolanda was in discussing my

                                                        Page 49

1  schedule.

2  Q    Is that Yolanda Solee?

3  A    Yeah.  That -- they was in there -- in the office, and he

4  said, be careful because they going to try to write you up or

5  get you in trouble or something.  And she came and said, Coy

6  said stop doing overtime.

7  Q    At this point, were you reporting to Alex Van Pelt?

8  A    I -- I -- I think so.  I'm not sure.

9  Q    Okay.

10  A    But I think so.

11  Q    But who's the one that told you to stop working overtime?

12  A    Yolanda and Earnest.  He advised me that they didn't want

13  me to do it, so just come in and start working your -- your

14  regular shift.

15  Q    Okay.  What -- and this was a conversation that you had

16  with Yolanda and --

17  A    No.  This was --

18  Q    -- Earnest?

19  A    -- I -- it -- Earnest like told me like just give me a

20  heads up on it.  Like they was gonna do something.

21  Q    And give you a heads up on what?

22  A    That they were going to change my schedule.  Coy was gonna

23  change my schedule.

24  Q    Okay.  At some point were you told not to work overtime?

25  A    Yeah.  They told me not to.

1    Q    Okay.  When was that?

2    A    I'm not sure, but it was after the -- the incident, weeks

3    after.

4    Q    How many weeks?

5    A    Probably, about a month.

6    Q    Okay.  And who told you not to -- that you could no longer

7    work overtime?

8    A    It would have probably been Yolanda and it came from Coy.

9    Q    Who told you?

10   A    It would have probably been Earnest and Yolanda.  They

11   like the team leaders that get information to pass it on.

12   Q    Okay.  So you think that Yolanda Solee and Earnest Terry

13   told you that you were no longer allowed to work overtime?

14   A    No.  Yolanda told me not to come in no more, and Earnest

15   told me that they was going to change my schedule.  They were

16   going to do something, because they was in the office talking

17   about it prior.

18   Q    When you say Yolanda said, don't come in no more, do you

19   mean that she said don't come in to work overtime?

20   A    Yes.

21   Q    Just work your regular shift?

22   A    Yes.

23   Q    Okay.  So that's a conversation that you had with Yolanda

24   Solee?

25   A    Yeah.

```
1   Q    Okay.  And that was about a month after the bathroom
2   incident?
3   A    Yes.
4   Q    Okay.  Where were you when you had that conversation with
5   Ms. Solee?
6   A    Probably, on the floor.
7   Q    Was it just you and her?
8   A    Yes.
9   Q    And she told you something to the effect of we want you to
10  come in and work your regular shift?
11  A    Yes.
12  Q    Okay.  What did you say in response?
13  A    I just went to the office and tried -- and that's when I
14  had the -- the meeting with Beth and Johnny about why.
15  Q    And when you say, Johnny, you mean Johnny Center?
16  A    Yes.
17  Q    And was that just the three of you in this meeting?
18  A    Yes.
19  Q    And was it in Beth's office?
20  A    Yes.  I think it might have been Alex in there.  I don't
21  know.  I -- I just remember Johnny, because I remember the
22  things that -- what Johnny and Beth said about the situation.
23  Q    And Johnny is African American; correct?
24  A    Yes.
25  Q    And what did they say about the situation?
```

Page 52

1    A    Johnny told me in that meeting, he said I could work

2    overtime, but I couldn't work it on -- on Coy's shift.

3    Q    Didn't he, in fact, tell you that you -- if you wanted to

4    work overtime, you had to sign up for it beforehand?

5    A    No.  It never was like that until the incident.

6    Q    Okay.  But this was after the incident.

7    A    After the incident –

8    Q    Right.

9    A    -- you couldn't do it.  There -- he came up with the way

10   he -- the -- answer -- I'm gonna -- do the question again.

11   Q    All right.  Sure.

12       Isn't it true that it's something -- well, I'll ask you a

13   different question.  Isn't it true that at some point the

14   overtime procedure changed such that you had to sign up for

15   overtime?

16   A    Yeah.  After the incident.  Yeah.

17   Q    Okay.  That was about a month after the incident?

18   A    Yeah.

19   Q    Okay.  How did you find out about that process, who

20   explained that to you, if you can remember?

21   A    I don't know if it was Earnest or Yolanda.

22   Q    One of them?

23   A    Yes.

24   Q    Okay.  So you could have signed up for the overtime;

25   right?

Page 53

1    A    Yeah.  But I couldn't -- I -- on -- on the way they --

2    they had changed my schedule, I couldn't -- I couldn't do it on

3    what he wanted me doing.  And he knew I couldn't do it, because

4    I got the grandkids and stuff to pick up.

5    Q    So what couldn't you do?

6    A    I couldn't change my schedule and -- and do it the way he

7    wanted me to do it.

8    Q    How did -- how did he want you to do it?

9    A    To do it where it can be inconvenience for me.

10   Q    Well, what -- did he want you to work particular hours?

11   A    Yeah.

12   Q    What hours did he want you to work?

13   A    They just didn't want -- Coy just didn't want me to work

14   on his shift.

15   Q    Did he say that to you?

16   A    Johnny said it.  Johnny -- Johnny said you don't -- you

17   don't -- you can work somewhere else, but you can't -- he don't

18   want you on his shift.

19   Q    So that meant you would have had to work the overtime

20   prior to or after your --

21   A    And -- yeah.

22   Q    -- shift into the afternoon?

23   A    Yeah.  Something like that.  Yeah.

24   Q    And you couldn't do that?

25   A    No.

                                                          Page 54

```
 1    Q    That's true?

 2    A    Yes.  I couldn't -- I couldn't --

 3    Q    Okay.

 4    A    -- do it.

 5    Q    And Johnny said it -- your claim is that Johnny said that

 6    you shouldn't work overtime on Mr. Snider's shift?

 7    A    I can work it, but I can't work it on his.

 8    Q    On Johnny -- on --

 9    A    Yeah.  That's what they --

10    Q    -- Coy's?

11    A    -- both of them, and then Beth only -- and Beth -- on that

12    same meeting, that's when Beth said, well, don't -- don't worry

13    about it.  We'll hire somebody.

14    Q    Okay.  So what were the reasons that you couldn't work the

15    overtime, you said you had to pick up your grandkids?

16    A    Yes.

17    Q    From school?

18    A    Yeah.  From the babysitters and stuff like that.

19    Q    How many grandkids do you have?

20    A    Plenty.

21    Q    How many?

22    A    Five that I know of.

23    Q    Okay.  The five over which you had responsibilities for?

24    A    Yes.

25    Q    Okay.  And you pick them up from babysitters?
```

Page 55

```
 1    A    Yes.

 2    Q    Okay.  Did Johnny Center tell you why you couldn't work on

 3    Coy's shift?

 4    A    He just -- it was just like they was gonna do what he

 5    wanted to do, and --

 6    Q    Well, did he tell you why?

 7    A    No.  He just --

 8    Q    Okay.

 9    A    -- told me don't work -- don't work overtime.

10    Q    On Coy's shift?

11    A    Yeah.

12    Q    He said you could work the overtime, but you'd have to do

13    it in the afternoon, and you weren't able?

14    A    Yeah.

15    Q    Okay.  And that was said in this meeting with Beth Ellis?

16    A    Yeah.  It -- yeah.

17    Q    Okay.  I mentioned there being a sign up sheet for

18    overtime.  Do you remember when I said that?

19    A    Yes.  Yeah.  I got -- I got a copy of it.

20    Q    Right.  You -- I think I've got a copy of it, too.  So let

21    me -- let me give it to you, and so you can -- I'll mark it as

22    an exhibit.

23                    COURT REPORTER:  Do you want to mark them, or

24           you want me to?

25                    MR. McKEEBY:  I'll do it.
```

Page 56

1    MR. McKEEBY CONTINUING:

2    Q    This is a document that your lawyer provided to us, and

3    I'm going to mark it as Exhibit 1.

4                    (WHEREUPON, Deposition Exhibit Number 1, Sign Up

5              Sheet, was introduced and is attached hereto.)

6    MR. McKEEBY CONTINUING:

7    Q    Is this what you're talking about, the overtime sheet?

8    A    Yeah.

9    Q    That's what you have?

10   A    Yeah.

11   Q    Okay.  Well, this is a -- it looks like a -- it says, Wash

12   Operator Overtime for 4-23 through 4-26; correct?

13   A    Yes.

14   Q    And this is the sheet that was -- was it -- was this sheet

15   posted somewhere at the facility?

16   A    Yes.

17   Q    Where was it posted, the break room?

18   A    Office.

19   Q    The office.  Okay.

20        And this looks like it's someone named Michael Hawkins has

21   signed up for overtime on Wednesday -- on every day, Tuesday,

22   Wednesday, Thursday, and Friday; correct?

23   A    Yes.

24   Q    And Mr. Hawkins was -- did your job, too?

25   A    Yes.  No.  He -- he -- he just a wash operator.  I do his

Page 57

1    job for him.

2    Q    Okay.  But I guess this is the document that you were

3    supposed to sign if you wanted to work overtime; correct?

4    A    Yeah.

5    Q    And do you recognize the signature at -- on the top of his

6    name for Wednesday?

7    A    No.  I -- I -- what -- I can't read that.

8    Q    I can't either.  That's why I asked you.

9         So is this -- this is an example of the overtime sheet;

10   correct?

11   A    Yes.  That I never saw that came out after.  This never,

12   never -- this is the first time I seen it.  That's why I took

13   the picture of it.

14   Q    Okay.  Did you ever see -- is this the only example of

15   this that you ever saw?

16   A    It never came out until this -- this -- this -- it's all I

17   know about it.  I just took the picture of it.

18   Q    Right.

19        But is -- did it come out after this time -- this kind of

20   sheet?  Was it used after this -- these four days?

21   A    No.

22   Q    Is this just the first time?

23   A    No.  Like now, it ain't being used -- it ain't -- it just

24   was used until -- and he -- he -- he -- it was never used after

25   this.

Page 58

1    Q    So, I mean, you went out on leave.  Is it your testimony

2    that this is the first -- this Exhibit 1, is the first time you

3    ever saw an overtime sheet like this?

4    A    Yeah.

5    Q    Okay.  And then you went out on leave -- let me get this

6    right -- on the 13th of May; correct?

7    A    Yes.

8    Q    Okay.  Is this the only overtime sheet like this that you

9    saw or did you see others?

10   A    I never seen that.

11   Q    You never seen any others?

12   A    Not --

13   Q    Just this one?

14   A    I never seen that till after, you know, that's the first

15   time I seen it, and it never popped back up.

16   Q    Okay.  Did anybody ever talk to you about this -- this

17   sheet?

18   A    I think they said something about it.

19   Q    Who's they?

20   A    Probably, Yolonda.

21   Q    And what they said was that if you want overtime, you

22   should sign up for it on this sheet?

23   A    Yes.

24   Q    Okay.  And that's Yolanda Solee; correct?

25   A    Yes.

1    Q    But you could -- you didn't do that on this occasion,

2    because you knew you couldn't work the overtime hours into the

3    afternoon; correct?

4    A    And it conflicted with them changing my schedule like

5    every week to make me saying that I'm not gonna do that.  My

6    answer was based on getting your schedule every change every

7    week knowing that they playing games with you that you go --

8    you can't -- you gotta go tell your wife this.  You got to go

9    tell your -- your daughter this.  And so I said, I'm not gonna

10   to -

11   Q    All right.

12   A    -- that's the reason why, you know, my answer is that.

13   Q    Okay.  So you said that your schedule was changed or that

14   you were -- you were told not to work the two hours pre-shift

15   overtime about a month after the bathroom incident; correct?

16   A    That's correct.

17   Q    Okay.  So that would put us into late -- kind of this time

18   frame -- late April of 2024?

19   A    Uh-huh.

20   Q    Is that a yes?

21   A    I can't remember.

22   Q    Okay.  But we -- you do remember that it was the 29th of

23   March?

24   A    Yeah.  Yeah.  I do remember that.

25   Q    Okay.

1    A    Yeah.  It was in April when stuff start changing, if

2    that's what you're asking me.

3    Q    Okay.  So -- and this was one of the changes, is this sign

4    up sheet?

5    A    Yes.

6    Q    Okay.  And then you went out on leave on May 13th;

7    correct?

8    A    Yes.

9    Q    Okay.

10        So let me just ask you between the period of March 29th,

11   when we know that's when the bathroom incident occurred, and

12   May 13th, when you went out on leave, in terms of your -- you

13   were still on the day shift during that period; right?

14   A    Yes.

15   Q    Okay.

16   A    No.  I don't think so.  I got a schedule when they changed

17   my schedule.  That's another reason for my actions.  They

18   changed my schedule several times, and I start --

19   Q    So they changed it between March 29th and May 13th; is

20   that your testimony?

21   A    Let me -- let me see.

22   Q    Okay.  I think I bet -- I bet I know what you're looking

23   for.  Is this the document that you're looking for?

24   A    Yes.

25   Q    All right.

```
 1   A    And also it's another one that I took a picture of -
 2   Q    Well, I don't have that one, but I have this one.  So we
 3   can talk about it.
 4        But let me ask you, in terms of the hours that you
 5   actually worked -- well, let me back up.  Was there a -- when
 6   you were working day shift from what did we say 5:00 to 3:15?
 7   No.  Yeah.  5:00 to 3:15, the normal shift was 7:00 to 3:15;
 8   right?
 9   A    Uh-huh.
10   Q    Correct?
11   A    Yes.
12   Q    So would there be like a weekly schedule that was -- that
13   you would look at or would you just know, hey, I'm on first
14   shift?  I know when to come in?
15   A    Yeah.
16   Q    Which one was it?
17   A    The -- it was -- it was -- me and Ryan had already --
18   Q    Made that arrangement?
19   A    Yeah.  Yeah.
20   Q    Right.
21   A    It was already --
22   Q    But you didn't like come in and look at it and, oh, let's
23   see when I'm supposed to come to work.  You knew.
24   A    No.  I knew.
25   Q    Because you were on first shift?
```

Page 62

```
1    A    I'd been doing it for two -- two years.

2    Q    Okay.

3    A    Two and a half years that I've been doing it.

4    Q    Got it.  Okay.

5         So you said about a month after the incident, that's when

6    you found out that you're -- that you weren't supposed to work

7    though -- that overtime schedule?

8    A    Yes.

9    Q    Okay.

10        At any point between March 29th and May 13th, did you --

11   were you assigned to the night shift; did you work the night

12   shift?

13   A    No.  I -- I -- I did not.

14   Q    Okay.  And the document that I've marked as Exhibit 2,

15   what is a -- is a -- let me give that to you -- where did you

16   see this?

17              (WHEREUPON, Deposition Exhibit Number 2, Work

18         Schedule, was introduced and is attached hereto.)

19   MR. MCKEEBY CONTINUING:

20   A    It was in our office.

21   Q    Was it up on the -- on the -- on the -- it looks like it

22   was on the wall?

23   A    Yeah.

24   Q    It looks like it was a thumbtack below it.

25   A    Yeah.
```

Page 63

1   Q    Okay.  And you took a picture of this?

2   A    Yes.

3   Q    When did you do that?

4   A    I don't -- I'm not -- I'm not -- in between those days.

5   I'm not sure, but I'm -- I -- I did take that picture.

6   Q    Okay.  And this -- and this shows you in the 10:30 p.m. to

7   6:45 a.m. slot; right?

8   A    Yes.

9   Q    Okay.  Did you ever talk to anybody about this document at

10  the company?

11  A    I went to HR, and I was so stressed out that I didn't know

12  what to do.  And I just went to medical to get some help,

13  because I was about to have a breakdown.

14  Q    Okay.  Who did you go to HR, to Beth Ellis?

15  A    Yeah.

16  Q    What did she tell you about this document?

17  A    That's -- that's -- that's what it is.  That's like -- I

18  guess what I -- that's what they wanted me to perform.  That's

19  all.  And I -- I asked why.  Why would I get put as being the

20  less seniority.  This 10:30, that's the less seniority.  That's

21  people that have been there with one and two years.

22  Q    Right.  Who -- isn't it true that you had the least

23  seniority in your position?

24  A    No.  That's not true.

25  Q    Okay.

Page 64

```
 1   A    The highest.
 2   Q    Okay.  But you were never told you had to work this shift?
 3   A    I -- I went on leave and that's when -- when they changed
 4   it back.
 5   Q    Okay.
 6   A    I couldn't do --
 7   Q    Well, when you --
 8   A    -- it.
 9   Q    -- when you came back from leave?
10   A    I never had to do it.
11   Q    Okay.  When you went out on leave, you filled out some
12   paperwork, I take it?
13   A    Yes.  I -- I went for help to the EEOC.
14   Q    But in terms of your leave of absence from the company
15   between May and September, you filled out some paperwork?
16   A    What kind of paperwork?
17   Q    A Family Medical Leave paperwork?
18   A    Yeah.  Mental health.
19   Q    Okay.  And who did you work with at the company in
20   connection with that paperwork, if anyone?
21   A    Nobody.
22   Q    Okay.  Did you turn it in?
23   A    Yes.  I had to turn it in to Matrix.
24   Q    To Ms. Ellis?
25   A    Matrix.
```

Page 65

```
1    Q    Oh, through Matrix.

2    A    Yeah.

3    Q    That's a system?

4    A    Yeah.

5    Q    On the computer?

6    A    No.  It's -- it was -- it was done in the office, I guess,

7    faxed.

8    Q    So Matrix is the -- an administrator?

9    A    The people who you contact when you -- in -- in this

10   situation.

11   Q    When you need leave?

12   A    Yes.

13   Q    Okay.  And you had made the assessment that you needed

14   some time off?

15   A    Yes.

16   Q    Did your -- did the doctors tell you that or did you kind

17   of come up with that on your own?

18   A    I knew -- I knew the doctors told me that, and -- yeah,

19   the doctors told me that.  Uh-huh.

20   Q    What doctors you talking about?

21   A    The doctors that I was seeing at -- the paperwork should

22   -- I --

23   Q    Yeah.

24   A    -- don't --

25   Q    Ms. Sterling?
```

Page 66

```
 1   A    Yes.
 2   Q    Okay.  And is it -- maybe I don't understand your
 3   testimony.
 4        Is it -- is it your testimony that you talked about
 5   Exhibit 2, with Ms. Ellis?
 6   A    I'm not sure, but I -- I talked to somebody about it.
 7   Q    Who?
 8   A    I don't -- I'm not clear with it.
 9   Q    Okay.
10   A    I'm not sure, but I'm -- I'm -- I'm quite sure --
11   Q    Okay.
12   A    -- that I talked, and this is not the only schedule.  It
13   was another schedule for to keep the confusion up.  Like every
14   week I would go, and they would change the schedule.
15   Q    All right.
16        What -- wait -- and so you came -- during your leave of
17   absence, is when you filed your EEOC charge; correct?
18   A    No, it was before.  It was before the paperwork just
19   probably hadn't got to them.
20   Q    I see.  Just so that you have it here -- here's the --
21   here's the EEOC charge.
22   A    Okay.
23   Q    I'm going to mark it as Exhibit 3.
24                    (WHEREUPON, Deposition Exhibit Number 3, EEOC
25              Charge, was introduced and is attached hereto.)
```

Page 67

1    MR. MCKEEBY CONTINUING:

2    Q    There you go.  Does that look like an EEOC charge?

3    A    Yes.

4    Q    And does that show when you filed it?  That's your

5    signature at the bottom?

6    A    Yes.

7    Q    Okay.  And you think you filed this before you went out on

8    a leave of absence?  It looks like it says, May, up there at

9    the very top.

10   A    Yeah.  It say, May something.

11   Q    So that -- you think you filed this with the EEOC in May?

12   A    In between that time.  I don't -- I'm -- I'm not exact.

13   Q    In between what time?

14   A    After it happened.

15   Q    Yeah.  It looks like you say the latest time that the

16   discrimination had occurred is here in this box.  It says, May

17   8th, 2024.  So it would have to be before that; right?

18   A    Yes.

19   Q    Okay.

20   A    I'm not sure how they work they system.

21   Q    All right.  But did you actually go down to their offices

22   to file this or did you do it online?

23   A    Yes.

24   Q    Went to their offices?

25   A    Yes.

Page 68

1    Q    Okay.  Were you represented by a lawyer at that time?

2    A    No.

3    Q    Okay.  And you had not -- your testimony and I think

4    that's accurate based on this document, is that you had not

5    gone out on a leave of absence when you filed this charge of

6    discrimination; correct?

7    A    I'm not sure.

8    Q    Okay.

9         While you were on leave of absence between May and

10   September of 2024, I take it you didn't work at any other jobs?

11   A    No.  I just did stuff around the house.

12   Q    Okay.  And did you -- you saw your doctors, too?

13   A    Yes.

14   Q    Ms. Sterling?

15   A    Yes.

16   Q    And she's at -- what's the company she's with, Unity

17   Health?

18   A    Yes.

19   Q    And she -- you were on some prescription drugs --

20   A    Yes.

21   Q    -- through her?

22   A    Yes, sir.

23   Q    And those were Zoloft and Hydroxyzine?

24   A    Yes.

25   Q    What -- were you on -- were you taking those drugs before

Page 69

1    you went to see Ms. Sterling?

2    A    I think I -- I think -- I think so, and I think I went and

3    talked to HR, I think, and asked them was it okay to take them

4    on the job or something.  I just -- I can remember.

5    Q    And that was before you went to see Ms. Sterling at Unity

6    Health?

7    A    No.  No.  No.  Huh-uh.  Huh-uh.

8    Q    Well, what --

9    A    Whatever -- I had never been on no medication until I went

10    and seen her and -- and she described it.

11    Q    Prescribed it?

12    A    Yeah.

13    Q    Okay.  So she prescribed Zoloft and Hydroxyzine?

14    A    Yes.

15    Q    Okay.  And that was the first time you took those drugs?

16    A    Yes.

17    Q    Okay.  And you asked HR if you could perform your job

18    while you were taking those drugs?

19    A    Yes.  I -- I think it's something like that.

20    Q    And you asked that of Ms. Ellis, I take it?

21    A    I don't remember.  I know -- I think I asked.  I don't --

22    I don't remember, but I know I did.

23    Q    What was the response -- that you could -- you could do

24    your job?

25    A    Yes.

Veritext Legal Solutions
800-336-4000

```
 1    Q    Okay.

 2    A    I could.

 3    Q    Now, at some point, I think prior to you going out on

 4    leave of absence, you also had a meeting with Ms. Elmore?

 5    A    Ms. Elmore.

 6    Q    Darnitha?

 7    A    Yes.

 8    Q    Okay.  Darnitha's Beth's boss; right?

 9    A    Yes.

10    Q    And she would be at the Lonoke -- I don't think I ever

11    said it -- you work at the Lonoke facility?

12    A    Yes.

13    Q    And so Ms. Elmore would be present at the Lonoke facility

14    on occasion?

15    A    Yes.

16    Q    And you had a meeting with her?

17    A    Yes.

18    Q    What -- tell me, what do you remember about that meeting?

19    A    Well, we were talking about the racist problem in there.

20    Q    Okay.  Who will -- who else was at the meeting?

21    A    I think Alex Van Pelt.  I think a couple of employees.  I

22    know -- I think Beth was in there.  I think a Sonia Tucker, and

23    a -- I don't know -- Sherry's last name.

24    Q    Sonia Tucker?

25    A    Yeah.  I know --
```

Page 71

```
 1    Q    Who is she?

 2    A    She worked on the floor out there on the second floor.

 3    Q    Okay.  And Sherry?

 4    A    I don't know her last name.

 5    Q    Okay.  And I think we established it, but you'd agree with

 6    me that some -- at some point in April, Alex Van Pelt became

 7    your supervisor and Ryan Jenkins was moved to a different area?

 8    A    Yes.

 9    Q    Okay.  So was the meeting with Ms. Elmore that we were

10    talking about, that was before you went out on a leave of

11    absence; correct?

12    A    Yes.

13    Q    Okay.  And what was it -- tell me, what was -- was that in

14    her office?

15    A    I think it was in one of -- like a team room -- one where

16    everybody have meetings at.

17    Q    Okay.  So like in a conference room like this?

18    A    Yes.

19    Q    Okay.  What was the -- what was the issue raised at that

20    meeting?

21    A    It was about all of the racist act that we were

22    complaining about.

23    Q    So who spoke at the meeting?  Did you?

24    A    I did.  I think Sherry did.  And I think all -- Sonia did,

25    and we was -- we was addressing racial issues.
```

Page 72

1   Q    Okay.  And Ms. Elmore is African American; correct?

2   A    Yes.

3   Q    What racial issues were you addressing at the meeting?

4   A    They performed one on Ryan Jenkins -- the -- the super --

5   my supervisor.  Alex Van Pelt had been -- I guess he went to

6   another job and got hired somewhere else, and was gone for a

7   year or several years, and came back and was placed as senior

8   supervisor over Ryan Jenkins, which, when -- when you leave

9   there, you lose your seniority.  So it was a big issue.  That

10  came up.  My bathroom incident, all of that came up in that

11  meeting.  We all addressed that.

12  Q    Okay.  So, yeah, I just want a list of the -- of the

13  issues that came up.

14       You said that the fact that Alex Van Pelt was placed over

15  Ryan Jenkins was an issue that came up?

16  A    Yes.

17  Q    And your -- the bathroom incident came up?

18  A    Yes.  And –

19  Q    And what else?

20  A    -- and a lot of issues that whites were getting placed

21  over the blacks over friendship and buddy-type situations.

22  That's basically what the meeting was all about.

23  Q    Who did you have in mind, if you did?  Is that something

24  that you raised?

25  A    No.  It was the whole -- it was just like a -- a several

Page 73

1    of us.

2    Q    Okay.

3    A    I wasn't the only -- I was motivated to do something about

4    this --

5    Q    Right.

6    A    -- whole situation, and that's why I had back up with

7    people.

8    Q    How long was the meeting with Ms. Elmore?

9    A    Long.

10   Q    What?

11   A    Long.

12   Q    Like more than an hour?

13   A    Probably, so.

14   Q    Half a day?

15   A    Not a half a day.

16   Q    Okay.

17   A    Just like an hour and a half or two.

18   Q    Okay.

19        Anything else other than Alex Van Pelt being placed over

20   Mr. Jenkins, the bathroom incident, and whites getting placed

21   over black that came up at this meeting, in terms of racist

22   acts?

23   A    Just the one on me by not being able to get my seniority

24   and being able to be treated right by my seniority taking jobs

25   and getting a job title.

1    Q     What do you mean by that?

2    A     For instance, I was working there, and the guy that went

3    out on leave, he got, I guess, he got hurt, and he went on

4    retire.  And that's the cup dumping job.  He was titled the

5    job.  It's an individual job, which I was asked to perform.

6    That was my next position.  That was my career.  I was

7    thinking, well, when he retire, I wanted that job.  I wanted

8    that title job, because I was in for it in my seniority.  And I

9    was refused that job to keep the floor coordinating job and

10   made done his job and plus two other jobs.

11   Q     Who was that that retired?

12   A     Kenneth Campbell.

13   Q     Who?

14   A     Kenneth Campbell.

15   Q     Kenneth Campbell.  When did that happen?

16   A     Like probably about six or seven, maybe, eight years ago.

17   Q     Did somebody else get his position?

18   A     I'm doing it, but I can't -- I'm doing it, but I don't --

19   I don't get the -- that's the job that they say they terminate.

20   Q     Okay.

21   A     Yeah.

22   Q     But you're doing the work?

23   A     The main job that you got, you cannot run that building

24   without that job done.

25   Q     Without the cup dumping job?

Page 75

1    A    Yes.

2    Q    Okay.

3    A    But they told me that they terminated the job, but I

4    turned paperwork in for doing the job every day.

5    Q    I see.  Okay.

6         So that came up in the meeting with Ms. Elmore?

7    A    Yes.

8    Q    Okay.

9    A    Yes.

10    Q    Was there some type of petition presented at the meeting?

11    A    I know other people were doing other stuff about

12    the -- the problem that was going in, but I don't know what.

13    Q    Did -- was there any -- so no documents were provided to

14    Ms. Elmore summarizing these complaints or anything like that?

15    A    I -- I know Ryan had a lot of support because they fixed

16    that immediately when we got to complaining about it -- about

17    him -- about the position and the situation that was going on.

18    They gave him back his position and moved Alex away.  And

19    then –

20    Q    But that didn't happen until December?

21    A    All of this stuff.  Yeah.  To all -- yeah.

22    Q    Okay.  Was Mr. Jenkins at the meeting as well or no?

23    A    I don't think so.

24    Q    Okay.  Okay.

25         So I take it during the time when you were on leave of

Page 76

```
1   absence from May through September, you didn't -- did you have
2   any contact with anyone at the company?
3   A    I think I -- I stayed -- I think I stayed in touch with --
4   yeah, I stayed in touch with Beth and -- and --
5   Q    Beth Ellis?
6   A    Yes, sir.
7   Q    Okay.  Anyone else?
8   A    If I ran into them, but I would -
9   Q    Yeah.  Did you -- did you give Beth Ellis a heads up as to
10  when you would be returning from leave of absence --
11  A    Yes.
12  Q    -- in September?
13  A    Yeah.
14  Q    How did you do that?
15  A    Probably, by phone or --
16  Q    And had -- did you just make an assessment that you were
17  ready to return to work?
18  A    Yes.
19  Q    Did your doctors release you?
20  A    Yes.  And I also got a phone call that they gave me back
21  my day job.  That's -- took stress back off of me.
22  Q    Who made that -- who called you about that?
23  A    Ernest Terry.
24  Q    And this is while you were on leave?
25  A    No.  I wasn't on leave.  I was on leave, because I was --
```

Page 77

1    Q    No.  No.  No.  This is while you were on leave?

2    A    Yeah.  Yeah.  Yeah.  Yeah.

3    Q    He called you and said what?

4    A    That they put me back on days.

5    Q    Okay.  Did that -- did that impact your return to work?

6    A    No.  Not at the time.  I was still trying to make a -- a -

7    - a decision on -- on what I was going to do.

8    Q    Okay.  About returning to work?

9    A    Yes.

10   Q    When was the -- when did Mr. --

11   A    Well, I was just trying to get my head together on what I

12   needed to do.

13   Q    When did Mr. Terry contact you?

14   A    Probably, after I seen that schedule and the day -- day

15   after.

16   Q    So back in -- at the beginning of your leave of absence?

17   A    Yeah.

18   Q    Okay.

19   A    Somewhere in there.

20   Q    Okay.  But it's not like he told you, okay, you're getting

21   returned today, and then you said, okay.  I'll show up the next

22   week.  You still had to take some time off; correct?

23   A    Yes, sir.

24   Q    Okay.  Did he say anything else about why they were

25   putting you back on days or any other commentary or statements

Page 78

```
1    regarding that decision?

2    A    No.

3    Q    Okay.  Let's take a five-minute break if that's okay with

4    you.

5    A    Yes.

6              COURT REPORTER:  We're off the record at 10:40.

7              (WHEREUPON, after a break, the proceedings

8         resumed as follows.)

9              COURT REPORTER:  We are back on the record at

10        10:46.

11   MR. McKEEBY CONTINUING:

12   Q    Okay.  Back on the record after a short break.

13        Mr. McKinney, so I think we established that you returned

14   to work on August 2nd of 2024, from your leave of absence;

15   correct, around that time?

16   A    Yeah.  It was around that time.

17   Q    All right.

18        I know that's tough to get on -- give a specific -- a

19   specific date, but let me -- and then you went on another leave

20   of absence on -- in mid September?

21   A    Yes.

22   Q    Okay.  So I'd like to talk about that period of time

23   between early August when you returned and September when you

24   went back and got on leave; okay?

25   A    Yes.
```

Page 79

```
 1   Q    Now, during that time, did you report to Mr. Van Pelt?

 2   A    I think so.

 3   Q    Okay.  And you worked day shift during that time?

 4   A    Uh-huh.

 5   Q    Is that a yes?

 6   A    Yes.

 7   Q    And it was also during that time when they changed the

 8   schedule from five days to four days; correct?

 9   A    Yes.

10   Q    And that was a plant-wide change; right?

11   A    No.  It happened -- it happened in the center fire --

12   center fire.  That's one --

13   Q    Okay.  In the center fire group?

14   A    Yeah.  Yeah.

15   Q    And the center fire group includes -- hold on a second --

16   it includes the shells which you were in?

17   A    Yeah.

18   Q    It, also, includes bullets?

19   A    Yeah.

20   Q    Packaging?

21   A    Yeah.

22   Q    Loading?

23   A    Yes.

24   Q    Okay.

25        So all the employees who worked in the center fire group
```

Page 80

```
1   and those subgroups went from working a five-day a week

2   schedule to a four-day a week schedule working 10 hours per

3   day?

4   A    Yes.

5   Q    Okay.  Do you remember how you were told about that

6   change?

7   A    Yes.  I think they had a meeting and called us in there

8   and let us know.

9   Q    Okay.  I don't think I asked this question, but if I did,

10  I apologize.

11       During that period of time in between your leaves of

12  absences in August and September, did you work overtime?

13  A    No.  I -- every -- no, I didn't work no overtime.

14  Q    Okay.

15  A    I did when I came back, when they changed in December.

16  Q    Okay.  But now I'm just talking about that one period of

17  time between the leave of absences.  And so, you know,

18  approximately early August through September, mid-September,

19  did you work overtime during that time period?  You don't think

20  so?

21  A    No.  Huh-uh.  Huh-uh.  I was at -- no, I didn't do it.

22  Q    Did you have any discussions with any of your supervisors

23  about working overtime?

24  A    It was already did, and I -- and it was already discussed,

25  and I know that they would -- I wasn't going to get what I was
```

Page 81

```
1   been doing.  I just wanted -- I just wanted to work like I had
2   been.
3   Q    So did you have any discussions with -- about working any
4   overtime hours during that -- just during that period or no?
5   A    I don't --
6   Q    Because you --
7   A    -- I left it alone when they told me -
8   Q    Okay.
9   A    Yeah.  I think when they told me that they were going to
10  hire somebody else, and they said that, I just left it alone.
11  Q    And that's when you went -- the discussion about them
12  hiring somebody else was what Ms. Ellis told you back in the
13  Spring; right?
14  A    Yeah.
15  Q    Did they actually hire somebody else?
16  A    No.
17  Q    Okay.  Hold on.  Okay.
18       Then, in mid-September, you went on another leave of
19  absence.
20  A    I think so.
21  Q    Why was that?
22  A    My therapist was talking to me all along before I even
23  came and we discussed events.
24  Q    Okay.  Did something happen that made you go out on
25  another leave, or did you start feeling depressed again, or
```

Page 82

1    what?

2    A    Yeah.  Something -- I -- I had an emergency.  And I had to

3    go to the hospital emergency, and I had a doctor's note saying

4    that -- that -- that I needed to be off.

5    Q    Okay.  What was it -- was it -- is it a medical emergency?

6    A    Yeah.

7    Q    What -- something -- what happened?

8    A    I just woke up, and I -- I -- I had a pain.  I think it

9    was -- it was like a pychotic (sic) pain.

10   Q    A pain where?  Sciatic?

11   A    Yeah.  Yeah.  Sciatic.  Yeah.  Yeah.

12   Q    In your back?

13   A    No.  Yeah.  It was going down -- it was -- and then I went

14   to the hospital, and I brought a -- a note from the doctor

15   and –

16   Q    From the doctor at the hospital?

17   A    Yeah.

18   Q    So this is something different than Ms. Sterling?

19   A    It -- yeah.  Yeah.

20   Q    It was an actual physical injury?

21   A    Yeah.

22   Q    Okay.

23   A    It wasn't -- no, it wasn't an injury.  It was just -- it

24   just happened.  Like sometime you can wake up and -- and you

25   would be -- you be hurting.  It was one of them, and I went to

Page 83

1    the hospital.

2    Q    Okay.

3    A    And I brought the note.

4    Q    Who'd you bring -- give the note to?

5    A    They didn't -- they didn't want to see it.  I took it to

6    HR, and they told me that I had to send it to Matrix.

7    Q    Okay.

8    A    And they told me that I was going to get docked some

9    points for it, and they just kind of triggered off that -- why

10   I'm getting treated wrong.  And I'm physically disabled right

11   now.

12   Q    Who'd you have that conversation with, Ms. Ellis or

13   someone else?

14   A    I don't remember.  I can't recall, but I went to HR.  And

15   they told me I needed to talk with Matrix.  So I left that

16   situation alone.

17   Q    So you completed the paperwork again through Matrix?

18   A    Yeah.

19   Q    And got approved for another leave of absence?

20   A    Yes.

21   Q    And this was as a result of the sciatic injury?

22   A    No.  It was just -- it was the way I was treated, and

23   it -- it was a build up, because I was -- after -- after that,

24   I was -- I was being watched and I was being harassed.

25   Q    Okay.  So the way -- you said the way you were treated.

Page 84

```
 1    You said that's -- you were treated by being watched and being
 2    harassed, and that's what caused you to go out on a leave?
 3    A    No.  It was just the way that I was -- my mind wasn't
 4    right then.  And --
 5    Q    Okay.
 6    A    -- yeah.  I wasn't -- I wasn't -- my mind was like, well,
 7    why I'm getting done like this?  It's something ain't -- in the
 8    back of your head or saying, you know -- and everybody, you
 9    know, at the place was knowing that I wasn't being --
10    Q    Well, what was happening to you that you weren't being
11    done right during this period of time before -- and are we
12    talking about between --
13    A    It was --
14    Q    -- August and September, while --
15    A    -- it was --
16    Q    -- you were back at work?
17    A    -- it was before.  When I went -- yeah, when I came back.
18    Q    What happened that you weren't being done right during
19    that period of time?
20    A    It was like -- like I said, I had -- they had people like
21    watching and seeing if I was going on break on time and stuff
22    like that.
23    Q    Okay.  And that's the first time you've told me this.
24    Going -- okay -- so the way you weren't being treated right
25    during that period in between your leaves of absence, when you
```

Page 85

```
1    were working, i.e. August and early September, you weren't
2    being treated right, because they were monitoring your breaks?
3    A    And --
4    Q    What else?
5    A    -- they -- when I got back, my record was perfect with
6    attendance and my evaluations.  I was the only one that had a
7    perfect score.  And all that diminished when I came back.  I
8    was already on the urge of being called in office for
9    attendance, and somebody went in my file and put extra points
10   on my file -- on -- on -- add them to me.
11   Q    Okay.
12   A    Getting me in trouble, where I can be when I never had a
13   attendance problem.
14   Q    Okay.  So I'm going to talk about each one of these, but
15   what else was done that was, you know, not right, during that
16   approximately six-week period?  You were monitored when you
17   were going on breaks, and your attendance records were changed
18   such that extra points were added.
19   A    Yeah.
20   Q    Okay.  What -
21   A    Points was added.  I've never had none.
22   Q    Okay.  What else?
23   A    I just couldn't get back where I wanted to be with him
24   being over there.  I couldn't do none of the -- I -- my
25   seniority was tooken where I couldn't use it and get treated
```

Page 86

```
1    right where I -- and as long as he was over that department --
2    Q    You're talking about Mr. Snider?
3    A    Yeah.  As long as he was in that department, I never did
4    get treated fairly.
5    Q    All right.  But I want to know how you weren't treated
6    fairly, and you've told me a couple things.
7    A    Yeah.
8    Q    You've told me you weren't treated fairly because you were
9    monitored while you were going on breaks.  People watched you
10   when you were going on breaks.
11   A    Yes.
12   Q    And you also told me that your attendance records were
13   changed so that extra points were added.
14   A    Yes.
15   Q    What else was done to treat you unfairly?
16   A    I was trying to get my cup dumping job legitimate.  I
17   didn't get that.  I tried to leave the department, and I
18   applied for another job.
19   Q    And you're referring to your notes?
20   A    Yeah.  I don't -- I don't know if you got that one, but I
21   applied for another job.  And I -- my seniority was - was --
22   was there for me to get it.  And when -- when it was time for
23   me to get that job, I -- I -- they told me that I had to wait
24   two weeks or I can take this other job and take a test.  But
25   when it came for me to take the test for the job, the guy got
```

Page 87

```
 1    sick, so I was trying to get out of that department.  And I --
 2    and I was -- and I was, but -- but they wouldn't let me go.
 3    Q    What was the job that you were applying for?
 4    A    I got it in here.  I just looked at it a minute ago.  Let
 5    me find it.
 6    Q    Are these -- you're looking for notes?
 7    A    Yeah.  I don't -- I don't know if you got that, but I got
 8    it.
 9    Q    I think I do, but I don't -- I'm not sure what exactly
10    you're referring to.  You don't remember what job it was though
11    without looking at your notes?
12    A    No.  Huh-uh.  I was just trying to -- I was just trying to
13    get -- yeah -- it's --
14    Q    What did they -- what did they --
15    A    -- I applied for a --
16    Q    What is that you're looking for?
17    A    -- shell making technician.
18    Q    A shell making technician.  What are you looking for?
19    A    And these are some notes that I wrote to the EEOC.  I
20    don't think -- you might not have this one.
21    Q    I believe I do have this.
22    A    See, these jobs I was eligible to get.
23    Q    Okay.  Let me –
24    A    And I --
25    Q    -- let me look at this, because I haven't -- I don't think
```

Page 88

1   I've seen this.  So this is back in May, though; right?

2   A    Yes.

3   Q    Okay.  So we'll get your lawyer to make a copy of this,

4   and we'll introduce it as an exhibit in a minute.  But let me

5   ask you, so in May -- prior to May -- and this is while you're

6   on leave of absence; right?

7   A    Yes.

8   Q    Okay.  So you had previously applied for a shell making

9   position?

10  A    Yes.

11  Q    A shell making technician job?

12  A    Yeah.

13  Q    Okay.  And an AIM operator job?

14  A    Yes.

15  Q    Those are separate jobs?

16  A    Yes.

17  Q    Okay.  When had you applied for those jobs?

18  A    It was prior -- it had to be prior to these dates.

19  Q    Okay.  And those were separate job requisitions that you

20  completed?

21  A    Yes.  And I was -- I was the only one eligible on my

22  seniority to get these jobs and wasn't -- I wasn't able to get

23  neither one.

24  Q    Were these jobs posted --

25  A    Yes.

Page 89

```
1    Q    -- as available?

2    A    Yeah.

3    Q    And what did you do to apply?

4    A    Went online.

5    Q    And did what?

6    A    Apply for them.

7    Q    Okay.  Was that like in 2023 or when was that?

8    A    It was in '24.

9    Q    Okay.  Well, 2024 is when you were -- when you were --

10   when you got -- had the call with Remington HR.  When -- and it

11   says, about a job I applied for, shell making technician and

12   AIM operator.

13        Did you apply for the jobs in 2024, you think?

14   A    Yeah.

15   Q    Okay.

16   A    I -- I -- I'm -- I'm not sure.

17   Q    Okay.

18   A    I know I applied for it though.

19   Q    All right.

20        Well, let me just ask you.  Who did you in Remington HR

21   did you talk to?

22   A    Beth and Brandis.

23   Q    And who?

24   A    Brandis.  And her name might be Brandis.

25   Q    Okay.  I don't know her.  Beth Ellis, though?
```

Page 90

```
1   A    Yes, sir.
2   Q    Okay.  And they said -- you said that they were told you
3   had to wait 30 days before you could move into the new job?
4   A    Yes.
5   Q    Okay.
6   A    And I -- I think I -- I know I followed up, and for some
7   reason I knew that they didn't want -- that they -- they always
8   -- I was always told that I'm where I need to be.
9   Q    You didn't interview for those jobs?
10  A    I didn't -- I didn't have to.
11  Q    You were automatically entitled to them?
12  A    Yeah.  Just like the cup dumping job.  I was automatic
13  entitled to them.  If your apply for them, and your seniority
14  is there -
15  Q    So what did -- what did HR tell you during this call, that
16  you had to wait 30 days?
17  A    Yeah.
18  Q    Before what?
19  A    Before I can move to it.
20  Q    But they said that within 30 days you could move to one of
21  those positions?
22  A    Yeah.  And I went back -- when I went back, I think Beth
23  said, well, under the circumstances, we would -- we would have
24  put you there, but the jobs were gone.
25  Q    By the time you got back?
```

Page 91

1    A    Yeah.

2    Q    From leave of absence?

3    A    I don't -- I don't remember.  Just -- I was just

4    remembered that when I asked back and followed up on getting

5    a -

6    Q    When did you follow up, in August?

7    A    I just remember days after -- after this.  I don't -- I

8    don't remember the days, but I kept following up and kept on

9    trying to get away and get to other jobs and everything.

10   Q    Right.  But you were on leave of absence at this point

11   on -- in late May?

12   A    Yeah.

13   Q    All right.

14   A    I -- I guess.  I don't -- I'm not sure on that though.  I

15   don't know.

16   Q    Okay.  So again, I want to go back to the -- the time

17   period between September and August of 2024, when you returned

18   from your first leave of absence.  You said that you weren't

19   done right during that period of time.

20        So let me ask questions about some of the things that

21   you've told me.  You said you felt like you were being

22   monitored while you were going out on your breaks.

23   A    Yeah.

24   Q    Who monitored you?

25   A    It just -- it seemed like this guy named Burt Weaver.

Page 92

```
1    Q     Burt Weaver?

2    A     Yeah.  And -- and I asked --

3    Q     Who was he?

4    A     He's -- I guess he's a team lead, too.  And I -- I

5    remember asking why was he on the shift and not doing nothing?

6    Q     Who did you ask that?

7    A     The team leads, Ernest Terry.  And didn't nobody know why

8    he was there.  He just walked around on the phone, and -- and

9    that -- that was it.  Watching.

10   Q     Okay.  Who -- and did you ever talk to Mr. Weaver about

11   it?

12   A     No.  Because I think it might have been a conflict.

13   Q     What do you mean?

14   A     I -- I just kind of -- I know I talked to HR about it, but

15   I -- I -- I -- I wouldn't approach him.

16   Q     Who did you talk to at HR?

17   A     I -- I think I talked to Johnny Center and all of them.

18   You know, if I seen him on the floor, I would always try to

19   have a sidebar with them and talk about the things that were

20   going on and what could I do about it.

21   Q     All right.  Did you ever -- do you -- did you ever --

22   would you -- were you ever told by Mr. Terry or otherwise why

23   Mr. Weaver was watching your breaks?

24   A     No.

25   Q     Was there anybody else that you believe were watching your
```

Page 93

```
1    break or just Mr. Weaver?

2    A     Just him.

3    Q     Okay.  Did you have -- and you never talked to Mr. Weaver

4    about it?

5    A     No.

6    Q     Okay.  Did you talk to Johnny Snider about it?

7    A     Yes.

8    Q     What did he tell you?

9    A     Well, I just -- I don't think we went too far with it.  I

10   was just advised to just -- almost just work the regular hours

11   and just stay out of, you know, the -- the -- stay out the way

12   of trouble or whatever.

13   Q     Okay.  So how did you find out that your attendance

14   records had been changed?

15   A     I was informed that I needed attendance records and

16   something like that, and I requested.  And I thought it was

17   going to be good, but it was something that I don't know

18   nothing about because I -- I think it was done when I was

19   absent.

20   Q     So what was done?

21   A     The -- my evaluation.

22   Q     Your performance evaluation?

23   A     Yeah.

24   Q     What about your performance evaluation?

25   A     I got a copy of it, and I think I was reporting it
```

Page 94

1  somewhere.  And that's when I noticed that it was the worst it

2  ever been.

3  Q     What was the worst?

4  A     My evaluation.

5  Q     Well, how was it the worst you've ever been?

6  A     I always was perfect on my attention and on my -- my

7  performance.  Like I said, I was one of the only ones that got

8  a perfect performance on one before this incident.

9  Q     Did somebody sit down and give you a performance review,

10 or is this something you just found from your file?

11 A     It -- when I -- that -- that is -- it just popped up in my

12 file without me signing it, without me knowing about it.

13 Q     And the, it, that popped up in your file was in a

14 performance evaluation?

15 A     Yes.

16 Q     And you had never seen that before?

17 A     No.

18 Q     And did it show that your performance was poor and also

19 that you had poor attendance?

20 A     It was just everything was like well, he can just -- he

21 can do the job.  It wasn't no -- I don't think it was no real

22 bad, but it was nothing outstanding.

23 Q     It was average?

24 A     Yeah.  Average.  Yeah.

25 Q     What -- who completed the evaluation?

                                                    Page 95

1   A    It might have been -- I -- I don't know.

2   Q    Okay.

3   A    I don't know.

4   Q    And did you raise this issue with Ms. Ellis?

5   A    No.  At that point in time, I just didn't -- I -- it

6   wouldn't -- it wasn't -- it got where it wasn't -- it was

7   useless to talk to her.

8   Q    Uh-huh.

9   A    To me -- for me.

10  Q    Do you think the evaluation had something to do with you

11  making complaints about Mr. Snider?

12  A    Yes.

13  Q    What makes you think that?

14  A    Everything after that incident went all against me, and I

15  never had a problem with hardly anybody in there, never --

16  never had issues with -- with nothing, never.

17  Q    But everything went against you after that?

18  A    The schedule never been changed.  After that day,

19  everything just changed.

20  Q    Well, I'm talking specifically about this performance

21  evaluation.  What makes you think that the performance

22  evaluation had something to do with you making complaints about

23  Mr. Snider?

24  A    Just to make me look -- look like -- take me out of my

25  character.

Veritext Legal Solutions
800-336-4000

1    Q    Right.  But why do you think that whoever completed that

2    performance evaluation was doing it in response to you making a

3    complaint six months earlier?

4    A    For one thing, I wasn't there, and I think something like

5    -- the last time I know I were there, and this -- this -- this

6    last time.  And then it's people in there that I asked right to

7    this date that -- when did y'all have this performance.  They

8    ain't got none.

9    Q    What do you mean?

10   A    They didn't have -- they didn't get evaluated.

11   Q    What was the date of the performance evaluation?

12   A    I don't know.

13   Q    How did you come upon to find it?

14   A    I was asked to get -- if I can get a copy of it, and

15   that's when I got a copy of it.

16   Q    Who asked you to get a copy of it?

17   A    The attorney.  I think --

18   Q    At that point?

19   A    Yeah.  Well, I know -- I can't ask you, or don't want you

20   to tell me what you talked to your attorney about.  Who -- but

21   you made the -- how did you request the evaluation from the

22   company, I mean, you just asked to see your file or --

23   A    Yeah.  You can ask that, or you can go online to the work

24   app, and you can get it off of there.

25   Q    Is that what you did?

Page 97

```
 1    A    I think I did both of them, because I was trying to get
 2    the old one, and they got that -- that new one.  So I kind of
 3    did –
 4    Q    Did you provide that to your attorney?
 5    A    Yes.  I think I did.
 6    Q    And you don't remember the date on that?
 7    A    No.
 8    Q    Okay.  And what's the -- what's the significance of
 9    points?  That's the -- is that a term in the connection with
10    the attendance policy?
11    A    Yes.
12    Q    Were you ever written up for any attendance issues?
13    A    No.  But I did -- I did ask why -- why did that happen?
14    Q    Why what happened?
15    A    Why I got points on -- why did these points -- where
16    did -- where did they come from?
17    Q    Who did you ask that?
18    A    I think I asked Ryan and I asked Beth.
19    Q    Ryan who?
20    A    Jenkins.
21    Q    Okay.
22    A    And he didn't know because he wasn't -- I don't think he
23    was over me then.  So I asked Beth, and she told me that Rick
24    was in -- in, and he had something to do with it.  And I kind
25    of left it alone after that because he's kind of up high, and I
```

Page 98

1    just didn't want no --

2    Q    Who?  That's Rick Cox?

3    A    Yeah.

4    Q    So what's your testimony about Mr. Cox, that he had

5    something to do with it?

6    A    I asked Beth where did these points come up on my record.

7    Q    Right.

8    Q    And she told me it had something to do with Rick, and I

9    kind of -- I -- I just left it alone at that point.

10   Q    Okay.  And he's the manager over Coy Snider and over Alex

11   Van Pelt?

12   A    Not no more.

13   Q    But he was at the time?

14   A    Yes.

15   Q    Okay.  What happened that he's no longer in that role, did

16   he leave?

17   A    All of them got devote -- they -- they got dropped down

18   out of their positions to -- they moved them all.

19   Q    Okay.

20   A    He -- he -- he no longer over us no more.

21   Q    Do you -- so the attendance points, that was something

22   that you saw on the evaluation as well?

23   A    Yes.

24   Q    Okay.  And they showed days that you supposedly were

25   absent from work or tardy or both or do you know?

                                                    Page 99

```
1    A    I don't -- I don't know.  I don't know exactly.  Probably,

2    one tardy -- I don't -- I don't know.  Probably, something like

3    a whole day or something just popped up, like I missed the

4    whole day, which I never did out of the whole 14 years.

5    Q    Okay.

6    A    I never had a problem with being on work.  I always worked

7    overtime.  So I -- I don't know -- that -- I was real

8    disappointed in that evaluation.

9    Q    Okay.  And you talked to that -- about that evaluation

10   with Beth Ellis?

11   A    No.  Beth was -- by the time I got that, Beth -- I think

12   Beth was -- I -- I think she might have been gone, but I

13   probably wouldn't have anyway --

14   Q    Okay.

15   A    -- because she wasn't there -- she wasn't help -- she

16   wasn't --

17   Q    Oh, that's what you said by that time, you didn't feel

18   like it was productive?

19   A    Yeah.  Yeah.

20   Q    So you didn't --

21   A    It wasn't.

22   Q    -- talk to anybody about the evaluation?

23   A    I just started asking people, when did they get evaluated

24   to see if it --

25   Q    Other coworkers?
```

Veritext Legal Solutions
800-336-4000

1    A    -- such thing, and it -- and to a lot of it -- it ain't

2    even -

3    Q    But you never talked to your managers about the

4    evaluation?

5    A    No.

6    Q    Is that true?

7    A    Yes.

8    Q    Okay.

9    A    And I didn't sign it, so I don't -- I don't know when --

10   when they did it or what, but whoever did it, they didn't --

11   they didn't call me in there and -- and let me know.  And I

12   wouldn't have never knew if I was not asked to -- to provide

13   it.

14   Q    In the past, who would normally do your evaluations, your

15   immediate supervisor?

16   A    Ryan.  Yes.

17   Q    Okay.  Ryan Van Pelt did that evaluation?

18   A    I don't remember.

19   Q    All right.

20   A    But at the time that I got it, Ryan was back my

21   supervisor, but it was done.  It had to be done.  I don't know

22   when it was done.

23   Q    I see.  But it was -- but it was -- it was done after you

24   came back in December, or you found it after you came back in

25   December?

1    A    I didn't start researching for it until I had to report

2    to, you know, to somebody that else wanted -- wanted it.  And

3    that's when --

4    Q    You mean your lawyers?

5    A    Yes.

6    Q    And that was in December?

7    A    Probably.

8    Q    And right –

9    A    Yeah.  Yeah.  Probably, so.

10   Q    Okay.  Okay.

11   A    Uh-huh.

12   Q    What were the points, the absences that were mentioned in

13   the evaluation, was that -- over what period of time were those

14   recorded?

15   A    On the new one -- on the new one -- the new evaluation?  I

16   don't --

17   Q    No.  No.  The evaluation that caused you -- that upset you

18   that showed that you had some attendance points on there, and

19   you meant -- you've been testifying about that.

20   A    That's -- that's -- that's just was -- you can go on, and

21   you can look at and see how many points you got on a -- on a

22   time clock when you clocked in.

23   Q    So that wasn't part of the evaluation or was it?

24   A    It was on there.  Yeah.  Yeah.

25   Q    It was?

Veritext Legal Solutions
800-336-4000

1    A    Yeah.  It's on -- it's on --

2    Q    Okay.

3    A    -- there.

4    Q    And what -- for -- over what period of time was it -- did

5    it say you had missed days at work or do you remember?

6    A    I don't remember.

7    Q    All right.

8    A    I just know they was just -- they were just up there all

9    -- they just popped up there.

10   Q    Okay.  And then you returned to work on the -- in mid-

11   December of last year; correct?

12   A    Yes.

13   Q    And by that time, Mr. Jenkins was back over in your group?

14   A    Yes.

15   Q    And you started working overtime again under the system

16   that we discussed wherein you guys would just have an informal

17   dialog about --

18   A    Yes.

19   Q    -- needing some additional time?

20   A    And Coy was gone.  He got out of -- he was -- he was no

21   longer in the area.

22   Q    He got moved to bullets; right?

23   A    Yeah.  Yeah.

24   Q    And that happened while you were on your second leave of

25   absence; right?

Veritext Legal Solutions
800-336-4000

1   A    I guess so.

2   Q    Okay.

3   A    And that's when my -- the doctor said when -- when he

4   was -- when he was gone, it would be better for me.  It would

5   probably be all right for him to -- me to go back.

6   Q    Okay.  Did you ever talk to any of the HR employees during

7   the meetings that you had about Mr. Snider supposedly using the

8   word nigger in the workplace, did that come up in any of your

9   meetings?

10  A    Yes.  I -- I -- I -- yeah, I did say that.

11  Q    To who?

12  A    I think I -- some kind of way it came up, and somebody

13  asked me a question like you asked.  Do I think he was

14  prejudiced?  And I -- and I said, yeah, because of what I went

15  through and what he did and what he did to several others.

16  Q    Who asked you that question?

17  A    It might have been -- it might have been Adam or Craig.

18  Q    Okay.  Who's Adam?

19  A    He was a like, I guess, he was like a plant manager, but

20  he no longer there.  Or some kind of upper --

21  Q    And then Craig Thomas is who you meant there?

22  A    Yeah.  I think Craig asked me.  It was one of the two that

23  asked me was -- was he -- it might have been Craig.

24  Q    Did -- do you know someone named Chris Pence?

25  A    Yeah.

Veritext Legal Solutions
800-336-4000

```
1    Q    He's another manager?

2    A    Yeah.

3    Q    Is he African American or white?

4    A    White.

5    Q    Okay.  Did you ever work with him?

6    A    No.  I worked around him.

7    Q    Okay.  He didn't supervise you, though?

8    A    No.

9    Q    Did you have any problems with Mr. Pence?

10   A    No.

11   Q    Did you tell Mr. Pence at some point that if you ever saw

12   Coy Snider outside of the workplace, that there would be a

13   problem or something to that affect?

14   A    No.

15   Q    Did you ever say anything to Mr. Pence that could be

16   regarded as threatening to Mr. Snider?

17   A    No.

18   Q    Did you say anything to anyone that --

19   A    No.

20   Q    -- would be threatening to Mr. Snider?

21   A    No.

22   Q    How are you so sure about that, just you know?

23   A    I wouldn't do it.  I wouldn't do that.

24   Q    Okay.  Fair enough.

25   A    Huh-uh.  Wow.
```

Page 105

1  Q    Do you have an understanding if -- about whether or not

2  the attendance issues raised in your performance evaluation,

3  are they still like, I mean, are they -- are you still under

4  that -- those violations or do they have any impact on you?

5  A    Yeah.

6  Q    What is that impact?

7  A    Just in fear that if -- if something happened seriously,

8  and I need them to help me, that they gonna let me down.

9  Q    Okay.  But in terms of like the policies, though, you're

10  not like subject to termination if you're absent another day or

11  anything like that?

12  A    I don't think so.

13  Q    Okay.  Okay.  I was just wanting to ask about that.  Okay.

14       Are you still seeing the -- Ms. Sterling?

15  A    No.  It's another doctor that -- they replaced her.

16  Q    Is that -- is it a man or a woman?

17  A    Woman.

18  Q    Do you know her name?

19  A    No.  Not -- no -- she was a -- she knew what I'm not -- I

20  seen her about two or three times, I think.

21  Q    When was the last time you saw her?

22  A    It might have been the last month.

23  Q    Are you still taking Zoloft?

24  A    No.

25  Q    Are you still taking Hydroxyzine?

Page 106

1    A    No.

2    Q    When did you stop taking those drugs, at different times?

3    A    Right before when I came back.

4    Q    In December?

5    A    December.  Yeah.

6    Q    Is that -- the decision to stop taking those drugs, was

7    that something that you made or did the doctors take you off of

8    those drugs?

9    A    The -- well, once everything cleared up in that department

10   and stuff like that, we were going by -- me going in there,

11   back around the same environment and the people.  That's how we

12   was working it.  I was just saying I was scared that we was

13   gonna have an altercation, and she was trying to keep me away

14   from him.

15   Q    Who is she, your doctor?

16   A    Yeah.

17   Q    Trying to keep you away from who?

18   A    Coy.  Trying to keep us from -- she didn't want me

19   interacting with him.

20   Q    Right.  But she didn't talk to the people at Remington

21   about that; did she, as far as you know?

22   A    I'm not sure.  That's my -- she -- she -- I'm not sure.  I

23   don't know.

24   Q    Okay.  But my question is, in terms of you not taking

25   those drugs anymore, was that a decision that you made or is

```
1    that the doctor -- was that the doctor's recommendation?

2    A    I -- I ran out, and I didn't go -- I think I just

3    didn't -- I didn't get no more.

4    Q    Okay.  You didn't get the prescription refilled?

5    A    No.

6    Q    They were both prescription drugs; right?

7    A    Yeah.

8    Q    Okay.  When was the last time you saw this new doctor, you

9    said through --

10   A    Last month.

11   Q    Last month.

12   A    Uh-huh.

13   Q    Okay.  Do you have like an ongoing appointment that you

14   have with them?

15   A    Well, anytime I have something that's like going on --

16   Q    Right.

17   A    -- for advice, I'll go see her.

18   Q    Okay.  Okay.  And how are they paid, by Remington's

19   insurance policy, as far as you know?

20   A    It's -- it's through my wife insurance.

21   Q    Okay.  So you're not out of pocket?

22   A    No.

23   Q    Was --

24   A    Just -- just on, you know, like days on something like

25   a -
```

Page 108

```
1    Q    Copay?

2    A    -- visit.  Yeah.  And stuff like that.  And for the drugs,

3    yeah.  I have to pay the cost and stuff like that for all

4    that –

5    Q    A portion?

6    A    -- prescription and stuff like that.

7    Q    Okay.  And you're under your wife's medical plan?

8    A    Yes.

9    Q    Where does she work?

10   A    Lomanco.

11   Q    What's that?

12   A    The place that make the whirly birds that go on top of the

13   house.

14   Q    Oh, yeah.  In Jacksonville?

15   A    Yes, sir.

16   Q    Is that where you live?

17   A    Yes.

18   Q    And do you live with your wife, I take it?

19   A    Yeah.

20   Q    What's your -- what's your -- how long have you lived at

21   that location?

22   A    Probably, about 14 years.

23   Q    Fourteen years.  Is it just you and your wife who live

24   there?

25   A    Yes.  The kids are already out.  They gone.
```

Veritext Legal Solutions
800-336-4000

1    Q    What's the address of the place?

2    A    1116 Stone Street, Jacksonville, Arkansas.

3    Q    I'm going to mark this as Exhibit Number 4.  These are

4    some of your notes, I think.  I marked this is Exhibit 4.

5                    (WHEREUPON, Deposition Exhibit Number 4,

6                    Handwritten Notes Overtime Witness, were

7                    introduced and are attached hereto.)

8    MR. McKEEBY CONTINUING:

9    Q    Those are your handwritten notes; correct?

10    A    Yes.

11    Q    And these refer to overtime, to the term overtime witness?

12    A    Yes.  Some of them are.

13    Q    Some of them are.  Okay.  What does that mean?

14    A    Okay.  That -- that mean like Michael Hawkins -

15    Q    Uh-huh.

16    A    -- that one picture that I --

17    Q    We showed previously?

18    A    Yeah.

19    Q    Exhibit 1, I think it was.

20    A    Yeah.  Yeah.

21    Q    Yeah.

22    A    And then like, you know, me and him, we -- we -- we kind

23    of close friend, and he was like -- he -- he -- he told me that

24    he didn't really, he didn't have to sign that paper.  Once I

25    was on, he didn't have to sign that paper.

Veritext Legal Solutions
800-336-4000

1    Q    Okay.  And these are their phone numbers, I take it?

2    A    Yes.

3    Q    Okay.  Is Mr. Hawkins still employed?

4    A    Yes.

5    Q    Okay.  What about Tony Jackson, what does he know about

6    overtime?

7    A    He just -- he know that -- he feel like I feel, like they

8    did -- just stop my overtime to get back at me.

9    Q    Why does he feel that way?

10   A    Because it's like everybody in there know it, and it

11   happened.  And it is something that you just can't, you know,

12   you would know that.  If -- if you were working there and you

13   was in that department, it's real clear what they done to -- to

14   me, and that's why he -- he feel like that.

15   Q    Okay.  Is he still employed?

16   A    Yes.

17   Q    What's his job?

18   A    He -- he my backup.

19   Q    Oh, that's right.  You mentioned him a while ago.

20        What does it mean to say that he's an overtime witness,

21   what does he know about your overtime?

22   A    He know that they -- after the -- the event happened, they

23   cut my overtime.  And he said, as -- that's messed up that they

24   messing with your hours.  And this and that, you know, their

25   kind of situation or conversation.

1    Q    When you first called Ms. Ellis on the 29th of March, did

2    you mention to her that you believe that Mr. Snider's actions

3    had something to do with your race?

4    A    Yeah.

5    Q    You said that from the beginning?

6    A    Yeah.  I know it did.  Yeah.

7    Q    Okay.  And who's Pat Holder?

8    A    He's -- he's like a friend, and know about the --

9    everything that's going on.  Somebody that be up there and just

10   kind of -

11   Q    Does he work at Remington?

12   A    Yeah.

13   Q    All right.  What is it that he knows?

14   A    He know about those times that they -- they -- they cut my

15   overtime out.

16   Q    What's his job?

17   A    I think he worked on taper line downstairs.

18   Q    I mean, how does he know that they cut you overtime,

19   because you told him?

20   A    Really everything that's -- everybody know everything.

21   It's like everybody -- you know, he say and state and come up

22   to you and ask you what's going on.  And you just know what's

23   going on because we in the same department and we interact with

24   work and everything.

25   Q    Well, what about Larry Hightower, who was that?

Page 112

1    A    He worked in a bullet area under Chris Pence.

2    Q    Under Chris Pence?

3    A    Yeah.

4    Q    And what does he know?

5    A    He -- he just -- he knew about the overtime, because he

6    one of the persons that like on break, he worked right across

7    from me.  And he'll talk to me about why you didn't come in,

8    about the overtime because, you know, I've been doing it for

9    years.

10   Q    Okay.  Okay.  And what about Cat Jones, is that a man or

11   woman?

12   A    The same thing.  He's a man.

13   Q    Okay.  The same thing in terms of his knowledge of your

14   overtime --

15   A    Yes.

16   Q    -- issues?  Does he still work with the company?

17   A    Yes.

18   Q    But why did you -- did you create this document for the

19   EEOC, or do you know, that I've marked as Exhibit 4?

20   A    It might have been -- it might have been, or it might have

21   been for the attorney.  I don't -- I just feel like I needed to

22   do it.

23   Q    Okay.  But this is your writing?

24   A    Yes.

25   Q    And Mike Pickens, who is that?

```
1    A    I don't know.  Did you see Byron Shavers?

2    Q    I don't see him listed yet.  He might be on the next page,

3    but --

4    A    Yes.

5    Q    -- I've got Mike Pickens here.  Who is that?

6    A    It's a guy that seen me.

7    Q    Oh, yeah, Brian Shavers is above it.  I forgot Brian.

8    A    Yeah.

9    Q    Let me -- I'll go back to Brian.  Well, let me start with

10   Mike just because I'm talking about him.  Who is he -- Mike

11   Pickens?

12   A    He -- he is a friend that work in an apartment that was in

13   the hallway when me and Coy were coming out of the break room.

14   Q    So he saw -- he observed your conversation with --

15   A    He -- no -- he just seen him when he -- when -- us walking

16   out -- outside of the room when he came and got me out of the

17   break room.

18   Q    So was he in the break room Mr. Pickens?

19   A    No.  He was down the hallway when we came out of the

20   break -- okay, say if that hallway was right down there --

21   Q    Yeah.

22   A    -- he was coming out where we -- he was -- he was walking

23   down the hallway while we was going -- coming out of the -- the

24   break room.

25   Q    Got it.  Is he still employed?
```

1    A    No.  He retired.

2    Q    Okay.

3    A    He just retired.

4    Q    But he -- you're saying he would have witnessed,  maybe

5    not heard, but witnessed your exchange -

6    A    Possibly.

7    Q    -- with Mr. --

8    A    Yeah.  He's -- he kind of seen it.

9    Q    And go back to Mr. Shavers, then, is -- what does he know

10   about your overtime?

11   A    No.  He don't -- he -- he know -- that's not overtime.  He

12   is one of the ones that clean out that -- that office area

13   where he has a -- supposed to have been and people supposed to

14   have been.  And he clean all of that out early in the morning,

15   and he will be a person that can say don't nobody be in there.

16   If she was in there, she didn't supposed to be working, because

17   she on salary.

18   Q    She being Heather?

19   A    Yeah.

20   Q    Heather Jones?

21   A    Yeah.

22   Q    Okay.

23   A    He would be --

24   Q    So you don't -- you don't think -- you don't think

25   there -- do you dispute that a complaint was made?  Do you

Page 115

1    think -- do you disagree with -- you don't think a complaint

2    was ever made, or do you know?

3    A    I think it was -- I think that -- I don't think it was

4    about me doing something in there wrong or being loud, because

5    it if you seen the hallway, and you -- and then the hall -- the

6    talking -- the yelling was Coy, because I had never said

7    nothing.

8    Q    You mean when he came into the bathroom?

9    A    Yeah.  He was the one that was talking loud.  She said

10   we're yelling -- hollering and yelling and I didn't say

11   nothing.

12   Q    Have you ever asked Heather Jones whether or not she made

13   a complaint about you?

14   A    No.

15   Q    You did not?

16   A    She told one of my friends she didn't.

17   Q    That she did not?

18   A    Yeah.  And he -- and he's a black guy, too.

19   Q    Who did -- who was that?

20   A    Tyrone Walker.

21   Q    Okay.  You're -- Tyrone Walker conveyed to you that

22   Heather Jones told her -- him that she had never made a

23   complaint about you in the bathroom?

24   A    Yeah.

25   Q    Okay.  But you haven't talked directly to Heather Jones

Page 116

1  about that?

2  A    No.

3  Q    I take it Mr. Snider on this one occasion, when he told

4  you not to use that restroom, did -- and did he tell you not to

5  use the restroom or that he'd prefer for you to use the

6  restroom closer to your workstation?

7  A    He was aggressive.

8  Q    And what did he say?

9  A    Don't you use that bathroom no more, with body movement

10  and the hands.

11  Q    Okay.  Is that -- is that the only time anyone at the

12  company's told you not to use that restroom?

13  A    Yes.

14  Q    Okay.  Was Kevin Davis -- was he like Mike Pickens, was he

15  in -

16  A    Kevin Davis and Addie, they was in the break room, like we

17  sitting in the break room now --

18  Q    Okay.

19  A    -- all four of us.  There were four of us in there, and he

20  just popped up in the bathroom, and you come here.  And we went

21  out on the floor.  That's when Mike Pickens seen us.

22  Q    Yeah.  So -- and -- but Kevin Davis and Addie, they were

23  in the break room?

24  A    And Chris Watson.

25  Q    And Chris Watson were all in the break room?

1    A    Yeah.

2    Q    And they're all co-employees of yours?

3    A    Yeah.  And they kind of told me that they advised me to go

4    report him.

5    Q    Okay.  So if you look at the next page, this is where it

6    talks about Mitch Wood.  At this point, when you wrote this,

7    apparently you had found out that the company's position was

8    that it was, in fact, Mitch Wood and not Coy Snider that had

9    come to check on you in the bathroom; correct?

10   A    Repeat that.

11   Q    Yeah.  I mean, when you're talking about Mitch Wood –

12   A    Saying that it was him.

13   Q    -- saying that it was him –

14   A    Yeah.  Yeah.  Yeah.

15   Q    Right.  You had found out that the company's position is

16   that --

17   A    No.  No.  No.  I knew it wasn't him.

18   Q    Okay.  But I'm --

19   A    I knew it was Coy.

20   Q    -- hold on.  You're not letting me ask my --

21   A    Okay.

22   Q    -- let me --

23   A    Okay.

24   Q    -- let me ask my questions.

25        You had found out that the company had -- the company's

Page 118

1  position was that it was Mitch Wood that had came in there.

2  A    Yeah.

3  Q    That may be wrong, according to you, I understand.  But

4  that you had an understanding that that's what the company had

5  told the EEOC, in fact; right?

6  A    Yes.

7  Q    You saw --

8  A    Yes.

9  Q    -- our position statement?

10  A    Yeah.

11  Q    Okay.  And you disagree with that?

12  A    Truly.

13  Q    Okay.  And that's because you recognized Mr. Snider's

14  voice?

15  A    Yes, sir.

16  Q    Did Mr. Snider ever tell you that he was the one that was

17  in the bathroom?

18  A    Yeah.

19  Q    He told you?

20  A    He -- he -- no -- he -- he said that he -- he -- he

21  connected himself with it when he said -- he did say that I was

22  not to use -- when he told -- he did say that I didn't use the

23  bathroom.  He came right out there -- when I came out of the

24  bathroom in the break room, he came in there and got me.  And

25  he had to be looking at a camera because he never seen

Page 119

1   anything.  How could he know that it was me?

2   Q    Okay.

3   A    If anybody was in there doing something wrong, and didn't

4   nobody never see me.  So he probably was looking at the camera

5   when I went in there, because --

6   Q    Okay.

7   A    -- I never said a word.

8   Q    Was there a camera at -- in the -- not in the bathroom,

9   but a camera outside --

10  A    In the hallway --

11  Q    -- the bathroom?

12  A    -- yeah.  And outside in the hallway.

13  Q    So you're believing that he looked at that camera?

14  A    Yeah.

15  Q    Okay.

16  A    If you didn't see me, and I didn't say nothing, and you

17  were in that bathroom, and you yelling at me, and I come out

18  and go in the break room, and he's just coming in and tell me

19  to come --

20  Q    Well, what is this second to last sentence mean, Coy

21  admits I never said anything in the bathroom?  At the bottom,

22  second to last entry.

23  A    He said I was -- I was -- I didn't say nothing.  If I -- I

24  was writing that he said that I didn't say nothing.

25  Q    Okay.

Veritext Legal Solutions
800-336-4000

1    A    And my thing, how you know I was in there?  If -- if -- if

2    you didn't see me either, who -- anybody -- just nobody know

3    who it was.

4    Q    Well, maybe, somebody saw you leave the bathroom; isn't

5    that possible?

6    A    No.

7    Q    Why not?

8    A    Because there wasn't nobody in there.  I didn't see

9    nobody.  Didn't nobody see me.  There wasn't nobody -- don't

10   nobody be in there.  If I -- if you did a video of it right

11   tomorrow the day, there wouldn't never be nobody in there, but

12   clean up people.

13   Q    No.  No.  No.  I'm talking about when you come out of the

14   bathroom.

15   A    When I came out, it's nobody -- don't nobody -- there

16   wasn't nobody in there.  Nobody be in there.

17   Q    Nobody was around the bathroom to see you come out?

18   A    Nobody was even on that floor, second floor, in that

19   building in that office.  They don't make it there till

20   8:00 -- or 8:00 or 9:00.

21   Q    Okay.  But you were in the bathroom?

22   A    Yeah.  Yeah.  Like I say, I was in a bathroom.

23   Q    Okay.

24   A    Yeah.  But this at 6:00 in the morning.

25   Q    Right.  I understand.  And so the next -- if you'll turn

Page 121

1    the page -- turn the page to the last page of that document.

2       So the last entry says, I didn't get a chance to work

3    overtime until that's Coy left the shell area.

4    A    Yes, sir.

5    Q    He went back to the bullet area; is that true?

6    A    That's true.

7    Q    That's, I mean, I read that properly?

8    A    That's true.

9    Q    Okay.  And I think we established that Coy went back to

10   the bullet -- well, when did Coy go back to the bullet area?

11   A    I -- it was before I got back, because I was kind of

12   communicating with people to see where he was going.

13   Q    Oh, I see.  So before you got back in December?

14   A    Yeah.

15   Q    Okay.  Was he in the shell area in August/September, when

16   you came back the first time?

17   A    I think so.  Yeah.

18   Q    Did you have any interactions with him during that time?

19   A    No.  Just -- he was doing the attacks by other people --

20   the other employees.

21   Q    Like monitoring you?

22   A    And telling me to mop the floor up, humiliation.

23   Q    Well, let me ask you about that because when did that

24   happen?  That happened before you went out on leave the first

25   time; right?

Page 122

1    A    I think so.  Yeah.

2    Q    Okay.  And was that something that you hadn't previously

3    done mop the floor?

4    A    No.  Never.  They got a whole cleaning crew with cleaning

5    machines.

6    Q    And did he ask you to mop the floor on one occasion?

7    A    No.  He told Yolanda that he did a walk through and the

8    housekeeping was bad.

9    Q    Uh-huh.

10    A    And to tell Lloyd to mop the floor.  And we have a meeting

11    every day, so I addressed her in front of the people at the

12    meeting and asked him why I -- am I the only one that got to

13    mop the floor?

14    Q    You had -- you asked Coy that?

15    A    No.  I asked --

16    Q    Yolanda?

17    A    -- and -- and -- and -- and Alex Van Pelt, too.

18    Q    Okay.  So at some point Yolanda -- because Yolanda told

19    you needed to mop the floor, because --

20    A    Coy -

21    Q    -- Coy had -- let me finish.

22    A    Okay.

23    Q    Because -- so let me get this on the record.

24         So at some point, Yolanda came to you and said, hey, you

25    need to mop the floor, because Coy didn't think the cleaning

Veritext Legal Solutions
800-336-4000

1    crew did a good enough job or something to that effect?

2    A    Well, he did a walk through and he wanted me to mop the

3    floor.

4    Q    Okay.  And that's what Yolanda told you?

5    A    Yeah.

6    Q    And this was before you went out on your first leave of

7    absence; correct?

8    A    I'm not sure.

9    Q    Okay.  Did you actually mop the floor?

10   A    Yeah.

11   Q    Okay.

12   A    Because it would have been -- what's -- if I wouldn't have

13   did it, he -- it would have been insubordination.

14   Q    Okay.  That's the only time that you were asked to mop the

15   floor?

16   A    Yes, sir.

17   Q    Okay.  How long did it take you?

18   A    Probably, about over 30 minutes because if I do something,

19   I try to do it to satisfaction.

20   Q    Satisfaction?

21   A    Yeah.

22   Q    Yeah.  Got it.  Okay.

23        And then you raised the issue of having to mop the floor,

24   you said in the meeting?

25   A    Yes.

                                          Page 124

1    Q    Was this after you mopped the floor or before?

2    A    Before.

3    Q    Okay.  And what -- was this just a shift meeting?

4    A    Yes.

5    Q    Okay.  Who --

6    A    Like the whole team was in there.

7    Q    -- and did that include Mr. Snider?

8    A    No.

9    Q    Okay.  Did it -- it included Yolanda?

10   A    Yeah.

11   Q    And who did you direct your question to?  Yolanda?

12   A    And -- and Alex Van Pelt.

13   Q    Okay.  And your question was, specifically, why do I have

14   to do this?

15   A    Yeah.

16   Q    And what did they tell you?

17   A    They wouldn't talk to me about it.

18   Q    Okay.  When was this?  Did this -- you're not sure if this

19   happened before or after your first leave of absence?

20   A    I think it was before.

21   Q    Okay.  What's your highest level of education?

22   A    I went to -- I -- I -- I graduated and went to UAPB, and I

23   went to Henderson State University on a football scholarship.

24   Q    Did you graduate?  You graduated high school?

25   A    Yeah.  Sylvan Hills.

Page 125

```
1    Q    Did you graduate -- how many -- seven years?

2    A    Sylvan Hills.

3    Q    Sylvan Hills School.  Okay.

4    A    Yeah.  Yeah.  Yeah.

5    Q    Is that local, is that Jacksonville?

6    A    It's Sherwood.

7    Q    Sherwood.  And then you went to foot -- play -

8    A    Henderson State.

9    Q    -- Henderson?

10   A    And I played at UAPB.

11   Q    The University of Arkansas Pine Bluff?

12   A    Yeah.

13   Q    Did you play football there?

14   A    Yeah.

15   Q    Did you graduate there?

16   A    No.

17   Q    When did you go to school?

18   A    I think '87,'88, probably.

19   Q    Okay.  I've marked Exhibit 5 some -- what I think are some

20   additional notes.

21                  (WHEREUPON, Deposition Exhibit Number 5,

22             Handwritten Notes, was introduced and are attached

23             hereto.)

24   MR. McKEEBY CONTINUING:

25   Q    Can you just confirm that for the record for me?  Are
```

Page 126

```
 1    those more of your handwritten notes?

 2    A    Yeah.

 3    Q    Okay.  Do you remember why you prepared these?

 4    A    Just probably to give to the attorneys.

 5    Q    Okay.  I'm just going to read through here and see what

 6    we've talked about and what we -- anything we haven't.

 7          On the -- on the second page, it says, so we went to the

 8    plant manager, Craig T.  That's Craig Thomas?

 9    A    Yeah.

10    Q    And the, we, there is you and Lisa Leberuw?

11    A    Yeah.

12    Q    Okay.  Entry Number 6 says, I had been working 5:00 a.m.

13    to -- well, I had been working 5:00 to 3:15 over the last two

14    years.  Coy Snider stopped me from coming in early on his

15    shift.

16          Do you see that?

17    A    Yeah.

18    Q    How do you know that Coy Snider stopped you from coming in

19    early on your -- on his shift?

20    A    I was warned by Ernest that he was gonna do it.

21    Q    Going to do what?

22    A    I think I got it on one of these notes.  I gotta find it.

23    I came to work on one occasion, and Earnest told me to be

24    careful, because they -- he overheard Yolanda and Coy talking

25    about changing my schedule.
```

Page 127

1    Q    Okay.  What did -- Earnest told you that?

2    A    Yeah.

3    Q    Earnest Terry?

4    A    Yeah.  Earnest Terry.

5    Q    When did he tell you that?

6    A    It was weeks after the incident.  I got it somewhere, too.

7    I wrote it down.

8    Q    Yeah.  It's on -- it's on the next one.

9    A    Okay.

10   Q    Number 7.  Yeah.

11   A    Okay.  Okay.  Okay.

12   Q    Earnest Terry, Team Lead, informed me that --

13   A    Yeah.

14   Q    -- Coy was asking questions about my schedule.  The next

15   week, my schedule changed.

16   A    Yes.

17   Q    I was no longer allowed to do my schedule.  Is that 3:00

18   a.m. or 5:00 --

19   A    Yeah.

20   Q    -- a.m. to 3:15?

21   A    Yes.  That's right.

22   Q    Okay.  Is that what -- that's what Earnest Terry told you?

23   A    Yes.

24   Q    Did she say -- did he say what Coy was asking about?

25   A    He just said they was going to do something to affect me,

Page 128

1    like be careful, because they going to -- they going to --

2    ,they going to try to do something to your schedule.  And you

3    might get pointed up or anything.  He was just giving me heads

4    up.

5    Q    Is Earnest Terry still employed there?

6    A    Yes, sir.

7    Q    And is he African American?

8    A    Yes, sir.

9    Q    And what about Yolanda Solee, is she African American?

10   A    She mixed.

11   Q    Mixed.  Okay.

12        The next page, the first one, Number 9, says Coy and Mitch

13   Wood are being untruthful about who entered the bathroom on me.

14        Do you see that?

15   A    Yes.

16   Q    Have you ever talked to Mitch Wood -- is it Mitch Wood?

17   A    I wouldn't doubt -- yeah -- I would never say nothing to

18   him.

19   Q    Why is that?

20   A    I -- I feel if I say anything to him, sure enough, it

21   would not seem something like that that he did that's not true,

22   I wouldn't -- no.  I just -- that's why I -- I feel some type

23   of way that I want to get -- if I said something to him, I

24   think he would have did just like Chris and said something

25   untrue about me.

Veritext Legal Solutions
800-336-4000

1    Q    Like what?  What did Chris say that was untrue?

2    A    I said that if I seen him --

3    Q    Outside the office?

4    A    Yeah.  Yeah.

5    Q    Well --

6    A    I feel like -

7    Q    What -- when did -- had you heard that before I asked you

8    the -

9    A    No.

10   Q    -- the question today?  Okay.

11   A    I just -- I just heard you say it, and I can't believe he

12   did, because I went fishing with him, but I didn't never say

13   nothing to him about -

14   Q    Well --

15   A    -- something would happen like that.

16   Q    -- went fishing with Chris Pence?

17   A    Yeah.

18   Q    When did you do that?

19   A    Me and him and another guy met after the cup.  We got a

20   little pond out on the side of the yard.

21   Q    Oh.

22   A    It was about a year ago.

23   Q    Okay.  All right.

24        So then on this last page, it talks about the mop --

25   having to mop that one time.

1    A     Uh-huh.

2    Q     And that recounts what we just talked about when you were

3    asked to mop the floor?

4    A     Yes.

5    Q     And it was Yolanda Solee who gave you the direction to mop

6    the floor?

7    A     Yes.

8    Q     Okay.  And she had said that that direction came from Coy

9    Snider?

10   A     Yes.

11   Q     Okay.  When did you -- do you remember the time of day

12   when you mopped the floor?

13   A     Yeah.  Right after -- right after me -- right after about

14   6:30 in the morning --

15   Q     Okay.

16   A     -- when we had the meeting.  I went and mopped the floor.

17   Q     Okay.

18   A     But it was about 30 people in there listening to the

19   conversation that we had about that.

20   Q     Have you seen these documents before?

21   A     Yeah.

22              (WHEREUPON, Deposition Exhibit Number 6, Typed

23         Notes, were introduced and are attached hereto.)

24   MR. McKEEBY CONTINUING:

25   Q     What are they?

                                                  Page 131

1    A    That's what -- that's what I had typed up for them -- the

2    people that was in that break room that asked me to do that --

3    that explained to me that we need to do something about this.

4    And --

5    Q    So you typed these up?

6    A    I'm not -- no.  I don't -- I don't think I typed them up,

7    but I had them -- I wrote it out and had somebody to type it.

8    Q    Who typed it?

9    A    I'm not -- I don't remember.

10   Q    But these are the people that --

11   A    Was in the break room at -

12   Q    All right.  So --

13   A    -- the time.

14   Q    -- Chris Watson, Keith Davis -- Kevin Davis, and --

15   A    Yeah.

16   Q    -- Addie Geans.

17   A    Yeah.  Addie.

18   Q    Addie Geans?

19   A    Addie.  Yeah.  She -- they was in there.

20   Q    G-E-A-N-S.

21   A    Yeah.

22   Q    Okay.  So you provided them these statements and they

23   signed the statements?

24   A    Yeah.

25   Q    Did you -- what did you do with the statements, did you

Page 132

1    give them to your lawyer or give them to the EEOC or do you

2    know?

3    A    Probably, both.

4    Q    Probably, both.  Okay.  It looks like they got -- the EEOC

5    got them based on --

6    A    Yeah.

7    Q    -- this receipt --

8    A    Yeah.

9    Q    -- stamp.

10         I asked if you were taking those medications, Zoloft and

11    what was the other one Hydroxyzine.  Are you taking any other

12    medications?

13    A    No.

14    Q    Do you still have active prescriptions for those

15    medications?

16    A    No.

17    Q    This is an exhibit.

18                    (WHEREUPON, Deposition Exhibit Number 7, EEOC

19          Letter, was introduced and is attached hereto.)

20    MR. McKEEBY CONTINUING:

21    Q    This is the right to sue notice that you got from the

22    EEOC; correct?

23    A    Yeah.

24    Q    Do you remember how you got that, just in the mail?

25    A    Yeah.

1    Q    Okay.  I don't really have any questions about it.  I just

2    wanted to make sure you -- did you see any other doctors in

3    connection with your depression, other than Ms. Sterling and

4    the newer doctor whose name you can't remember?

5    A    Yes.  Yeah.  I'm quite sure I did, but I don't remember

6    their names.

7    Q    Were they with that same facility?

8    A    Yeah.  The same -- yeah.

9    Q    Union City -- Unity Health?

10   A    Yeah.  Yeah.  Right.

11   Q    Okay.  This is Summer Peace, is that one of the doctors?

12   A    Probably, so.  Their name on that, they -- they --

13   Q    Okay.  It could be an intake person, though.  If you don't

14   know, that's all right.

15        Patricia Snow, does that ring a bell as one of the doctors

16   that you saw?

17   A    Yeah.  Yeah.  That's it.  Yeah.

18   Q    And she's with Unity Health, as well?

19   A    Yeah.  Yeah.  That's her.  That's who I seen.

20   Q    Have you seen anyone outside of Unity Health in connection

21   with your depression?

22   A    No.  I -- I -- I don't -- I don't think so.

23   Q    What about Brian Howard, does that sound like another one

24   of the doctors?

25   A    Yeah.  I think so.

Veritext Legal Solutions
800-336-4000

1    Q    In your interrogatories it talked about you having a --

2    you're on CD Baby.  What is that?

3    A    Oh, they -- they -- -- they sell my music.

4    Q    What kind of music is it?

5    A    All kind.

6    Q    And do you actually make the music?

7    A    Yeah.  I'm a producer.

8    Q    Are you a musician or just produce other people's?

9    A    Both.  All of it.

10   Q    Okay.  Do you make money off of it?

11   A    Yeah.

12   Q    That's sort of a side job or a side -

13   A    I've been doing it --

14   Q    -- gig?

15   A    -- since I was a child.

16   Q    Well, do you play an instrument?

17   A    Yeah.  I play keyboard and --

18   Q    Okay.

19   A    -- program drum machines and got the music already up

20   probably right now playing on rotation.

21   Q    Under your name or --

22   A    Yeah.  DJ Lloyd.

23   Q    DJ Lloyd.

24   A    Yeah.

25   Q    So can I find it on Apple Music?

Page 135

1    A    Probably, so.  It's probably on there.  I'm on all

2    platforms.

3    Q    I'm going to -- I'm going to call you on that.  Hold on.

4    This is a first for me.

5    A    You probably could hear it from -- I know you can get it

6    off CD Baby and --

7    Q    What is CD -- right here it is.

8    A    Like a place that will -- huh?

9              COURT REPORTER:  Are you saying CD Baby?

10             THE WITNESS:  Yeah.

11             COURT REPORTER:  Okay.  I wasn't quite sure.

12   MR. McKEEBY CONTINUING:

13   Q    Do you know a song called House of Bollywood?

14   A    Huh-uh.

15   Q    No.  That's a different DJ Lloyd?

16   A    Yeah.

17   Q    What about Funky Feet?

18   A    No.

19   Q    There's a couple on here, maybe, it's somebody else.  Let

20   me take five minutes.  I may be done.

21             COURT REPORTER:  We're off the record at 11:58.

22             (WHEREUPON, after a break, the proceedings

23          resumed as follows.)

24   MR. McKEEBY CONTINUING:

25   Q    (Inaudible) directly to Coy Snider.

                                                    Page 136

1    A    Yeah.

2    Q    Since that meeting?

3    A    Uh-huh.

4    Q    After the bathroom --

5    A    Yeah.

6    Q    -- incident?

7    A    Yeah.

8    Q    You haven't talked to him since then?

9    A    Huh-uh.

10                MR. McKEEBY:  I don't have any further questions

11           for the witness at this point.  You know, I guess I

12           take that back.

13   MR. McKEEBY CONTINUING:

14   Q    Can you -- you know that one document, can you make a copy

15   of that, because I don't think I had that?  Can we go ahead and

16   get that on the record?

17   A    Which one was it?

18   Q    It was a -- it was the handwritten -- the handwritten --

19   this -- I know it was a white page with a blue marking on it.

20                MR. BROCKERT:  Neither of these are it.  It's

21           something you got in there.

22                MR. McKEEBY:  We're going to leave the

23           deposition open so that I can mark this is an

24           exhibit.  Are we on Exhibit 8?

25                COURT REPORTER:  Uh-huh.

Veritext Legal Solutions
800-336-4000

```
 1                    MR. BROCKERT:  It was handwritten.

 2                    MR. McKEEBY:  I think there it is.

 3                    THE WITNESS:  Oh, okay.

 4                    MR. McKEEBY:  Yeah.  Can you just get me a copy

 5          of that, and we'll mark it as Exhibit 8.

 6                    (WHEREUPON, Deposition Exhibit Number 8,

 7          Handwritten Notes, was introduced and are attached

 8          hereto.)

 9                    Now, we can go off the record.

10                    COURT REPORTER:  Okay.  We are off the record at

11          12:06.

12                    (WHEREUPON, the proceedings were concluded in

13          this matter.)

14                              (WITNESS EXCUSED)

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
800-336-4000

139

C E R T I F I C A T E

STATE OF ARKANSAS        )

                         ) ss

COUNTY OF YELL           )


    I, Shawna K. Shepherd, Certified Court Reporter #751, does
hereby certify that the facts stated by me in the caption on
the foregoing proceedings are true; and that the foregoing
proceedings were reported verbatim through the use of the
voice-writing method and thereafter transcribed by me or under
my direct supervision to the best of my ability and
understanding, taken at the time and place set out on the
caption hereto.

    I FURTHER CERTIFY, that I am not a relative or employee of
any attorney or employed by the parties hereto, nor financially
interested or otherwise, in the outcome of this action, and
that I have no contract with the parties, attorneys, or persons
with an interest in the action that affects or has a
substantial tendency to affect impartiality, that requires me
to relinquish control of an original deposition transcript or
copies of the transcript before it is certified and delivered
to the custodial attorney, or that requires me to provide any
service not made available to all parties to the action.

140

WITNESS MY HAND AND SEAL this 4th day of April, 2025.

SHAWNA K. SHEPHERD, CCR

Certified Court Reporter #751

SHAWNA SHEPHERD
ARKANSAS
SUPREME
COURT
No. 751
CERTIFIED COURT
REPORTER

**[1 - able]**

| 1 |
|---|
| **1** 1:19 2:3,4,8 3:5 4:5 57:3,4 59:2 110:19 |
| **10** 24:4,23 81:2 |
| **10:30** 64:6,20 |
| **10:40** 79:6 |
| **10:46** 79:10 |
| **110** 2:13 |
| **1116** 110:2 |
| **11:58** 136:21 |
| **126** 2:15 |
| **12:06** 138:11 |
| **131** 2:17 |
| **133** 2:19 |
| **138** 2:21,23 |
| **13th** 12:2 59:6 61:6,12,19 63:10 |
| **14** 7:7 23:4 100:4 109:22 |
| **140** 2:25 |
| **1500** 1:24 |
| **15th** 12:6 19:6 19:21 |
| **16th** 12:5 |
| **1st** 48:4 |

| 2 |
|---|
| **2** 2:9 3:7 63:14 63:17 67:5 |
| **2023** 41:8 90:7 |
| **2024** 10:24 11:4,24 12:10 |

18:15,16 20:12
20:12 41:6
60:18 68:17
69:10 79:14
90:9,13 92:17
**2025** 1:13 4:4
140:1
**21** 18:4
**21.48.** 18:4
**24** 90:8
**25** 8:5
**2850** 1:23
**28th** 1:13 4:4
**29th** 23:15,17
25:7 26:6,21
27:6,16,24
47:18 49:10
60:22 61:10,19
63:10 112:1
**2nd** 12:2 79:14

| 3 |
|---|
| **3** 2:11 3:9 67:23,24 |
| **30** 91:3,16,20 124:18 131:18 |
| **38** 16:10 |
| **38s** 8:5,14 |
| **3:15** 25:6 62:6 62:7,7 127:13 128:20 |

| 4 |
|---|
| **4** 2:5,13 3:11 110:3,4,5 113:19 |
| **4-23** 57:12 |
| **4-26** 57:12 |
| **45** 18:24 19:23 |
| **4:24** 1:6 |
| **4:30** 14:5,6,18 |
| **4:45** 14:4 |
| **4th** 140:1 |

| 5 |
|---|
| **5** 2:7,15 3:13 126:19,21 |
| **57** 2:8 |
| **5:00** 24:2 25:4 25:5 62:6,7 127:12,13 128:18 |

| 6 |
|---|
| **6** 2:17 3:15 127:12 131:22 |
| **63** 2:9 |
| **67** 2:11 |
| **6:00** 30:14 44:10 121:24 |
| **6:15** 30:14 44:10 |
| **6:30** 30:14,23 44:10 131:14 |
| **6:45** 64:7 |

| 7 |
|---|
| **7** 2:19 3:17 128:10 133:18 |
| **72114** 1:20 4:6 |
| **745** 1:19 4:6 |
| **751** 139:6 140:9 |
| **75201** 1:25 |
| **7:00** 62:7 |

| 8 |
|---|
| **8** 2:21 3:19 137:24 138:5,6 |
| **87** 126:18 |
| **88** 126:18 |
| **880** 1:6 |
| **8:00** 44:9 121:20,20 |
| **8th** 68:17 |

| 9 |
|---|
| **9** 129:12 |
| **9:00** 25:11 44:9 121:20 |
| **9:30** 1:13 4:5 |

| a |
|---|
| **a.m.** 4:5 14:6 14:18 25:5 64:7 127:12 128:18,20 |
| **ability** 139:11 |
| **able** 20:1 36:11 56:13 74:23,24 89:22 |

Page 1

**[above - apparently]**

| | | | |
|---|---|---|---|
| **above** 4:4 | **adam** 104:17 | **aggressive** | **altercations** |
| 114:7 | 104:18 | 31:20,21 33:4 | 33:22 |
| **absence** 11:25 | **add** 86:10 | 33:5,11 39:15 | **american** 40:4 |
| 12:5,12 19:6 | **added** 10:15 | 40:10 42:17 | 40:6 42:20 |
| 19:21,22 65:14 | 86:18,21 87:13 | 43:1,5 117:7 | 52:23 73:1 |
| 67:17 68:8 | **addie** 117:16 | **aggressively** | 105:3 129:7,9 |
| 69:5,9 71:4 | 117:22 132:16 | 42:6,7 | **ammunition** |
| 72:11 77:1,10 | 132:17,18,19 | **ago** 75:16 88:4 | 1:7 |
| 78:16 79:14,20 | **additional** 17:4 | 111:19 130:22 | **amount** 15:19 |
| 82:19 84:19 | 103:19 126:20 | **agree** 8:22 10:9 | **announce** |
| 85:25 89:6 | **address** 110:1 | 15:22 72:5 | 15:18 |
| 92:2,10,18 | **addressed** | **agreeable** 6:5 | **answer** 6:2,12 |
| 103:25 124:7 | 73:11 123:11 | 6:16,17 | 6:20 53:10 |
| 125:19 | **addressing** | **ahead** 15:1 | 60:6,12 |
| **absences** 81:12 | 72:25 73:3 | 32:3 137:15 | **answered** 15:5 |
| 81:17 102:12 | **administrative** | **aim** 89:13 | **answering** 33:9 |
| **absent** 24:17 | 44:3 | 90:12 | **answers** 4:2 |
| 94:19 99:25 | **administrator** | **ain't** 7:13 58:23 | **anticipate** 6:10 |
| 106:10 | 66:8 | 58:23 85:7 | **anybody** 15:8 |
| **accurate** 17:2 | **admits** 120:21 | 97:8 101:1 | 44:16 45:3 |
| 19:1,1 69:4 | **advice** 108:17 | **alex** 11:5,6,13 | 59:16 64:9 |
| **act** 46:20 72:21 | **advised** 33:8 | 11:15 15:14 | 93:25 96:15 |
| **action** 139:16 | 50:12 94:10 | 22:5 23:6 50:7 | 100:22 120:3 |
| 139:18,25 | 118:3 | 52:20 71:21 | 121:2 |
| **actions** 61:17 | **affect** 105:13 | 72:6 73:5,14 | **anymore** 35:25 |
| 112:2 | 128:25 139:19 | 74:19 76:18 | 107:25 |
| **active** 133:14 | **affects** 139:18 | 99:10 123:17 | **anytime** 108:15 |
| **acts** 74:22 | **african** 40:4,6 | 125:12 | **anyway** 100:13 |
| **actual** 83:20 | 42:18 52:23 | **align** 8:9 | **apartment** |
| **actually** 41:13 | 73:1 105:3 | **allowed** 18:23 | 114:12 |
| 45:25 62:5 | 129:7,9 | 19:12 51:13 | **apologize** 81:10 |
| 68:21 82:15 | **afternoon** | 128:17 | **app** 97:24 |
| 124:9 135:6 | 54:22 56:13 | **altercation** | **apparently** |
| | 60:3 | 107:13 | 118:7 |

Page 2

**[appearances - back]**

| | | | |
|---|---|---|---|
| **appearances** 2:4 | **arrangement** 24:12 62:18 | 43:18 | **automatically** 91:11 |
| **apple** 135:25 | **arrival** 25:2 | **attached** 57:5 | **available** 15:7 |
| **applied** 87:18 | **asked** 23:11,11 | 63:18 67:25 | 90:1 139:25 |

**appearances**
2:4
**apple** 135:25
**applied** 87:18
87:21 88:15
89:8,17 90:11
90:18
**apply** 90:3,6,13
91:13
**applying** 88:3
**appointment**
108:13
**approach** 33:7
93:15
**approached**
43:15 45:6,11
**approved**
84:19
**approximately**
19:23 41:3,4
81:18 86:16
**april** 48:4
60:18 61:1
72:6 140:1
**area** 32:21 72:7
103:21 113:1
115:12 122:3,5
122:10,15
**arkansas** 1:1
1:20 4:6 110:2
126:11 139:2
**arm** 45:9
**arms** 5:10,13

**arrangement**
24:12 62:18
**arrival** 25:2
**asked** 23:11,11
29:20 31:8
43:7 45:14
46:5 47:8 58:8
64:19 70:3,17
70:20,21 75:5
81:9 92:4 93:2
97:6,14,16,22
98:18,18,23
99:6 101:12
104:13,13,16
104:22,23
116:12 123:12
123:14,15
124:14 130:7
131:3 132:2
133:10
**asking** 6:1,10
11:3 34:19
61:2 93:5
100:23 128:14
128:24
**asks** 28:23
**assessment**
66:13 77:16
**assigned** 63:11
**assistance** 7:8
**associate** 7:12
8:24 9:21 10:2
10:4,14 11:16
12:17 13:14

43:18
**attached** 57:5
63:18 67:25
110:7 126:22
131:23 133:19
138:7
**attacked** 40:2
42:3
**attacks** 122:19
**attendance**
86:6,9,13,17
87:12 94:13,15
95:19 98:10,12
99:21 102:18
106:2
**attention** 33:7
95:6
**attorney** 1:18
1:23 21:4
97:17,20 98:4
113:21 139:15
139:23
**attorneys** 127:4
139:17
**audibly** 6:2
**august** 12:2
18:15 19:5,20
20:11 79:14,23
81:12,18 85:14
86:1 92:6,17
122:15
**automatic**
91:12

**automatically**
91:11
**available** 15:7
90:1 139:25
**average** 95:23
95:24
**aware** 36:11

**b**

**b** 1:8 3:1 32:13
**baby** 135:2
136:6,9
**babysitters**
55:18,25
**back** 10:25
11:22,22 12:12
12:15 18:11
19:2,6,21
22:22,23 36:14
48:23 49:5
59:15 62:5
65:4,9 73:7
74:6 76:18
77:20,21 78:4
78:16,25 79:9
79:12,24 81:15
82:12 83:12
85:8,16,17
86:5,7,23 89:1
91:22,22,25
92:4,16 101:20
101:24,24
103:13 104:5
107:3,11 111:8

**[back - byron]**

114:9 115:9
122:5,9,10,11
122:13,16
137:12
**backed**  13:10
**backup**  12:25
13:20 111:18
**bad**  19:17 27:3
95:22 123:8
**based**  17:20
21:7 60:6 69:4
133:5
**basically**  73:22
**basis**  21:22
22:6
**bath**  31:22
**bathroom**  9:17
25:7,16,21,24
25:25 26:6,23
27:2,6,9,12,13
27:18,21,25
28:12 29:17,20
29:25 30:6,8
30:10,16 31:23
32:18 33:2
34:2 35:2,25
37:11 44:6
46:18 49:11
52:1 60:15
61:11 73:10,17
74:20 116:8,23
117:9,20 118:9
119:17,23,24
120:8,11,17,21

121:4,14,17,21
121:22 129:13
137:4
**becoming**
11:20
**began**  12:13
**beginning**
10:24 78:16
112:5
**behalf**  1:17,21
**believe**  88:21
93:25 112:2
130:11
**believing**
120:13
**bell**  134:15
**ben**  1:18
**best**  6:2,21 21:7
31:18,18
139:11
**bet**  61:22,22
**beth**  19:15
20:17,21 21:10
46:22 49:6
52:14,22 55:11
55:11,12 56:15
64:14 71:22
77:4,5,9 90:22
90:25 91:22
98:18,23 99:6
100:10,11,11
100:12
**beth's**  52:19

**beth's**  71:8
**better**  104:4
**big**  73:9
**birds**  109:12
**bit**  9:19
**black**  39:18
46:9,11,13
74:21 116:18
**blacks**  73:21
**blood**  45:7,15
**blue**  137:19
**bluff**  126:11
**board**  16:22,23
16:25
**body**  117:9
**bollywood**
136:13
**boss**  71:8
**bottom**  68:5
120:21
**box**  68:16
**brandis**  90:22
90:24,24
**brass**  16:8
**break**  3:15
27:13,18 30:9
30:11,17 31:1
31:3,5 33:6,20
34:15 57:17
79:3,7,12
85:21 94:1
113:6 114:13
114:17,18,20
114:24 117:16

117:17,23,25
119:24 120:18
132:2,11
136:22
**breakdown**
64:13
**breaks**  86:2,17
87:9,10 92:22
93:23
**brian**  114:7,7,9
134:23
**briefly**  5:8
11:13
**bring**  84:4
**brockert**  1:18
6:24 137:20
138:1
**brought**  83:14
84:3
**buddy**  22:1
73:21
**build**  84:23
**building**  75:23
121:19
**bullet**  23:3
113:1 122:5,10
122:10
**bullets**  8:3,7
80:18 103:22
**burt**  92:25 93:1
**business**  23:1
**byron**  114:1

Veritext Legal Solutions
800-336-4000

[c - commentary]

| c | | | |
|---|---|---|---|
| **c** 1:15 5:1 139:1 139:1 | **cd** 135:2 136:6 136:7,9 | **changes** 61:3 | **clocked** 102:22 |
| **call** 5:17,17 16:6 26:9,11 26:11,18,19,20 27:1 40:13 77:20 90:10 91:15 101:11 136:3 | **cee** 9:4 | **changing** 9:6 49:15,17,21 60:4 61:1 127:25 | **close** 25:25,25 36:13 41:18 110:23 |
| **called** 7:25 9:22 38:18,24 40:13 41:21 47:3 77:22 78:3 81:7 86:8 112:1 136:13 | **center** 19:16 48:15,17 52:15 56:2 80:11,12 80:13,15,25 93:17 | **character** 96:25 | **closer** 117:6 |
| **calling** 27:7 40:2 | **central** 1:2 | **charge** 3:9 10:1 12:19 67:17,21 67:25 68:2 69:5 | **come** 14:16,16 15:2,2,11,17 16:12,16 17:5 19:18 20:6 22:22,23 24:12 25:11 31:10,15 33:13,15,16,19 33:20 43:12,25 44:8,9 49:7,9 50:13 51:14,18 51:19 52:10 58:19 62:14,22 62:23 66:17 97:13 98:16 99:6 104:8 112:21 113:7 117:20 118:9 120:17,19 121:13,17 |
| **camera** 119:25 120:4,8,9,13 | **certain** 15:19 | **check** 118:9 | |
| **campbell** 75:12 75:14,15 | **certificate** 2:25 | **child** 135:15 | |
| **caption** 2:5 4:1 139:7,13 | **certified** 139:6 139:21 140:9 | **chris** 104:24 113:1,2 117:24 117:25 129:24 130:1,16 132:14 | |
| **career** 75:6 | **certify** 139:7,14 | **circumstances** 91:23 | |
| **careful** 50:4 127:24 129:1 | **chance** 22:7,10 22:12 122:2 | **city** 134:9 | |
| **cat** 113:10 | **change** 7:5 10:13,21 11:16 22:23 23:1 50:22,23 51:15 54:6 60:6 67:14 80:10 81:6 | **claim** 55:5 | |
| **cause** 4:4 | | **clean** 6:15 115:12,14 121:12 | **comes** 16:3,3 28:23 |
| **caused** 85:2 102:17 | **changed** 9:10 9:13 13:3 19:14 22:21,22 49:3 53:14 54:2 60:13 61:16,18,19 65:3 80:7 81:15 86:17 87:13 94:14 96:18,19 128:15 | **cleaning** 123:4 123:4,25 | **coming** 19:12 24:2,19 25:10 114:13,22,23 120:18 127:14 127:18 |
| **ccr** 140:7 | | **clear** 17:18 67:8 111:13 | **commentary** 78:25 |
| | | **cleared** 107:9 | |
| | | **clique** 22:2 | |
| | | **clock** 27:20 102:22 | |

**[communicating - coy]**

| | | | |
|---|---|---|---|
| **communicating** 122:12 | **conflicted** 60:4 | 111:25 114:14 131:19 | 80:8 103:11 110:9 118:9 |
| **communicati...** 47:23 | **confrontations** 39:10 | **conversations** 22:11 | 124:7 133:22 |
| **company** 64:10 | **confusion** 67:13 | **conveyed** 116:21 | **cost** 109:3 |
| 65:14,19 69:16 | **connected** 119:21 | **coordinating** 75:9 | **cotton** 45:8 |
| 77:2 97:22 | **connection** | **coordinator** | **council** 6:8 |
| 113:16 118:25 | 65:20 98:9 | 7:8 9:22,23 | **count** 17:3 44:1 |
| 119:4 | 134:3,20 | 10:10,13,23 | 44:1 |
| **company's** | **contact** 36:9 | 13:2 | **county** 139:4 |
| 117:12 118:7 | 66:9 77:2 | **copay** 109:1 | **couple** 5:25 |
| 118:15,25 | 78:13 | **copies** 139:21 | 11:14 20:12 |
| **compared** | **contend** 22:13 | **copy** 56:19,20 | 24:13 71:21 |
| 49:10 | **contents** 2:1 | 89:3 94:25 | 87:6 136:19 |
| **complaining** | **continue** 47:8 | 97:14,15,16 | **court** 1:1 2:25 |
| 72:22 76:16 | 47:13 49:9 | 137:14 138:4 | 6:4,15 13:5 |
| **complaint** | **continuing** 7:2 | **correct** 5:20 | 56:23 79:6,9 |
| 43:13 46:18,23 | 13:8 57:1,6 | 8:19 11:18,25 | 136:9,11,21 |
| 97:3 115:25 | 63:19 68:1 | 14:19 23:15,23 | 137:25 138:10 |
| 116:1,13,23 | 79:11 110:8 | 24:9,13 25:8 | 139:6 140:9 |
| **complaints** | 126:24 131:24 | 27:15,25 29:15 | **covered** 18:13 |
| 34:3 76:14 | 133:20 136:12 | 31:6,8 32:4 | **coworkers** |
| 96:11,22 | 136:24 137:13 | 36:6 37:12 | 100:25 |
| **completed** | **contract** | 42:9 47:4,9 | **cox** 99:2,4 |
| 84:17 89:20 | 139:17 | 48:4 52:23 | **coy** 20:3 29:15 |
| 95:25 97:1 | **control** 139:20 | 57:12,22 58:3 | 38:5 49:25 |
| **computer** 66:5 | **conversation** | 58:10 59:6,24 | 50:5,22 51:8 |
| **concluded** 2:23 | 20:5 26:22 | 60:3,15,16 | 54:13 99:10 |
| 138:12 | 34:20 35:5,13 | 61:7 62:10 | 103:20 105:12 |
| **conference** | 36:2,12 39:1,3 | 67:17 69:6 | 107:18 114:13 |
| 72:17 | 39:13 49:10 | 72:11 73:1 | 116:6 118:8,19 |
| **confirm** 126:25 | 50:15 51:23 | 78:22 79:15 | 120:20 122:3,9 |
| **conflict** 93:12 | 52:4 84:12 | | 122:10 123:14 |
| | | | 123:20,21,25 |
| | | | 127:14,18,24 |

Page 6

**[coy - discriminate]**

128:14,24
129:12 131:8
136:25
**coy's** 29:9
55:10 56:3,10
**coy's** 53:2
**craig** 22:15
37:1 38:4
104:17,21,22
104:23 127:8,8
**crates** 25:23
**create** 113:18
**crew** 123:4
124:1
**cup** 7:8,17,21
8:2 9:24 10:1
10:17 12:24
13:17,18 15:24
23:7 75:4,25
87:16 91:12
130:19
**cups** 8:6,9,10
15:25 16:7,7,7
16:8 31:8,9,12
31:12
**current** 7:3
18:3
**currently** 14:1
14:3,18 15:14
**custodial**
139:23
**cut** 111:23
112:14,18

**cv** 1:6

**d**

**d** 1:8 5:1
**dallas** 1:25
**darnitha** 71:6
**darnitha's** 71:8
**date** 79:19 97:7
97:11 98:6
**dates** 89:18
**daughter** 60:9
**davis** 117:14,16
117:22 132:14
132:14
**day** 4:4 7:20,23
8:8,15 14:1
16:13 17:2
22:24 23:21
24:5,11,13,15
24:23 38:11,18
41:18 47:4,18
57:21 61:13
62:6 74:14,15
76:4 77:21
78:14,14 80:3
81:1,2,3 96:18
100:3,4 106:10
121:11 123:11
131:11 140:1
**days** 14:12,19
14:23 18:25
19:23 23:23
24:25 58:20
64:4 78:4,25

80:8,8 91:3,16
91:20 92:7,8
99:24 103:5
108:24
**december**
11:23 12:6,13
12:15 17:7,12
18:9,10,11
76:20 81:15
101:24,25
102:6 103:11
107:4,5 122:13
**decision** 78:7
79:1 107:6,25
**defendant** 1:8
1:21 4:3
**delivered**
139:21
**demonstration**
33:13
**denied** 34:7
**department**
15:1 87:1,3,17
88:1 107:9
111:13 112:23
**deposed** 5:22
**deposition** 1:9
2:8,9,11,13,15
2:17,19,21,23
4:2 5:17 57:4
63:17 67:24
110:5 126:21
131:22 133:18
137:23 138:6

139:20
**depressed**
82:25
**depression**
134:3,21
**described**
70:10
**designation**
9:21 10:7
**determines**
17:4
**devote** 99:17
**dialog** 103:17
**different** 8:6,7
53:13 72:7
83:18 107:2
136:15
**diminished**
86:7
**direct** 42:9
125:11 139:11
**direction** 131:5
131:8
**directly** 116:25
136:25
**disabled** 84:10
**disagree** 116:1
119:11
**disagreements**
39:9
**disappointed**
100:8
**discriminate**
22:14

Page 7

**[discriminated - ellis]**

discriminated
21:21
discriminating
22:6
discrimination
68:16 69:6
discussed 17:11
81:24 82:23
103:16
discussing
40:25 49:25
discussion
17:20 82:11
discussions
21:8 81:22
82:3
dispute 115:25
district 1:1,1
division 1:2
8:20
dj 135:22,23
136:15
docked 84:8
doctor 83:14,16
104:3 106:15
107:15 108:1,8
134:4
doctor's 83:3
108:1
doctors 66:16
66:18,19,20,21
69:12 77:19
107:7 134:2,11
134:15,24

document 16:3
57:2 58:2
61:23 63:14
64:9,16 69:4
113:18 122:1
137:14
documents
76:13 131:20
doing 7:7,23
12:19 13:10
21:16,24 24:4
24:16,18 26:1
28:7,7 32:17
33:5 48:25
50:6 54:3 63:1
63:3 75:18,18
75:22 76:4,11
82:1 93:5 97:2
113:8 116:4
120:3 122:19
135:13
door 33:15,15
doubt 129:17
downstairs
32:23,25 43:25
112:17
draw 15:18,23
16:1,1,9
draws 15:24
drew 45:15
dropped 99:17
drugs 69:19,25
70:15,18 107:2
107:6,8,25

108:6 109:2
drum 135:19
duly 5:3
dump 7:21 8:11
9:24 13:18
dumper 7:17
10:2
dumping 7:8
8:2 10:17
12:24 13:17
15:24 23:8
75:4,25 87:16
91:12
dunn 40:19,20
40:22,23
dunn's 41:14
duties 10:12
12:19

**e**

e 1:15,15 3:1
5:1,1 32:13,13
132:20 139:1,1
earlier 47:2
97:3
early 24:13
79:23 81:18
86:1 115:14
127:14,19
earnest 35:6,8
35:10 49:22
50:12,18,19
51:10,12,14
53:21 127:23

128:1,3,4,12,22
129:5
eastern 1:1
education
125:21
eeoc 3:9,17 9:6
10:1 65:13
67:17,21,24
68:2,11 88:19
113:19 119:5
133:1,4,18,22
effect 52:9
124:1
eight 24:9,10
75:16
either 41:8 58:8
121:2
elevator 31:12
eligible 88:22
89:21
eliminate 23:1
23:2
eliminated
22:25 23:4,5,7
ellis 19:15
20:17,20,21
38:15,18 46:21
46:22 47:3
48:13 56:15
64:14 65:24
67:5 70:20
77:5,9 82:12
84:12 90:25
96:4 100:10

Veritext Legal Solutions
800-336-4000

[ellis - find]

| | | | |
|---|---|---|---|
| 112:1 | evaluated | exactly 9:8 19:1 | fact 38:11 |
| elmore 71:4,5 | 97:10 100:23 | 88:9 100:1 | 43:12 46:17 |
| 71:13 72:9 | evaluation | examination | 53:3 73:14 |
| 73:1 74:8 76:6 | 94:21,22,24 | 2:7 5:6 | 118:8 119:5 |
| 76:14 | 95:4,14,25 | example 58:9 | facts 139:7 |
| emergency | 96:10,21,22 | 58:14 | fair 105:24 |
| 25:24 83:2,3,5 | 97:2,11,21 | exchange 34:14 | fairly 87:4,6,8 |
| employed 5:20 | 99:22 100:8,9 | 115:5 | family 65:17 |
| 111:3,15 | 100:22 101:4 | excused 138:14 | far 13:11 94:9 |
| 114:25 129:5 | 101:17 102:13 | exhibit 2:8,9,11 | 107:21 108:19 |
| 139:15 | 102:15,17,23 | 2:13,15,17,19 | faxed 66:7 |
| employee 42:20 | 106:2 | 2:21 56:22 | fear 106:7 |
| 43:22 44:3,4 | evaluations | 57:3,4 59:2 | fearful 39:15 |
| 139:14 | 86:6 101:14 | 63:14,17 67:5 | feel 19:17 39:18 |
| employees | event 7:6,14 | 67:23,24 89:4 | 100:17 111:7,7 |
| 12:22 31:3 | 8:25 9:10,10 | 110:3,4,5,19 | 111:9,14 |
| 71:21 80:25 | 9:14,16 10:19 | 113:19 126:19 | 113:21 129:20 |
| 104:6 118:2 | 14:17 22:21 | 126:21 131:22 | 129:22 130:6 |
| 122:20 | 23:14,15 24:3 | 133:17,18 | feeling 82:25 |
| employer 5:17 | 24:18 111:22 | 137:24,24 | feet 136:17 |
| entered 129:13 | events 7:5 | 138:5,6 | felt 39:20 45:11 |
| entitled 91:11 | 82:23 | explained 47:6 | 92:21 |
| 91:13 | everybody 8:13 | 53:20 132:3 | female 20:21 |
| entry 120:22 | 8:17 17:1 | extra 19:14 | file 68:22 86:9 |
| 122:2 127:12 | 19:12 22:1 | 24:15 86:9,18 | 86:10 95:10,12 |
| environment | 33:6 72:16 | 87:13 | 95:13 97:22 |
| 107:11 | 85:8 111:10 | eyes 33:12 | filed 5:13 10:1 |
| ernest 20:8,8 | 112:20,21 | | 67:17 68:4,7 |
| 77:23 93:7 | everybody's | **f** | 68:11 69:5 |
| 127:20 | 7:15 | f 139:1 | filled 65:11,15 |
| established | ex 3:5,7,9,11,13 | facility 12:22 | financially |
| 72:5 79:13 | 3:15,17,19 | 57:15 71:11,13 | 139:15 |
| 122:9 | exact 33:23 | 134:7 | find 32:3 43:12 |
| | 68:12 | | 53:19 88:5 |

**[find - going]**

94:13 97:13
127:22 135:25
**fine** 32:2
**finish** 29:1
123:21
**finished** 6:11
6:19,21 28:12
29:17
**fire** 80:11,12,13
80:15,25
**first** 5:3 8:17
10:6 12:2
15:24 19:6
20:12 46:6
58:12,22 59:2
59:2,14 62:13
62:25 70:15
85:23 92:18
112:1 122:16
122:24 124:6
125:19 129:12
136:4
**fishing** 130:12
130:16
**fit** 15:20
**five** 23:23 24:4
24:25 55:22,23
79:3 80:8 81:1
136:20
**fixed** 76:15
**fixing** 25:9
**flexible** 15:21
**floor** 7:8,10,15
9:22,23 10:10

10:13,16,18,23
12:20 13:2
25:14,15,17
33:21 34:14,22
35:5,18 40:3
44:1 52:6 72:2
72:2 75:9
93:18 117:21
121:18,18
122:22 123:3,6
123:10,13,19
123:25 124:3,9
124:15,23
125:1 131:3,6
131:12,16
**follow** 19:25
92:6
**followed** 91:6
92:4
**following** 92:8
**follows** 5:5
79:8 136:23
**foot** 126:7
**football** 125:23
126:13
**foregoing**
139:8,8
**forget** 40:9
**forgot** 114:7
**forklift** 25:23
**found** 63:6
95:10 101:24
118:7,15,25

**foundation** 8:6
**four** 14:12,19
58:20 80:8
81:2 117:19,19
**fourteen**
109:23
**frame** 60:18
**friday** 47:20
57:22
**friend** 22:2
110:23 112:8
114:12
**friends** 41:18
116:16
**friendship**
73:21
**front** 123:11
**functions** 8:23
**funky** 136:17
**furnace** 42:23
**further** 43:9
137:10 139:14

**g**

**g** 5:1 132:20
**games** 60:7
**gary** 40:9 42:17
**geans** 132:16
132:18
**gentleman**
42:17
**getting** 23:4
49:5 60:6
73:20 74:20,25

78:20 84:10
85:7 86:12
92:4
**gig** 135:14
**give** 50:19,21
56:21 63:15
77:9 79:18
84:4 95:9
127:4 133:1,1
**giving** 129:3
**go** 8:15 16:8
25:25 26:1,3
26:17 30:20
32:3 34:17,17
36:20,22,22,23
45:22 60:7,8,8
64:14 67:14
68:2,21 82:24
83:3 85:2 88:2
92:16 97:23
102:20 104:5
108:2,17
109:12 114:9
115:9 118:3
120:18 122:10
126:17 137:15
138:9
**goes** 16:8
**going** 5:12 6:1
6:9,10 15:4
17:3 22:16,17
23:5,7 38:1
40:16 41:13
43:17 49:3

Page 10

**[going - hey]**

| | | | |
|---|---|---|---|
| 50:4,22 51:15 51:16 57:3 67:23 71:3 76:12,17 78:7 81:25 82:9 83:13 84:8 85:21,24 86:14 86:17 87:9,10 92:22 93:20 94:17 107:10 107:10 108:15 110:3 112:9,22 112:23 114:23 122:12 127:5 127:21 128:25 129:1,1,2 136:3,3 137:22 **gonna** 20:18 49:7,8 50:20 50:22 53:10 56:4 60:5,9 106:8 107:13 127:20 **good** 94:17 124:1 **gotta** 60:8 127:22 **graduate** 125:24 126:1 126:15 **graduated** 125:22,24 **grandkids** 54:4 55:15,19 | **ground** 5:25 **group** 80:13,15 80:25 103:13 **guess** 18:9 42:16 58:2 64:18 66:6 73:5 75:3 92:14 93:4 104:1,19 137:11 **guy** 20:3,3 46:11 75:2 87:25 92:25 114:6 116:18 130:19 **guys** 21:23 35:22 37:22 103:16 **h** **h** 3:1 **half** 18:7,22 63:3 74:14,15 74:17 **hall** 26:2 116:5 **hallway** 114:13 114:19,20,23 116:5 120:10 120:12 **hand** 13:6 31:21 33:17,23 140:1 **hands** 117:10 | **handwritten** 110:6,9 126:22 127:1 137:18 137:18 138:1,7 **happen** 47:17 47:23 75:15 76:20 82:24 98:13 122:24 130:15 **happened** 9:11 9:14 14:17 17:10 37:4,19 44:10 45:14,25 47:6 68:14 80:11,11 83:7 83:24 85:18 98:14 99:15 103:24 106:7 111:11,22 122:24 125:19 **happening** 85:10 **harassed** 84:24 85:2 **harwood** 1:23 **hawkins** 57:20 57:24 110:14 111:3 **he'll** 15:17 16:18,22,23 17:1,2 113:7 **head** 6:3 78:11 85:8 | **heads** 50:20,21 77:9 129:3 **health** 65:18 69:17 70:6 134:9,18,20 **hear** 6:25 36:12 136:5 **heard** 31:14 46:16 115:5 130:7,11 **hearsay** 41:15 42:25 **heated** 38:6,8 39:1,3,14,14 **heather** 43:13 46:13,17,23 115:18,20 116:12,22,25 **help** 16:13 17:5 17:21,22 34:18 64:12 65:13 100:15 106:8 **henderson** 125:23 126:8,9 **hereto** 57:5 63:18 67:25 110:7 126:23 131:23 133:19 138:8 139:13 139:15 **hey** 15:6 16:12 17:21 22:18 62:13 123:24 |

Page 11

[high - involved]

| | | | |
|---|---|---|---|
| **high** 98:25<br>125:24 | **housekeeping**<br>123:8 | **immediate** 11:4<br>23:18 101:15 | **informed** 17:10<br>94:15 128:12 |
| **highest** 65:1<br>125:21 | **howard** 134:23<br>**hr** 19:15 20:17 | **immediately**<br>36:22 76:16 | **injury** 83:20,23<br>84:21 |
| **hightower**<br>112:25 | 21:11 32:25<br>34:17 38:9,10 | **impact** 78:5<br>106:4,6 | **instance** 75:2<br>**instrument** |
| **hills** 125:25<br>126:2,3 | 38:11 40:1,19<br>64:11,14 70:3 | **impartiality**<br>139:19 | 135:16<br>**insubordinati...** |
| **hire** 19:18<br>20:18 49:8 | 70:17 84:6,14<br>90:10,20 91:15 | **inaudible**<br>136:25 | 124:13<br>**insurance** |
| 55:13 82:10,15 | 93:14,16 104:6 | **incident** 9:17 | 108:19,20 |
| **hired** 22:3 73:6 | **huh** 36:5 40:24 | 18:23 34:6 | **intake** 134:13 |
| **hiring** 82:12 | 41:16 48:5,14 | 35:10 39:11 | **interact** 112:23 |
| **hold** 80:15 | 60:19 62:9 | 44:9 47:17 | **interacting** |
| 82:17 118:20 | 66:19 70:7,7 | 48:4 49:11,22 | 107:19 |
| 136:3 | 80:4 81:21,21 | 51:2 52:2 53:5 | **interactions** |
| **holder** 112:7 | 88:12 96:8 | 53:6,7,16,17 | 122:18 |
| **hollering** | 102:11 105:25 | 60:15 61:11 | **interest** 139:18 |
| 116:10 | 108:12 110:15 | 63:5 73:10,17 | **interested** |
| **home** 38:21 | 123:9 131:1 | 74:20 95:8 | 139:16 |
| **hospital** 83:3 | 136:8,14 137:3 | 96:14 128:6 | **interrogatories** |
| 83:14,16 84:1 | 137:9,25 | 137:6 | 135:1 |
| **hour** 18:5 24:9 | **human** 38:1 | **include** 22:17 | **interview** 91:9 |
| 24:10 74:12,17 | **humiliation** | 125:7 | **introduce** 89:4 |
| **hourly** 18:3 | 122:22 | **included** 125:9 | **introduced** 5:8 |
| **hours** 20:9 24:4 | **hurt** 75:3 | **includes** 80:15 | 57:5 63:18 |
| 24:5,13,19,19 | **hurting** 83:25 | 80:16,18 | 67:25 110:7 |
| 24:23 54:10,12 | **hydroxyzine** | **inconvenience** | 126:22 131:23 |
| 60:2,14 62:4 | 69:23 70:13 | 54:9 | 133:19 138:7 |
| 81:2 82:4 | 106:25 133:11 | **individual** 75:5 | **introduction** |
| 94:10 111:24 | | **informal** 17:20 | 2:8,9,11,13,15 |
| **house** 69:11 | **i** | 103:16 | 2:17,19,21 |
| 109:13 136:13 | **i.e.** 86:1 | **information**<br>51:11 | **involved** 36:21 |

Veritext Legal Solutions
800-336-4000

**[issue - know]**

**issue**  72:19
  73:9,15 96:4
  124:23
**issues**  72:25
  73:3,13,20
  96:16 98:12
  106:2 113:16

**j**

**jackson**  12:25
  14:10 111:5
**jacksonville**
  109:14 110:2
  126:5
**january**  11:4
**jenkins**  10:24
  11:10,12,18,20
  12:13 13:24
  23:18 24:12
  40:5 42:3 43:2
  43:5,10 72:7
  73:4,8,15
  74:20 76:22
  98:20 103:13
**job**  7:6,7,11,13
  7:15,15,24 8:7
  8:7,23,23 9:6
  9:14,20 10:16
  10:19 12:16,24
  21:19 22:25
  23:1,2,3,5,7,12
  24:16 42:22
  43:20 44:2
  46:4 49:8

57:24 58:1
70:4,17,24
73:6 74:25
75:4,5,5,7,8,9,9
75:10,19,23,24
75:25 76:3,4
77:21 87:16,18
87:21,23,24,25
88:3,10 89:11
89:13,19 90:11
91:3,12 95:21
111:17 112:16
124:1 135:12
**jobs**  7:9 13:1
  15:8 69:10
  74:24 75:10
  88:22 89:15,17
  89:22,24 90:13
  91:9,24 92:9
**johnny**  19:15
  48:17 52:14,15
  52:15,21,22,23
  53:1 54:16,16
  54:16 55:5,5,8
  56:2 93:17
  94:6
**jones**  43:13
  45:6 46:13,13
  46:17,17,23
  113:10 115:20
  116:12,22,25
**june**  9:7

**k**

**k**  139:6 140:7
**keep**  67:13 75:9
  107:13,17,18
**keith**  132:14
**kenneth**  75:12
  75:14,15
**kept**  92:8,8
**kevin**  117:14
  117:16,22
  132:14
**keyboard**
  135:17
**kids**  109:25
**kind**  6:3 17:20
  27:3,3 29:3
  34:13,16 36:10
  41:18 42:8
  43:7,14,15
  46:19 58:19
  60:17 65:16
  66:16 84:9
  93:14 98:2,24
  98:25 99:9
  104:12,20
  110:22 111:25
  112:10 115:8
  118:3 122:11
  135:4,5
**knew**  43:18
  54:3 60:2
  62:23,24 66:18
  66:18 91:7

101:12 106:19
113:5 118:17
118:19
**know**  5:18 6:21
  7:16,16 8:5
  12:24 13:11,16
  13:18 14:14
  15:8 17:2 19:8
  20:23 21:16
  22:7,19 26:1
  26:13 28:2,18
  28:18 29:24
  35:22 37:22
  38:6,25 41:4,4
  42:7 43:9,18
  44:1,16 45:8
  45:18,19,20,23
  46:11,20 48:11
  52:21 53:21
  55:22 58:17
  59:14 60:12
  61:11,22 62:13
  62:14 64:11
  70:21,22 71:22
  71:23,25 72:4
  76:11,12,15
  79:18 81:8,17
  81:25 85:8,9
  86:15 87:5,20
  88:7 90:18,25
  91:6 92:15
  93:7,14,18
  94:11,17 96:1
  96:3 97:5,12

Page 13

**[know - look]**

97:19 98:22
99:25 100:1,1
100:2,7 101:9
101:11,21
102:2 103:8
104:24 105:22
106:18 107:21
107:23 108:19
108:24 110:22
111:5,7,10,11
111:12,21,22
111:24 112:6,8
112:14,18,20
112:21,22
113:4,8,19
114:1 115:9,11
116:2 120:1
121:1,2 127:18
133:2 134:14
136:5,13
137:11,14,19
**knowing**  22:1
41:17 60:7
85:9 95:12
**knowledge**
113:13
**knows**  112:13

**l**

**l**  32:13
**larry**  112:25
**late**  60:17,18
92:11

**latest**  68:15
**law**  1:18,23 4:5
4:5
**lawsuit**  5:13
22:13
**lawyer**  5:9 57:2
69:1 89:3
133:1
**lawyers**  102:4
**lead**  17:10
49:23 93:4
128:12
**leaders**  51:11
**leads**  20:5,7
93:7
**learned**  43:16
**leave**  11:22
12:2,5,12 17:2
18:10 19:6,21
19:22 20:9
29:1 59:1,5
61:6,12 65:3,9
65:11,14,17
66:11 67:16
68:8 69:5,9
71:4 72:10
73:8 75:3
76:25 77:10,24
77:25,25 78:1
78:16 79:14,19
79:24 81:17
82:18,25 84:19
85:2 87:17
89:6 92:2,10

92:18 99:16
103:24 121:4
122:24 124:6
125:19 137:22
**leaves**  11:24
28:24 81:11
85:25
**leberuw**  31:22
31:24,25 32:11
32:20 37:2
127:10
**left**  29:2 33:20
34:25 36:14
48:1 82:7,10
84:15 98:25
99:9 122:3
**legitimate**
87:16
**letter**  133:19
**letting**  49:8
118:20
**level**  125:21
**life**  14:14 22:21
**lights**  44:21,21
44:23 45:1
**line**  8:14 15:18
15:23 16:1
112:17
**lisa**  31:22,24
32:11,20 34:4
34:6 36:3,16
36:17,18 37:2
37:6 127:10

**list**  73:12
**listed**  13:2
114:2
**listen**  27:9
**listening**  27:7
131:18
**little**  1:20 4:6
22:11 130:20
**live**  109:16,18
109:23
**lived**  109:20
**llc**  1:7
**lloyd**  1:4,11 2:6
4:2 5:2 123:10
135:22,23
136:15
**loading**  80:22
**local**  126:5
**location**  109:21
**lomanco**
109:10
**long**  9:1,1
20:14 34:14,19
74:8,9,11 87:1
87:3 109:20
124:17
**longer**  51:6,13
99:15,20
103:21 104:20
128:17
**lonoke**  71:10
71:11,13
**look**  32:1 38:24
62:13,22 68:2

Page 14

**[look - meetings]**

| | | | |
|---|---|---|---|
| 88:25 96:24,24 | 116:12,22 | 60:23 61:10,19 | 75:1 93:13 |
| 102:21 118:5 | 139:25 | 63:10 112:1 | 97:9,22 102:4 |
| **looked**   18:14 | **mail**   133:24 | **mark**   56:21,23 | 106:3 110:13 |
| 88:4 120:13 | **main**   31:12 | 57:3 67:23 | 110:14 111:20 |
| **looking**   61:22 | 75:23 | 110:3 137:23 | 112:18 116:8 |
| 61:23 88:6,11 | **make**   7:14 8:3 | 138:5 | 118:11 120:20 |
| 88:16,18 | 8:6,11,13,14,14 | **marked**   63:14 | 122:7 |
| 119:25 120:4 | 15:25 23:2 | 110:4 113:19 | **meant**   28:19 |
| **looks**   18:14 | 26:9 36:9 60:5 | 126:19 | 54:19 102:19 |
| 57:11,20 63:21 | 77:16 78:6 | **marking** | 104:21 |
| 63:24 68:8,15 | 89:3 96:24 | 137:19 | **medical**   64:12 |
| 133:4 | 109:12 121:19 | **matrix**   65:23 | 65:17 83:5 |
| **lose**   73:9 | 134:2 135:6,10 | 65:25 66:1,8 | 109:7 |
| **lot**   73:20 76:15 | 137:14 | 84:6,15,17 | **medication** |
| 101:1 | **makes**   96:13,21 | **matter**   138:13 | 70:9 |
| **loud**   6:24 31:23 | **making**   88:17 | **mckeeby**   1:22 | **medications** |
| 32:16,16,18 | 88:18 89:8,11 | 2:7 5:7,9 7:2 | 133:10,12,15 |
| 116:4,9 | 90:11 96:11,22 | 13:8 56:25 | **meeting**   20:17 |
| **lower**   39:5 | 97:2 | 57:1,6 63:19 | 20:20 21:11 |
| **m** | **man**   106:16 | 68:1 79:11 | 30:20,21 47:24 |
| | 113:10,12 | 110:8 126:24 | 48:21,22,24 |
| **m**   1:13 | **manager**   37:1 | 131:24 133:20 | 49:3,4 52:14 |
| **machine**   8:11 | 48:19 99:10 | 136:12,24 | 52:17 53:1 |
| 16:8,9 | 104:19 105:1 | 137:10,13,22 | 55:12 56:15 |
| **machines**   123:5 | 127:8 | 138:2,4 | 71:4,16,18,20 |
| 135:19 | **managers** | **mckinney**   1:4 | 72:9,20,23 |
| **made**   10:16 | 101:3 | 1:11 2:6 3:11 | 73:3,11,22 |
| 19:17 22:5 | **manufacturing** | 3:13,19 4:2 5:2 | 74:8,21 76:6 |
| 33:5 43:13 | 7:11 8:23 9:21 | 5:8 13:5 79:13 | 76:10,22 81:7 |
| 46:18,23 62:18 | 10:2,3,4,14 | **mean**   6:18,19 | 123:10,12 |
| 66:13 75:10 | 11:16 12:16 | 8:2 15:14 42:4 | 124:24 125:3 |
| 77:22 82:24 | 13:12 | 45:6 47:1 | 131:16 137:2 |
| 97:21 107:7,25 | **march**   1:13 4:4 | 49:18 51:19 | **meetings**   19:15 |
| 115:25 116:2 | 23:15,17 49:10 | 52:15 59:1 | 47:18 48:4,11 |

**[meetings - newspaper]**

72:16 104:7,9
**memories**  27:3
**memory**  21:7
**mental**  65:18
**mention**  112:2
**mentioned**
  46:16 56:17
  102:12 111:19
**messed**  111:23
**messing**  111:24
**met**  130:19
**method**  139:10
**michael**  57:20
  110:14
**mid**  79:20
  81:18 82:18
  103:10
**middle**  18:15
**mike**  113:25
  114:5,10,10
  117:14,21
**millimeter**  16:9
**millimeters**  8:5
  8:14
**mind**  73:23
  85:3,6
**minute**  79:3
  88:4 89:4
**minutes**  124:18
  136:20
**missed**  100:3
  103:5
**missing**  19:16

**mitch**  118:6,8
  118:11 119:1
  129:12,16,16
**mixed**  129:10
  129:11
**monday**  48:3
  48:10
**money**  135:10
**monitored**
  86:16 87:9
  92:22,24
**monitoring**
  86:2 122:21
**month**  18:22
  51:5 52:1
  53:17 60:15
  63:5 106:22
  108:10,11
**months**  9:3,14
  11:14 97:3
**mop**  122:22
  123:3,6,10,13
  123:19,25
  124:2,9,14,23
  130:24,25
  131:3,5
**mopped**  125:1
  131:12,16
**morning**  25:21
  30:14 115:14
  121:24 131:14
**motioned**  33:17
**motivated**  74:3

**mouth**  13:6
**move**  91:3,19
  91:20
**moved**  10:25
  11:14 17:9
  72:7 76:18
  99:18 103:22
**movement**
  31:21 117:9
**moving**  31:21
  33:22 42:7
**music**  27:7,9
  30:3,6 31:23
  135:3,4,6,19,25
**musician**  135:8

**n**

**n**  1:15 5:1 40:1
  132:20
**name**  5:9 32:2
  36:21 40:10
  46:11 58:6
  71:23 72:4
  90:24 106:18
  134:4,12
  135:21
**named**  42:17
  57:20 92:25
  104:24
**names**  134:6
**near**  25:8,16
  35:2 44:6
**need**  16:12
  17:21 66:11

91:8 106:8
  123:25 132:3
**needed**  17:4,5
  66:13 78:12
  83:4 84:15
  94:15 113:21
  123:19
**needing**  103:19
**neither**  89:23
  137:20
**never**  20:4 22:7
  22:10,10,11
  29:23 31:14
  42:9 53:5
  58:11,11,12,16
  58:24 59:10,11
  59:14,15 65:2
  65:10 70:9
  86:12,21 87:3
  94:3 95:16
  96:15,15,16,16
  96:18 100:4,6
  101:3,12 116:6
  116:22 119:25
  120:4,7,21
  121:11 123:4
  129:17 130:12
**new**  91:3 98:2
  102:15,15,15
  108:8
**newer**  134:4
**newspaper**
  27:11 30:4

**[nigger - okay]**

| | | | |
|---|---|---|---|
| **nigger** 40:2,13 | **number** 2:3,8,9 | 86:8 115:12 | 30:2,13,16,23 |
| 41:21 104:8 | 2:11,13,15,17 | 121:19 130:3 | 30:25 31:11,15 |
| **night** 8:8 14:10 | 2:19,21 57:4 | **offices** 25:9,10 | 31:18,24 32:15 |
| 22:24 29:15 | 63:17 67:24 | 68:21,24 | 32:22 33:2,4 |
| 42:14 63:11,11 | 110:3,5 126:21 | **oh** 13:19 17:14 | 33:10,17,25 |
| **nights** 22:22 | 127:12 128:10 | 26:16 33:10 | 34:5,8,24 35:1 |
| **nine** 8:5,13 | 129:12 131:22 | 46:3,20 62:22 | 35:4,11,12 |
| 16:9 | 133:18 138:6 | 66:1 100:17 | 36:8,11,14 |
| **nope** 28:13 | **numbered** 4:4 | 109:14 111:19 | 37:4,11,14,17 |
| **nora** 40:20 | **numbers** 111:1 | 114:7 122:13 | 37:22 38:9,13 |
| **norma** 40:19 | **o** | 130:21 135:3 | 39:9,13 |
| 40:21,22 | | 138:3 | 39:18,22 40:8 |
| **normal** 14:18 | **o** 5:1 | **okay** 5:22,25 | 40:12 41:1,12 |
| 23:25 24:7 | **o'clock** 14:19 | 6:14 7:1,11,18 | 41:21 42:3,16 |
| 48:1 62:7 | **oath** 5:5 | 8:3,16,22 9:19 | 42:24 43:1,4 |
| **normally** | **observed** | 9:25 10:4,6,12 | 43:20,24 44:3 |
| 101:14 | 114:14 | 11:3,15,20 | 44:15,25 46:3 |
| **north** 1:23 | **occasion** 60:1 | 12:15 13:7,11 | 46:15,25 47:2 |
| **nos** 6:2 | 71:14 117:3 | 13:16,21,24 | 47:8,15 48:1,3 |
| **note** 83:3,14 | 123:6 127:23 | 14:12,18 15:4 | 48:8,12,21 |
| 84:3,4 | **occurred** 23:15 | 16:2,11,18,23 | 49:14,20 50:9 |
| **notes** 3:11,13 | 41:5 61:11 | 17:7,12 18:3 | 50:15,24 51:1 |
| 3:19 20:23,25 | 68:16 | 18:13 19:10,19 | 51:6,12,23 |
| 21:4 32:1 | **office** 4:5 25:8 | 19:25 20:7,11 | 52:1,4,12 53:6 |
| 87:19 88:6,11 | 25:16,16 32:21 | 20:20,24 21:2 | 53:17,19,24 |
| 88:19 110:4,6 | 35:2,9 36:20 | 21:6,13,17,25 | 55:3,14,23,25 |
| 110:9 126:20 | 36:22,23,25 | 22:9 23:17,21 | 56:2,8,15,17 |
| 126:22 127:1 | 37:9 40:16 | 24:7,18 25:2,5 | 57:11,19 58:2 |
| 127:22 131:23 | 41:14 43:22 | 25:7,12,19,19 | 58:14 59:5,8 |
| 138:7 | 44:3,6,11,24 | 26:5,9,12,21,25 | 59:16,24 60:13 |
| **notice** 3:17 | 45:3 50:3 | 27:5,11,15,18 | 60:17,22,25 |
| 133:21 | 51:16 52:13,19 | 27:22,24 28:4 | 61:3,6,9,15,22 |
| **noticed** 95:1 | 57:18,19 63:20 | 28:14,22 29:1 | 63:2,4,9,14 |
| | 66:6 72:14 | 29:10,15,22 | 64:1,6,9,14,25 |

**[okay - page]**

| | | | |
|---|---|---|---|
| 65:2,5,11,19,22 | 105:7,24 106:9 | **old** 98:2 | 17:4,19,20 |
| 66:13 67:2,9 | 106:13,13,13 | **once** 16:8 107:9 | 18:7,21,24 |
| 67:11,22 68:7 | 107:24 108:4,8 | 110:24 | 19:5,11,15 |
| 68:19 69:1,3,8 | 108:13,18,18 | **ones** 95:7 | 20:1,6,14 21:9 |
| 69:12 70:3,13 | 108:21 109:7 | 115:12 | 48:23 49:2,4,5 |
| 70:15,17 71:1 | 110:13,14 | **ongoing** 108:13 | 49:18,21 50:6 |
| 71:8,20 72:3,5 | 111:1,3,5,15 | **online** 68:22 | 50:11,24 51:7 |
| 72:9,13,17,19 | 112:7 113:10 | 90:4 97:23 | 51:13,19 53:2 |
| 73:1,12 74:2 | 113:10,13,23 | **open** 33:15,15 | 53:4,14,15,24 |
| 74:16,18 75:20 | 114:20 115:2 | 137:23 | 54:19 55:6,15 |
| 76:2,5,8,22,24 | 115:22 116:21 | **operations** 1:7 | 56:9,12,18 |
| 76:24 77:7 | 116:25 117:11 | **operator** 7:9 | 57:7,12,21 |
| 78:5,8,18,20,20 | 117:14,18 | 42:23 57:12,25 | 58:3,9 59:3,8 |
| 78:21,24 79:3 | 118:5,18,21,23 | 89:13 90:12 | 59:21 60:2,15 |
| 79:3,12,22,24 | 119:11,13 | **opportunity** | 63:7 81:12,13 |
| 80:3,13,24 | 120:2,6,15,25 | 16:19 | 81:19,23 82:4 |
| 81:5,9,14,16 | 121:21,23 | **opposed** 34:9 | 100:7 103:15 |
| 82:8,17,17,24 | 122:9,15 123:2 | **oral** 1:9 4:2 | 110:6,11,11 |
| 83:5,22 84:2,7 | 123:18,22 | **ordered** 20:4 | 111:6,8,20,21 |
| 84:25 85:5,23 | 124:4,9,11,14 | **original** 139:20 | 111:23 112:15 |
| 85:24 86:11,14 | 124:17,22 | **outcome** | 112:18 113:5,8 |
| 86:20,22 88:23 | 125:3,5,9,13,18 | 139:16 | 113:14 115:10 |
| 89:3,8,13,17,19 | 125:21 126:3 | **outside** 105:12 | 115:11 122:3 |
| 90:7,9,15,17,25 | 126:19 127:3,5 | 114:16 120:9 | **own** 66:17 |
| 91:2,5 92:16 | 127:12 128:1,9 | 120:12 130:3 | |
| 93:10 94:3,6 | 128:11,11,11 | 134:20 | **p** |
| 94:13 96:2 | 128:22 129:11 | **outstanding** | **p** 1:15,15 5:1 |
| 98:8,21 99:10 | 130:10,23 | 95:22 | **p.m.** 64:6 |
| 99:15,19,24 | 131:8,11,15,17 | **overheard** | **packaging** |
| 100:5,9,14 | 132:22 133:4 | 127:24 | 80:20 |
| 101:8,17 | 134:1,11,13 | **overtime** 3:5 | **page** 2:5 114:2 |
| 102:10,10 | 135:10,18 | 14:13,14,21,23 | 118:5 122:1,1 |
| 103:2,10 104:2 | 136:11 138:3 | 15:6,6,13,16 | 122:1 127:7 |
| 104:6,18 105:5 | 138:10 | 16:11,13,18 | 129:12 130:24 |

Veritext Legal Solutions
800-336-4000

**[page - point]**

137:19
**paid** 18:5
108:18
**pain** 83:8,9,10
**pallets** 25:24
**paper** 110:24
110:25
**paperwork**
7:16,19,22,23
7:25 8:1 9:8,12
9:13,23,25
65:12,15,16,17
65:20 66:21
67:18 76:4
84:17
**part** 102:23
**particular**
19:10 54:10
**parties** 139:15
139:17,25
**pass** 51:11
**past** 101:14
**pat** 112:7
**patricia** 134:15
**paulo** 1:22 5:9
**pay** 109:3
**peace** 134:11
**pelt** 11:6,7,15
18:19 20:4
21:8,13,21
22:5 23:6
48:12 50:7
71:21 72:6
73:5,14 74:19

80:1 99:11
101:17 123:17
125:12
**pence** 104:24
105:9,11,15
113:1,2 130:16
**people** 3:15
15:19 17:1
43:7 64:21
66:9 74:7
76:11 85:20
87:9 97:6
100:23 107:11
107:20 115:13
121:12 122:12
122:19 123:11
131:18 132:2
132:10
**people's** 135:8
**perfect** 86:5,7
95:6,8
**perform** 7:10
7:15 15:12
25:22 64:18
70:17 75:5
**performance**
94:22,24 95:7
95:8,9,14,18
96:20,21 97:2
97:7,11 106:2
**performed** 73:4
**performing**
23:4 24:16

**period** 18:18
19:11,20 20:1
20:11,13 23:13
23:25 25:3,20
61:10,13 79:22
81:11,16,19
82:4 85:11,19
85:25 86:16
92:17,19
102:13 103:4
**person** 7:10
19:16 24:17
28:4,24 29:19
43:18 115:15
134:13
**persons** 113:6
139:17
**petition** 76:10
**phone** 26:9,22
27:14 29:19,23
29:25 47:3
77:15,20 93:8
111:1
**physical** 33:22
36:9 38:5
83:20
**physically**
84:10
**pick** 25:23,23
54:4 55:15,25
**pickens** 113:25
114:5,11,18
117:14,21

**picture** 58:13
58:17 62:1
64:1,5 110:16
**piece** 45:8
**pine** 126:11
**place** 1:19 4:6
85:9 109:12
110:1 136:8
139:12
**placed** 73:7,14
73:20 74:19,20
**plaintiff** 1:4,17
**plan** 109:7
**plant** 37:1
80:10 104:19
127:8
**platforms**
136:2
**play** 30:6 126:7
126:13 135:16
135:17
**played** 126:10
**playing** 30:3
31:23 60:7
135:20
**plenty** 48:11
55:20
**plus** 75:10
**pocket** 108:21
**point** 23:18,23
38:9 50:7,24
53:13 63:10
71:3 72:6
92:10 96:5

Page 19

**[point - quite]**

97:18 99:9
105:11 118:6
123:18,24
137:11
**pointed** 129:3
**points** 84:9
86:9,18,21
87:13 98:9,15
98:15 99:6,21
102:12,18,21
**poke** 45:15
**policies** 106:9
**policy** 98:10
108:19
**pond** 130:20
**poor** 95:18,19
**popped** 59:15
95:11,13 100:3
103:9 117:20
**portion** 109:5
**position** 7:3,5
7:20 21:15
64:23 75:6,17
76:17,18 89:9
118:7,15 119:1
119:9
**positions** 91:21
99:18
**possible** 121:5
**possibly** 115:6
**post** 16:22,23
17:1
**posted** 57:15
57:17 89:24

**posts** 16:25
**practice** 25:20
**pre** 60:14
**prefer** 117:5
**prejudiced**
104:14
**prepared** 127:3
**prescribed**
70:11,13
**prescription**
69:19 108:4,6
109:6
**prescriptions**
133:14
**present** 48:12
71:13
**presented**
76:10
**previously** 89:8
110:17 123:2
**prior** 9:20 18:9
24:21 39:3,4,8
39:10 49:3
51:17 54:20
71:3 89:5,18
89:18
**prison** 45:21
46:1,8
**probably** 9:3,3
11:5,23 19:2
22:15 23:14
25:11 26:10,10
27:13 38:16
43:25 51:5,8

51:10 52:6
59:20 67:19
74:13 75:16
77:15 78:14
100:1,2,13
102:7,9 104:5
109:22 120:4
124:18 126:18
127:4 133:3,4
134:12 135:20
136:1,1,5
**problem** 10:25
17:9 21:18
71:19 76:12
86:13 96:15
100:6 105:13
**problems** 21:13
39:4 105:9
**procedure**
18:21 19:25
49:2 53:14
**proceedings**
79:7 136:22
138:12 139:8,9
**process** 15:5
16:11 19:10
53:19
**produce** 135:8
**produced** 4:3
**producer** 135:7
**productive**
100:18
**program**
135:19

**properly** 122:7
**prove** 9:8,9
**provide** 98:4
101:12 139:23
**provided** 21:4
57:2 76:13
132:22
**provoke** 33:22
**punchwork** 4:5
**purpose** 5:16
**push** 43:8
**put** 21:15 22:3
22:22,24 45:8
60:17 64:19
78:4 86:9
91:24
**putting** 78:25
**pychotic** 83:9

**q**

**question** 6:11
6:20 15:5 31:8
33:9,11 53:10
53:13 81:9
104:13,16
107:24 125:11
125:13 130:10
**questions** 5:12
6:1 31:9 92:20
118:24 128:14
134:1 137:10
**quite** 67:10
134:5 136:11

Page 20

[r - representing]

| r | | | |
|---|---|---|---|
| **r**  1:15 5:1 32:13 139:1 | **receipt**  133:7 | **regarding**  79:1 | 7:3 22:13 46:5 90:10,20 107:20 112:11 |
| **race**  21:22 22:6 112:3 | **recognize**  29:4 29:6 58:5 | **regular**  20:9 25:20 30:20 48:24 50:14 51:21 52:10 94:10 | **remington's** 108:18 |
| **racial**  72:25 73:3 | **recognized** 29:10,12 119:13 | | **repeat**  118:10 |
| **racist**  71:19 72:21 74:21 | **recollection** 26:21 31:15 32:2 | **relative**  139:14 | **replaced** 106:15 |
| **raise**  96:4 | **recommendat...** 108:1 | **release**  77:19 | **replacing**  19:17 |
| **raised**  72:19 73:24 106:2 124:23 | **record**  5:9 17:18 79:6,9 79:12 86:5 99:6 123:23 126:25 136:21 137:16 138:9 138:10 | **relinquish** 139:20 | **report**  10:23 11:2 39:24 40:3 45:16 80:1 102:1 118:4 |
| **ran**  77:8 108:2 | | **remember** 19:20 26:24 29:24,24 31:19 31:20 33:23,25 34:1 36:3,4 38:25 40:18 45:1,3 48:21 49:5,6,6 52:21 52:21 53:20 56:18 60:21,22 60:24 70:4,21 70:22 71:18 81:5 84:14 88:10 92:3,7,8 93:5 98:6 101:18 103:5,6 127:3 131:11 132:9 133:24 134:4,5 | |
| **rape**  45:21 | | | **reported**  7:9 10:20 18:18 21:1 32:16 139:9 |
| **rate**  18:3 | | | |
| **read**  27:11 58:7 122:7 127:5 | | | **reporter**  6:4,15 13:5 56:23 79:6,9 136:9 136:11,21 137:25 138:10 139:6 140:9 |
| **reading**  30:4 | **recorded** 102:14 | | |
| **ready**  30:18 77:17 | **records**  86:17 87:12 94:14,15 | | |
| **real**  31:21 95:21 100:7 111:13 | **recounts**  131:2 | | |
| | **refer**  110:11 | | **reporter's**  2:25 |
| **really**  7:4,16 21:16 110:24 112:20 134:1 | **referred**  9:25 | | **reporting** 12:13 17:8 20:2 49:15 50:7 94:25 |
| | **referring**  20:7 87:19 88:10 | | |
| **reason**  60:12 61:17 91:7 | **refilled**  108:4 | | |
| | **refresh**  32:1 | **remembered** 40:16,25 92:4 | **reports**  13:24 |
| **reasons**  55:14 | **refused**  75:9 | **remind**  6:7 | **represented** 69:1 |
| **recall**  21:12 35:4,6 39:12 84:14 | **regard**  47:17 | **remington**  1:8 5:10,13,18,20 | **representing** 5:10 |
| | **regarded** 105:16 | | |

**[request - satisfied]**

**request** 4:3
15:16 97:21
**requested**
94:16
**requesting**
19:11
**requires**
139:19,23
**requisitions**
89:19
**researching**
102:1
**resources** 38:1
**respect** 37:23
**respond** 16:19
28:8,24
**response** 37:15
52:12 70:23
97:2
**responsibilities**
12:23 55:23
**responsibility**
10:19
**responsible**
10:16
**restroom** 37:12
117:4,5,6,12
**result** 84:21
**resumed** 79:8
136:23
**retire** 75:4,7
**retired** 75:11
115:1,3

**retrieve** 31:13
**return** 11:20
77:17 78:5
**returned** 78:21
79:13,23 92:17
103:10
**returning**
77:10 78:8
**review** 95:9
**rick** 98:23 99:2
99:8
**rifle** 16:10
**rifles** 8:14
**right** 7:1,12 8:4
11:9 12:3,8
15:10,15,16
18:16 19:21
20:22 21:6,20
22:4,16 26:1,2
26:5 27:2 28:7
28:22,23 30:10
30:15 32:5
34:6 35:16,20
36:4,8 38:11
38:11,18,18,18
39:16 45:10
46:12,15 47:21
49:16,24 53:8
53:11,25 56:20
58:18 59:6
60:11 61:13,25
62:8,20 64:7
64:22 67:15
68:17,21 71:8

74:5,24 79:17
80:10 82:13
84:10 85:4,11
85:18,24 86:2
86:15 87:1,5
89:1,6 90:19
92:10,13,19
93:21 97:1,6
99:7 101:19
102:8 103:7,22
103:25 104:5
107:3,20 108:6
108:16 111:19
112:13 113:6
114:20 118:15
119:5,23
121:10,25
122:25 128:21
130:23 131:13
131:13,13
132:12 133:21
134:10,14
135:20 136:7
**ring** 134:15
**riverfront** 1:19
4:5
**rock** 1:20 4:6
**role** 99:15
**room** 3:15 30:9
30:11,17 31:1
31:3,5,6 33:6
33:21 34:16
37:6 57:17
72:15,17

114:13,16,17
114:18,24
117:16,17,23
117:25 119:24
120:18 132:2
132:11
**rotation** 135:20
**roughly** 18:24
**rules** 5:25
**rumors** 43:16
46:10
**run** 75:23
**ryan** 11:12
12:13 15:14
16:12 17:8,9
17:13,21 18:11
40:2,3,4,5 42:3
45:17 62:17
72:7 73:4,8,15
76:15 98:18,19
101:16,17,20
**ryan's** 40:4

| s |
| --- |

**s** 1:15 3:1 5:1
132:20
**salary** 25:11
115:17
**satisfaction**
124:20
**satisfication**
124:19
**satisfied** 37:14
37:18,18

[saw - shell]

| | | | |
|---|---|---|---|
| **saw** 10:1,6,13 | **scheduled** | 120:16 121:2,8 | **separate** 89:15 |
| 11:15 58:11,15 | 14:24 17:20 | 121:9,17 | 89:19 |
| 59:3,9 69:12 | 24:21 | 122:12,13 | **september** 12:5 |
| 99:22 105:11 | **scholarship** | 127:5,16 | 18:15 19:5,21 |
| 106:21 108:8 | 125:23 | 129:14 134:2 | 20:12 65:15 |
| 114:14 119:7 | **school** 55:17 | **seeing** 9:20 | 69:10 77:1,12 |
| 121:4 134:16 | 125:24 126:3 | 45:1,3 66:21 | 79:20,23 81:12 |
| **saying** 6:4 | 126:17 | 85:21 106:14 | 81:18,18 82:18 |
| 14:21 30:3 | **sciatic** 83:10,11 | **seem** 129:21 | 85:14 86:1 |
| 35:4 45:24 | 84:21 | **seemed** 92:25 | 92:17 122:15 |
| 49:7 60:5 83:3 | **score** 86:7 | **seen** 45:22 | **seriously** 106:7 |
| 85:8 107:12 | **screen** 45:8 | 58:12 59:10,11 | **service** 139:25 |
| 115:4 118:12 | **seal** 140:1 | 59:14,15 70:10 | **set** 139:12 |
| 118:13 136:9 | **second** 12:5,12 | 78:14 89:1 | **setting** 5:23 |
| **says** 57:11 68:8 | 25:14,15,17 | 93:18 95:16 | **seven** 75:16 |
| 68:16 90:11 | 72:2 80:15 | 106:20 114:6 | 126:1 |
| 122:2 127:7,12 | 103:24 120:20 | 114:15 115:8 | **several** 49:11 |
| 129:12 | 120:22 121:18 | 116:5 117:21 | 61:18 73:7,25 |
| **scared** 38:3,4 | 127:7 | 119:25 130:2 | 104:15 |
| 107:12 | **seconds** 34:22 | 131:20 134:19 | **sexually** 45:12 |
| **schedule** 3:7 | **see** 8:12 10:25 | 134:20 | 45:13 |
| 9:13 17:11 | 16:4 29:10,13 | **sell** 135:3 | **shakes** 6:3 |
| 22:22,23 48:24 | 29:14 30:8 | **send** 46:8 84:6 | **shavers** 114:1,7 |
| 50:1,22,23 | 31:25 41:13 | **senior** 48:19 | 115:9 |
| 51:15 54:2,6 | 43:21 44:20,21 | 73:7 | **shawna** 139:6 |
| 60:4,6,13 | 44:24 58:14 | **seniority** 22:25 | 140:7 |
| 61:16,17,18 | 59:9 61:21 | 64:20,20,23 | **she'll** 26:19 |
| 62:12 63:7,18 | 62:23 63:16 | 73:9 74:23,24 | 44:8 46:7 |
| 67:12,13,14 | 67:20 70:1,5 | 75:8 86:25 | **sheet** 3:5 56:17 |
| 78:14 80:8 | 76:5 84:5 | 87:21 89:22 | 57:5,7,14,14 |
| 81:2,2 96:18 | 88:22 97:22 | 91:13 | 58:9,20 59:3,8 |
| 127:25 128:14 | 100:24 101:23 | **sent** 45:20 46:1 | 59:17,22 61:4 |
| 128:15,17 | 102:21 108:17 | **sentence** | **shell** 8:19 88:17 |
| 129:2 | 114:1,2 120:4 | 120:20 | 88:18 89:8,11 |

Veritext Legal Solutions
800-336-4000

**[shell - start]**

| | | | |
|---|---|---|---|
| 90:11 122:3,15 | **sic**  43:15 83:9 | 84:16 111:25 | 82:15 86:9 |
| **shells**  15:25 | **sick**  88:1 | **situations** | 95:9 102:2 |
| 80:16 | **side**  130:20 | 73:21 | 104:12 112:9 |
| **shepherd**  139:6 | 135:12,12 | **six**  75:16 86:16 | 121:4 132:7 |
| 140:7 | **sidebar**  93:19 | 97:3 | 136:19 |
| **sherry**  72:3,24 | **sign**  3:5 53:4,14 | **sixty**  34:22 | **song**  136:13 |
| **sherry's**  71:23 | 56:17 57:4 | **sizes**  8:6 | **sonia**  71:22,24 |
| **sherwood** | 58:3 59:22 | **slot**  64:7 | 72:24 |
| 126:6,7 | 61:3 101:9 | **snider**  22:14 | **sorry**  26:14 |
| **shift**  8:8 14:1,3 | 110:24,25 | 31:5 35:14 | 28:16 |
| 14:10,12,18 | **signature**  58:5 | 36:12 37:20 | **sort**  15:5 |
| 22:24 23:21,25 | 68:5 | 39:2,4,10 | 135:12 |
| 24:7,9,21 | **signed**  53:24 | 41:13,24 42:9 | **sound**  7:12 |
| 27:15 29:15 | 57:21 132:23 | 87:2 94:6 | 12:3,8 18:16 |
| 30:15,20,21 | **significance** | 96:11,23 99:10 | 134:23 |
| 42:14 47:8,13 | 98:8 | 104:7 105:12 | **sounds**  34:1 |
| 50:14 51:21 | **signing**  95:12 | 105:16,20 | **speak**  6:24,24 |
| 52:10 53:2 | **sir**  5:11,15,21 | 117:3 118:8 | **speaking**  47:2 |
| 54:14,18,22 | 5:24 6:6,23 | 119:16 125:7 | **specific**  79:18 |
| 55:6 56:3,10 | 8:21 10:5,8 | 127:14,18 | 79:19 |
| 60:14 61:13 | 11:19 12:11,14 | 131:9 136:25 | **specifically** |
| 62:6,7,14,25 | 12:18,21 14:2 | **snider's**  55:6 | 96:20 125:13 |
| 63:11,12 65:2 | 18:2,6,8 48:7 | 112:2 119:13 | **spelling**  32:4 |
| 80:3 93:5 | 69:22 77:6 | **snow**  134:15 | **spent**  11:13 |
| 125:3 127:15 | 78:23 91:1 | **solee**  20:8 50:2 | **spoke**  42:6 |
| 127:19 | 109:15 119:15 | 51:12,24 52:5 | 72:23 |
| **shit**  28:20 | 122:4 124:16 | 59:24 129:9 | **spring**  82:13 |
| **short**  79:12 | 129:6,8 | 131:5 | **ss**  139:3 |
| **show**  68:4 | **sit**  30:25 95:9 | **somebody** | **stacker**  25:22 |
| 78:21 95:18 | **sitting**  117:17 | 19:18 20:19 | **stairs**  26:3 |
| **showed**  99:24 | **situation**  11:1 | 43:25 45:20,20 | **stalls**  28:10 |
| 102:18 110:17 | 43:14 45:5 | 45:21 49:8 | **stamp**  133:9 |
| **shows**  64:6 | 52:22,25 66:10 | 55:13 67:6 | **start**  8:6 30:20 |
| | 74:6 76:17 | 75:17 82:10,12 | 49:20 50:13 |

**[start - talked]**

| | | | |
|---|---|---|---|
| 61:1,18 82:25 102:1 114:9 | **street** 1:23 22:3 110:2 | **supervisors** 81:22 | **table** 2:1 |
| **started** 9:6 17:8 24:15 30:15 45:18,19 46:6 49:15,17 100:23 103:15 | **stress** 77:21 **stressed** 64:11 **stuff** 19:14 25:24 44:1 49:15,17 54:4 | **support** 7:8,12 8:24 9:21 10:2 10:4,14,15 11:16 12:16 13:3,9,12 | **take** 6:15 13:5 15:3 17:7 22:14,25 28:24 64:5 65:12 69:10 70:3,20 |
| | | 76:15 | 76:25 78:22 |
| **state** 112:21 125:23 126:8 139:2 | 55:18 61:1 69:11 76:11,21 85:21 107:10 | **supposed** 58:3 62:23 63:6 115:13,13,16 | 79:3 87:24,24 87:25 96:24 107:7 109:18 |
| **stated** 139:7 | 109:2,3,6 | **supposedly** | 111:1 117:3 |
| **statement** 119:9 | **style** 2:3 **styled** 4:4 | 99:24 104:7 | 124:17 136:20 137:12 |
| **statements** 3:15 78:25 132:22,23,25 | **subgroups** 81:1 **subject** 106:10 **substantial** | **sure** 8:11 27:6 33:14 44:17,23 50:8 51:2 53:11 64:5 | **taken** 1:13 4:3 139:12 **talk** 6:21 23:17 25:10 31:16 |
| **states** 1:1 | 139:19 | 67:6,10,10 | 37:1,22 38:1,9 |
| **stay** 15:1 45:18 46:7 94:11,11 | **sue** 133:21 **suite** 1:19,24 4:6 | 68:20 69:7 88:9 90:16 92:14 105:22 | 40:12 41:21 59:16 62:3 64:9 79:22 |
| **stayed** 43:16 77:3,3,4 | **summarizing** 76:14 | 107:22,22 124:8 125:18 | 84:15 86:14 90:21 93:10,16 |
| **staying** 45:18 | **summer** 134:11 | 129:20 134:2,5 | 93:19 94:6 |
| **steps** 37:23 | **super** 73:4 | 136:11 | 96:7 100:22 |
| **sterling** 66:25 69:14 70:1,5 83:18 106:14 | **supervise** 105:7 **supervision** 139:11 | **sworn** 5:3 **sylvan** 125:25 126:2,3 | 104:6 107:20 113:7 125:17 **talked** 17:16,17 |
| 134:3 | **supervisor** 11:4 | **system** 66:3 | 17:19 33:23 |
| **stone** 110:2 | 11:8,15,18,21 | 68:20 103:15 | 38:10,11,15,16 |
| **stop** 50:6,11 107:2,6 111:8 | 18:11 23:18 29:15 40:5 | **t** | 38:16,25 39:6 39:11 45:17 |
| **stopped** 17:9 127:14,18 | 42:10 72:7 73:5,8 101:15 | **t** 3:1 127:8 139:1,1 | 48:23 67:4,6 67:12 70:3 |
| **straight** 36:16 36:17 | 101:21 | | |

**[talked - think]**

| | | | |
|---|---|---|---|
| 93:14,17 94:3 | **tell**   5:3 16:15 | 107:24 113:13 | 43:8 46:20 |
| 97:20 100:9 | 16:18 20:13 | **terry**   20:8 35:6 | 47:20 48:3 |
| 101:3 116:25 | 21:19 22:25 | 35:8 49:22 | 50:8,10 51:12 |
| 127:6 129:16 | 23:3,7,10 | 51:12 77:23 | 52:20 56:20 |
| 131:2 135:1 | 36:19 38:1 | 78:13 93:7,22 | 59:18 61:16,22 |
| 137:8 | 43:5,10 48:21 | 128:3,4,12,22 | 68:7,11 69:3 |
| **talking**   5:18 | 53:3 56:2,6 | 129:5 | 70:2,2,2,2,3,19 |
| 6:12 7:22 9:12 | 60:8,9 64:16 | **test**   87:24,25 | 70:21 71:3,10 |
| 9:17 16:6 | 66:16 71:18 | **testified**   5:4 | 71:21,21,22,22 |
| 17:12 23:13 | 72:13 91:15 | **testifying** | 72:5,15,24,24 |
| 35:13 36:25 | 94:8 97:20 | 102:19 | 76:23 77:3,3 |
| 39:11 49:5 | 105:11 117:4 | **testimony**   26:7 | 79:13 80:2 |
| 51:16 57:7 | 119:16 120:18 | 49:2 59:1 | 81:7,9,19 82:9 |
| 66:20 71:19 | 123:10 125:16 | 61:20 67:3,4 | 82:20 83:8 |
| 72:10 81:16 | 128:5 | 69:3 99:4 | 88:9,20,25 |
| 82:22 85:12 | **telling**   7:6 35:6 | **texas**   1:25 | 90:13 91:6,22 |
| 87:2 96:20 | 35:20 49:6 | **thank**   13:6 | 93:12,17 94:9 |
| 114:10 116:6,9 | 122:22 | **therapist**   82:22 | 94:18,25 95:21 |
| 118:11 121:13 | **ten**   24:5 | **thing**   6:3,9 8:17 | 96:10,13,21 |
| 127:24 | **tendency** | 97:4 101:1 | 97:1,4,17 98:1 |
| **talks**   15:13 | 139:19 | 113:12,13 | 98:5,18,22 |
| 118:6 130:24 | **term**   9:16 98:9 | 121:1 | 100:11,12 |
| **taper**   112:17 | 110:11 | **things**   40:12 | 104:12,13,22 |
| **tardy**   99:25 | **terminate** | 52:22 87:6 | 106:12,20 |
| 100:2 | 75:19 | 92:20 93:19 | 108:2 110:4,19 |
| **team**   17:10 | **terminated**   7:6 | **think**   6:19 | 112:17 115:24 |
| 20:5,7 49:23 | 76:3 | 10:10 15:4 | 115:24 116:1,1 |
| 51:11 72:15 | **termination** | 18:4 19:9,24 | 116:3,3,3 |
| 93:4,7 125:6 | 106:10 | 20:8 21:10,11 | 122:9,17 123:1 |
| 128:12 | **terms**   10:20 | 21:21,23,25 | 123:25 125:20 |
| **technician** | 16:11 39:9 | 22:5,15 24:2,3 | 126:18,19 |
| 88:17,18 89:11 | 47:23 61:12 | 24:8,11 25:4,6 | 127:22 129:24 |
| 90:11 | 62:4 65:14 | 26:10 30:24 | 132:6 134:22 |
| | 74:21 106:9 | 37:8,14 40:9 | 134:25 137:15 |

Veritext Legal Solutions
800-336-4000

**[think - true]**

| | | | |
|---|---|---|---|
| 138:2 | 78:6,22 79:15 | **together** 78:11 | **took** 11:24 |
| **thinking** 75:7 | 79:16,22 80:1 | **told** 15:6 19:13 | 34:16 45:21 |
| **thomas** 22:15 | 80:3,7 81:11 | 20:5,16,17 | 58:12,17 62:1 |
| 37:1,4,7,11 | 81:17,19 85:11 | 23:5 31:9,15 | 64:1 70:15 |
| 38:4 47:3 | 85:19,21,23 | 31:22,22 32:16 | 77:21 84:5 |
| 104:21 127:8 | 87:22 91:25 | 35:7,12,24 | **tooken** 86:25 |
| **thought** 38:5 | 92:16,19 96:5 | 37:4,11 39:5,5 | **top** 58:5 68:9 |
| 43:14 94:16 | 97:5,6 99:13 | 42:1 43:7 | 109:12 |
| **threatening** | 100:11,17 | 45:17,20 46:23 | **touch** 9:3 43:17 |
| 105:16,20 | 101:20 102:13 | 47:1,2,11 | 77:3,4 |
| **three** 14:19 | 102:22 103:4 | 49:25 50:11,19 | **tough** 79:18 |
| 52:17 106:20 | 103:13,19 | 50:24,25 51:6 | **towards** 39:15 |
| **thumbtack** | 106:21 108:8 | 51:9,13,14,15 | 43:1,6 |
| 63:24 | 117:11 122:16 | 52:9 53:1 56:9 | **transcribe** 6:4 |
| **thursday** 15:17 | 122:18,25 | 60:14 65:2 | **transcribed** |
| 57:22 | 124:14 130:25 | 66:18,19 76:3 | 139:10 |
| **till** 6:11 25:6 | 131:11 132:13 | 78:20 81:5 | **transcript** 6:15 |
| 59:14 121:19 | 139:12 | 82:7,9,12 84:6 | 139:20,21 |
| **time** 9:14 10:6 | **times** 6:10 | 84:8,15 85:23 | **treat** 87:15 |
| 11:13 14:3,8 | 24:11 61:18 | 87:6,8,12,23 | **treated** 21:14 |
| 14:13,25 15:20 | 106:20 107:2 | 91:2,8 92:21 | 37:20 39:25 |
| 18:7,18 19:20 | 112:14 | 93:22 98:23 | 74:24 84:10,22 |
| 20:13,14 23:13 | **title** 7:11 8:23 | 99:8 110:23 | 84:25 85:1,24 |
| 23:25 25:2,2 | 9:2,15,20 | 112:19 116:16 | 86:2,25 87:4,5 |
| 25:20 26:1 | 10:10,13 11:16 | 116:22 117:3 | 87:8 |
| 28:2 39:4,5,13 | 13:11 44:2 | 117:12 118:3 | **tried** 34:17 |
| 39:20 44:13 | 74:25 75:8 | 119:5,19,22 | 52:13 87:17 |
| 45:22 46:6 | **titled** 75:4 | 123:7,18 124:4 | **triggered** 84:9 |
| 48:1,10 58:12 | **titles** 9:6 | 127:23 128:1 | **trouble** 27:4 |
| 58:19,22 59:2 | **today** 5:12 | 128:22 | 46:7 50:5 |
| 59:15 60:17 | 11:18 20:24 | **tomorrow** | 86:12 94:12 |
| 66:14 68:12,13 | 27:2 78:21 | 16:16 121:11 | **true** 39:15 |
| 68:15 69:1 | 130:10 | **tony** 12:24 13:9 | 42:12 53:12,13 |
| 70:15 76:25 | | 15:9 111:5 | 55:1 64:22,24 |

**[true - vs]**

101:6 122:5,6
122:8 129:21
139:8
**truly** 119:12
**truth** 5:3,4,4
**try** 6:7,18
14:14 15:1
50:4 93:18
124:19 129:2
**trying** 19:3
30:4 33:22
48:23,24 78:6
78:11 87:16
88:1,12,12
92:9 98:1
107:13,17,18
**tucker** 71:22,24
**tuesday** 57:21
**turn** 7:4,16,19
7:20,20,23
9:23 65:22,23
121:25 122:1
**turned** 13:9
76:4
**two** 11:24
24:19,19 48:25
49:1 60:14
63:1,1,3 64:21
74:17 75:10
87:24 104:22
106:20 127:13
**type** 73:21
76:10 129:22
132:7

**typed** 131:22
132:1,5,6,8
**typically** 14:23
18:1
**tyron** 40:2
**tyrone** 40:13,19
41:13,19,21
116:20,21

**u**

**u** 32:13
**uapb** 125:22
126:10
**uh** 36:5 40:24
41:16 48:5,14
60:19 62:9
66:19 70:7,7
80:4 81:21,21
88:12 96:8
102:11 105:25
108:12 110:15
123:9 131:1
136:14 137:3,9
137:25
**unappropriate**
43:15
**under** 91:23
103:15 106:3
109:7 113:1,2
135:21 139:10
**understand**
5:10,14 47:18
67:2 119:3
121:25

**understanding**
11:24 12:16
106:1 119:4
139:12
**understood**
6:22
**undetermined**
7:4
**unfairly** 87:15
**union** 134:9
**united** 1:1
**unity** 69:16
70:5 134:9,18
134:20
**university**
125:23 126:11
**untrue** 129:25
130:1
**untruthful**
129:13
**upper** 104:20
**upset** 37:20
102:17
**upstairs** 25:13
26:4 32:23
**urge** 86:8
**use** 25:21 26:6
27:2 34:2,2
35:1,24 37:11
44:19 86:25
117:4,5,5,9,12
119:22,22
139:9

**used** 14:13,16
27:21 40:1,19
58:20,23,24,24
**useless** 96:7
**using** 9:16
28:12 29:25
44:7 104:7
**usually** 14:15

**v**

**van** 11:6,7,15
18:18 20:4
21:8,13,21
22:5 23:6
48:12 50:7
71:21 72:6
73:5,14 74:19
80:1 99:11
101:17 123:17
125:12
**varied** 8:23
**verbatim** 139:9
**video** 121:10
**violate** 45:13
**violated** 45:12
**violations**
106:4
**visit** 109:2
**voice** 29:4,6,8
29:11,12 39:5
119:14 139:10
**vs** 1:6

Veritext Legal Solutions
800-336-4000

[w - woman]

| w | | | |
|---|---|---|---|
| **w** 32:13 | 64:18 75:7,7 | **week** 7:5 14:12 | 94:9 96:14,17 |
| **wait** 6:9,11 | 82:1,1 86:23 | 14:19 22:23,24 | 104:14 117:20 |
| 67:16 87:23 | 102:2,2 124:2 | 23:23 24:25 | 120:5 122:5,9 |
| 91:3,16 | 134:2 | 47:20 48:10 | 122:24 124:6 |
| **wake** 26:18,19 | **wanting** 106:13 | 49:11 60:5,7 | 125:22,22,23 |
| 27:1 83:24 | **wants** 22:18 | 67:14 78:22 | 126:7 127:7 |
| **walk** 123:7 | **warned** 127:20 | 81:1,2 86:16 | 130:12,16 |
| 124:2 | **wash** 57:11,25 | 128:15 | 131:16 |
| **walked** 30:10 | **watch** 7:8 | **weekly** 62:12 | **whirly** 109:12 |
| 34:25 93:8 | **watched** 84:24 | **weeks** 20:12 | **white** 22:2 |
| **walker** 40:2,13 | 85:1 87:9 | 49:11,13,22 | 46:13,14 105:3 |
| 116:20,21 | **watching** 85:21 | 51:2,4 87:24 | 105:4 137:19 |
| **walking** 25:22 | 93:9,23,25 | 128:6 | **whites** 73:20 |
| 114:15,22 | **watson** 117:24 | **weird** 29:3 | 74:20 |
| **wall** 63:22 | 117:25 132:14 | **went** 11:22 | **wide** 80:10 |
| **want** 15:2,7,21 | **way** 17:7 21:13 | 19:22 21:3 | **wife** 26:11,22 |
| 19:19 27:4 | 33:23 37:19 | 26:6 27:13,21 | 27:7 29:19 |
| 32:1 35:22 | 39:20,25 40:11 | 30:9,16,16,25 | 60:8 108:20 |
| 36:22 37:12 | 42:5,8 44:17 | 33:21 34:6 | 109:18,23 |
| 50:12 52:9 | 45:22 46:20 | 35:10 36:14,14 | **wife's** 109:7 |
| 54:8,10,12,13 | 53:9 54:1,6 | 36:16,18 37:1 | **wish** 45:15 |
| 54:13,18 56:23 | 84:22,25,25 | 38:10 43:8 | **witness** 2:6 4:3 |
| 56:24 59:21 | 85:3,24 94:11 | 44:18 52:13 | 7:1 13:7 42:24 |
| 73:12 84:5 | 104:12 111:9 | 59:1,5 61:6,12 | 42:25 43:1 |
| 87:5 91:7 | 129:23 | 64:11,12 65:3 | 110:6,11 |
| 92:16 97:19 | **we've** 17:18 | 65:11,13 68:7 | 111:20 136:10 |
| 99:1 107:18 | 39:11 127:6 | 68:24 70:1,2,5 | 137:11 138:3 |
| 129:23 | **weaver** 92:25 | 70:9 72:10 | 138:14 140:1 |
| **wanted** 22:2 | 93:1,10,23 | 73:5 75:2,3 | **witnessed** |
| 36:22 43:8 | 94:1,3 | 79:19,24 81:1 | 115:4,5 |
| 53:3 54:3,7 | **wednesday** | 82:11,18 83:13 | **woke** 83:8 |
| 56:5 58:3 | 15:17 57:21,22 | 83:25 84:14 | **woman** 106:16 |
| | 58:6 | 85:17 86:9 | 106:17 113:11 |
| | | 90:4 91:22,22 | |

Veritext Legal Solutions
800-336-4000

**[women's - yeah]**

| | | | |
|---|---|---|---|
| **women's** 37:12 | 81:19 82:1 | **worst** 95:1,3,5 | 32:14,14,19 |
| **wood** 118:6,8 | 85:16 94:10 | **wow** 105:25 | 35:6,9,15,17,19 |
| 118:11 119:1 | 97:23 99:25 | **write** 50:4 | 35:21 36:1,7 |
| 129:13,16,16 | 100:6 103:5,10 | **writing** 113:23 | 37:21 38:10,12 |
| **word** 30:3 40:1 | 105:5 109:9 | 120:24 139:10 | 38:14,22,24 |
| 104:8 120:7 | 112:11,24 | **written** 98:12 | 40:23 41:20,20 |
| **words** 34:8 | 113:16 114:12 | **wrong** 22:19,20 | 41:23,25 42:2 |
| 43:11 | 122:2 127:23 | 24:11 33:7 | 42:19,21 43:23 |
| **work** 8:13,13 | **worked** 17:13 | 84:10 116:4 | 44:5,8 45:5 |
| 8:18,19 12:25 | 18:14,15 19:24 | 119:3 120:3 | 46:2,6,19,20,22 |
| 14:1,3,10,12,13 | 32:21,25,25 | **wrote** 88:19 | 46:22,24 47:1 |
| 14:14,21,23,24 | 42:12,14 44:6 | 118:6 128:7 | 47:7,10,12,19 |
| 15:1,7 16:13 | 62:5 72:2 80:3 | 132:7 | 49:13,19 50:3 |
| 16:17 17:5,24 | 80:25 100:6 | | 50:25 51:25 |
| 18:24 19:3,5 | 105:6 112:17 | **x** | 53:16,16,18 |
| 20:1,4,6,9,14 | 113:1,6 | **x** 3:1 | 54:1,11,21,23 |
| 20:18 21:9 | **working** 14:14 | | 54:23 55:9,18 |
| 24:15 25:2 | 15:5,19,19 | **y** | 56:11,14,16,16 |
| 26:3,17 32:24 | 16:11,16 17:1 | **y'all** 97:7 | 56:19 57:8,10 |
| 33:1,2 36:15 | 17:19 18:21 | **yard** 130:20 | 58:4 59:4 |
| 41:18 45:8 | 23:21 24:4,23 | **yeah** 8:1 11:7 | 60:24,24 61:1 |
| 50:24 51:7,13 | 26:4 45:4 46:6 | 11:13 13:2,13 | 62:7,15,19,19 |
| 51:19,21 52:10 | 50:11,13 62:6 | 13:18 14:7,22 | 63:23,25 64:15 |
| 53:1,2,4 54:10 | 75:2 81:1,2,23 | 14:25 15:15 | 65:18 66:2,4 |
| 54:12,13,17,19 | 82:3 86:1 | 16:14,17,20 | 66:18,23 68:10 |
| 55:6,7,7,14 | 103:15 107:12 | 17:9,17,23,25 | 68:15 70:12 |
| 56:2,9,9,12 | 111:12 115:16 | 18:12 19:12 | 71:25 73:12 |
| 58:3 60:2,14 | 127:12,13 | 20:15,25 23:20 | 75:21 76:21,21 |
| 62:23 63:6,11 | **workplace** | 24:6,10,10,10 | 77:4,9,13 78:2 |
| 63:17 65:2,19 | 104:8 105:12 | 24:11,20,22,24 | 78:2,2,2,17 |
| 68:20 69:10 | **workstation** | 25:1,6,15,22 | 79:16 80:14,14 |
| 71:11 75:22 | 117:6 | 27:13,17,19 | 80:17,19,21 |
| 77:17 78:5,8 | **worry** 55:12 | 29:12 30:22,24 | 82:9,14 83:2,6 |
| 79:14 81:12,13 | | 31:17,25 32:6 | 83:11,11,11,11 |
| | | 32:6,7,8,10,12 | |

**[yeah - zoloft]**

| | | |
|---|---|---|
| 83:13,17,19,19 | 126:4,4,4,12,14 | **yolanda** 20:8 |
| 83:21 84:18 | 127:2,9,11,17 | 49:25 50:2,12 |
| 85:6,17 86:19 | 128:2,4,8,10,13 | 50:16 51:8,10 |
| 87:3,7,20 88:7 | 128:19 129:17 | 51:12,14,18,23 |
| 88:13 89:12 | 130:4,4,17 | 53:21 59:24 |
| 90:2,14 91:12 | 131:13,21 | 123:7,16,18,18 |
| 91:17,22 92:1 | 132:15,17,19 | 123:24 124:4 |
| 92:12,23 93:2 | 132:21,24 | 125:9,11 |
| 94:23 95:24,24 | 133:6,8,23,25 | 127:24 129:9 |
| 97:19,23 99:3 | 134:5,8,8,10,10 | 131:5 |
| 100:19,19 | 134:17,17,17 | **yolonda** 59:20 |
| 102:9,9,24,24 | 134:19,19,25 | **z** |
| 103:1,23,23 | 135:7,11,17,22 | **zoloft** 69:23 |
| 104:10,14,22 | 135:24 136:10 | 70:13 106:23 |
| 104:25 105:2 | 136:16 137:1,5 | 133:10 |
| 106:5 107:5,16 | 137:7 138:4 | |
| 108:7 109:2,3 | **year** 9:7 11:23 | |
| 109:14,19 | 45:7 48:25 | |
| 110:18,20,20 | 49:1 73:7 | |
| 110:21 112:4,6 | 103:11 130:22 | |
| 112:6,12 113:3 | **years** 7:7 23:4 | |
| 114:7,8,21 | 39:8 41:2 | |
| 115:8,19,21 | 48:25 63:1,3 | |
| 116:9,18,24 | 64:21 73:7 | |
| 117:22 118:1,3 | 75:16 100:4 | |
| 118:11,14,14 | 109:22,23 | |
| 118:14 119:2 | 113:9 126:1 | |
| 119:10,18 | 127:14 | |
| 120:12,14 | **yell** 139:4 | |
| 121:22,22,24 | **yelling** 116:6 | |
| 122:14,17 | 116:10,10 | |
| 123:1 124:5,10 | 120:17 | |
| 124:21,22 | **yep** 29:2 30:18 | |
| 125:10,15,25 | | |

Page 31

Federal Rules of Civil Procedure

Rule 30


(e)  Review  By  the  Witness;  Changes.

(1)  Review;  Statement  of  Changes.  On  request  by  the
deponent  or  a  party  before  the  deposition  is
completed,  the  deponent  must  be  allowed  30  days
after  being  notified  by  the  officer  that  the
transcript  or  recording  is  available  in  which:

(A)  to  review  the  transcript  or  recording;  and

(B)  if  there  are  changes  in  form  or  substance,  to
sign  a  statement  listing  the  changes  and  the
reasons  for  making  them.

(2)  Changes  Indicated  in  the  Officer's  Certificate.
The  officer  must  note  in  the  certificate  prescribed
by  Rule  30(f)(1)  whether  a  review  was  requested
and,  if  so,  must  attach  any  changes  the  deponent
makes  during  the  30-day  period.



DISCLAIMER:  THE  FOREGOING  FEDERAL  PROCEDURE  RULES
ARE  PROVIDED  FOR  INFORMATIONAL  PURPOSES  ONLY.
THE  ABOVE  RULES  ARE  CURRENT  AS  OF  APRIL  1,
2019.  PLEASE  REFER  TO  THE  APPLICABLE  FEDERAL  RULES
OF  CIVIL  PROCEDURE  FOR  UP-TO-DATE  INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.



## Wash Operator overtime for 4/23-4/26

| Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|
| Michael Haskin | Michael Haskin | Michael Haskin | Michael Haskin |
| | | | |
| | | | |
| | | | |

EXHIBIT

1

PENGAD 800-631-6989

| Job Description | 6:30AM-2:45PM | 2:30PM-10:45PM | 10:30PM-6:45AM |
|---|---|---|---|
| Plating Technician | David Reaves | | Audrey Ogden |
| Manufacturing Technician 3A (Draw-Heading-Headturn-Taper) | Kevin Raney<br>Roosevelt Wilson<br>Daniel Geisler<br>Tim Williams<br>Michael Baker<br>Dan Medlin<br>Steve James<br>David Chapman<br>Ambra Moore<br>Rich Velasquez | Tom Hershberger<br>Kevin Williams<br>Todd Davis<br>Harley Hooker<br>Jonathan Rogers<br>Brandon Vail<br>John Bush | Curtis Soho<br>Rick Baughman<br>Patrick Holder<br>Kalon Mills<br>Austin Rouse<br>Tony Owens<br>Gaston Robert<br>Chris Anders |
| Manufacturing Production Associates-2 (Draw-Heading-Headturn-Taper) | Sherry Dale<br>Barbara Anderson<br>Felicia Applewhite<br>Sandy Funderburg<br>Dana Richardson<br>Leah James | Dwight Rendell<br>Billy McGee<br>Koua Vang<br>Ben Wilson<br>Justine Goforth | Kelly Goode<br>Linda Wessey<br>Mark Tinnin<br>Terrance Bivins<br>Courtney Beasley |
| Manufacturing Support Associates-2 (Furnace-Wash-Floor Coord) | Joel Ritsma<br>Oonla Tucker<br>Michael Hawkins<br>Jeff Henson<br>Tyrone Walker | Jack Canady<br>Martha Goforth<br>Tony Jackson | Lloyd Mckinney<br>Kevin Davie<br>Gary Burnett |
| Manufacturing Production Associates - 1 Comp Inspet | Sherry Robinson<br>Cecilia Gonzales | Tamara Rummel | Sandra Ray |
| | 24 | 16 | 18 |

EXHIBIT
2

PENGAD 800-631-6989

4/22/24

Effective Monday we are going to change the way Maintenance
system, only Production specialist/Pr...

RECEIVED

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | U.S EEOC Little Rock Area Office Little Rock AR | EEOC | 493-2024-01941 |
| | | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.) | Home Phone | Year of Birth |
|---|---|---|
| Lloyd McKinney | (501) 960-4024 | 1967 |

Street Address

1116 Stone St.

Jacksonville, AR 72076

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| Remington Arms | 501+ Employees | (501) 676-3161 |

Street Address

Remington Rd.

Lonoke, AR 72086

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

Street Address | City, State and ZIP Code

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Race, Retaliation | 03/29/2024 | 05/08/2024 |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired on February 28, 2012, most recently as a Cup Dumper. On March 29, 2024, I was told by a white night supervisor that I wasn't allowed to use a universal bathroom that I was coming out of. I went to HR and reported the incident. I had a meeting with the Plant Manager, and HR told the Plant Manager about the incident. The Plant Manager told me that I can use whatever bathroom I want except a female bathroom. On April 16, 2024, I was told that the white night supervisor was asking about my schedule and changed my schedule to an 8 hour schedule instead of a 10 hour schedule.

I don't know why I have been subjected to different terms and conditions of employment.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| _____    _____ Date                                Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EXHIBIT
3

PEMUG 000-631-8989

LK000031

Tyrone Walker ~~overtime~~
overtims witness
Tony Jackson - 5ol-803-9355
   overtimes witness - ~~5ol 551 37~~
      MiKe HawKin S - 5ol-551-3707
Willian Hill-5ol-541-3645
      overtime withess

pat holder - 5ol - 517 - 0361
         overtime withess

Larry Hightower -5ol-541-7940
      overtime witness

Cat Jones  - 5ol-838-6569
         overtime witnes s
Byron Shavers
   overtimes witness

MiKe PicKenS -5ol-350-4268
Bathroom + overtime witpes S

Kevin Davis - ~~sto~~ -5ol- 240-9449
   Bathroom Incident witnes

aoldie -         870-319-0671
   Bathroom Incident witness

EXHIBIT
4
PENGAD 800-631-6989

Lloyd McKinney

Being accused of something I
didn't do.

Mitch wood being misled ~~by~~
By coy about who accused me
of ~~being~~ being loud in the bathroom

Not being truthful about the whole
Situation

Saying it was Mitch comeing
to the bathroom but all along
it was coy.

being untruthful about Lisa Saying
that I was the one being loud in
the bathroom.

coy admits ~~thread~~ I never said
anything I the bathroom

I never got apologized to.

I just got punished for something
I didn't do.

I had a meeting with Johnny denter
and Beth Ellis about these
events nothing was done.


So I contacted the EEoc
thaits ~~there~~ when everything stopped.

I didn't get a chance to work
overtimes until day left the
Sell area. He went back to
the bullet area.



1# on· 3-29-24

I Lloyd M°Kinney
Was using the bathroom upstairs
on a emergency As I was in
the stall coy snider entered
the bathroom loud and aggressive.
I was rudely Interrupted.

2# After leaving the bathroom.
In between 6:15 ₽ 6:30
coy snider entered the break
room being aggressive. again
Saying come with me Lloyd.
out on the floor in the work area
Body and hand's Moving being
Aggressive.

3# Coy snider said Lisa Hebrew said
Somebody was in the bathroom
being loud.
Lisa Hebrew Immediately said it
was not true.

④    So we went to the plant Manager
      Craig T

⑤    These attacks happen three
      different time's In the bathroom
      In the breakroom and in the
      work area.

⑥    I have been working 5:00→3:15
      for the last 2 year's.
      coy Snider stopped me from
      comeing in early on his shift.

⑦    Ernest T__y team lead Informed
      me that coy was asking questions
      about My schedule, the next week
      my schedule change
      I was no longer allowed to do
      My schedule 5:00 - 3:15.

⑧    I didn't get to work any overtime
      until coy Snider moved back to
      the Bullet area, In late December
      2024

LK000072

#9    Coy and Mitch wood are ~~not~~ being
      ~~x~~ untruthful about who entered
      the bathroom on me.

#10   it was Coy voice I recognized it
      This is presenting fale
      Documentis ~~too~~ a federal Courthouse.

#11   Mitch wood is not my supervison
      nor team lead.
      He has no Jurisdiction over
      the Shell area He work in Bullet
      area a conflict of interest.

#12   We had several meetings about this
      Incident but nothing Seems to
      happen about it

#13   I had to contact the EEOC
      to stop Coy Snider from
      ~~Haruss~~ Harassing me.

#14

LK000073

\#   out of 34 people in the sell
area. I was the only one
who was told to mop the ~~floor~~
foor my cox snider.
and Remington do got a
cleaning crew I took this
as intimidation.

\#

LK000074

I _Chris Watson_ was in the breakroom between 6:25a.m. and 6:30 a.m. when Coy Snider came and askes Lloyd McKinney to come with him on March 29, 2024

 Chris Watson  5-3-24

RECEIVED

MAY 13 ...

U.S. EEOC
Little Rock Area Office
Little Rock, AR



EXHIBIT
10

I ___Kevin Davis___ was in the breakroom between 6:25a.m. and 6:30 a.m. when Coy Snider came and askes Lloyd McKinney to come with him on March 29, 2024

5·3·24

___Kevin Davis___

Cell    501- 240- 9459

I _Addic Erans_ was in the breakroom between 6:25a.m. and 6:30 a.m. when Coy Snider came and askes Lloyd McKinney to come with him on March 29, 2024



**U.S.    .AL EMPLOYMENT OPPORTUNITY COMMISSION**
**Little Rock Area Office**

820 Louisiana St., Suite 200
Little Rock, AR 72201
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
FAX (501) 324-5991
Website: www.eeoc.gov

July 24, 2024

Lloyd McKinney
1116 Stone Street
Jacksonville, AR 72076



Re:    Lloyd McKinney vs. Remington Arms
       EEOC Charge No.: 493-2024-01941

Dear Mr. McKinney:

**This letter is to inform you the Commission is terminating the processing of your charge and gives notice of your right to file suit within 90 days. No further action will be taken by this office regarding your charge of discrimination. This determination concludes the processing of the charge by the EEOC, but does not affect your right to sue on your own behalf. You may pursue the matter by filing in Federal District Court as explained in the Dismissal and Notice of Rights. <u>You will receive an e-mail notification when the Dismissal and Notice of Rights has been uploaded into the Portal and available for you to download.</u>**

On June 3, 2024, a copy of the Respondent's position statement was released to you through the EEOC portal and you and your attorney had the opportunity to provide a response to the position statement, but no response was received. The investigation revealed the following facts:

You alleged that you were denied the use of a universal restroom on one occasion, and your schedule was changed, due to your race, Black, and in retaliation for engaging in a protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

You alleged that a supervisor, Coy Snider, told you not to use a specific restroom and pointed his finger at you. You complained to management, and alleged that this was because of your race. Management immediately allowed you to use any restroom, other than female restrooms, and informed you that this incident occurred because of staff complaining about someone talking loudly in the restroom that was near offices. This is a one-time incident, and even if it occurred due to your race, it does not rise to the level of a tangible employment harm. Respondent took immediate action once it was notified.

As to the allegation of your schedule being changed from 10 hour shifts to 8 hour shifts, due to your race and retaliation, the evidence indicates that your production specialist recommended the schedule change that affected other employees as well as you. During this time respondent considered other changes to their scheduling system, but that ultimately in June 2024 the 10-hour scheduled that you originally worked was restored. There is no indication that the initial change was due to your race or retaliation as it affected other employees and was not limited to you.

LK000029

Based upon the evidence gathered, EEOC is unable to conclude that there was a violation under the laws enforced by EEOC.

Sincerely,

July 24, 2024

Matilda Louvring
Investigator

Date

Cc. Luther Sutter, attorney for charging party

LK000030

fax-501-315-1916

EEOC #

493-2024-0194

# To The EEOC

ON 5-9-24 I Lloyd MCKinney
Was call By Remington H.R.
about a Job I applied for
Shell making technician
and a AIM operater.
When it came Down to signing the
paper work I was told i had to wait
30 Days befor i can move to the
New Job. This all started after the
March 29 Bathroom Incident
I Believe my opportunities at
Remington are Being Blocked

Lloyd McK___

May 31-24



# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**LLOYD MCKINNEY**                                                  **PLAINTIFF**

**VS.**                        **NO. 4:24-cv-00880 KGB**

**AMMUNITION OPERATIONS, LLC**                      **DEFENDANT**

## AFFIDAVIT

STATE OF ARKANSAS)
COUNTY OF Pulaski )

I, Lloyd McKinney, Plaintiff herein, make the following statement on oath:

1.       Earnest Terry is the individual who suggested I file an EEOC complaint.

2.       Earnest Terry told me Coy Snider was looking for an excuse to fire me or make me quit by changing my schedule.

3.       Earnest Terry is now mad at me because I will not participate in his gambling operation.

4.       Earnest Terry has received a promotion after I filed my EEOC complaint and he signed the affidavit.

5.       Earnest Terry is not my supervisor.

Further the affiant sayeth not.

*Lloyd Mc[signature]*

Lloyd McKinney

SUBSCRIBED AND SWORN to before me this _11_ day of _August_, 2025.

_____
Notary Public

My Commission Expires:

> D JOHNSON OGLES
> PULASKI COUNTY
> NOTARY PUBLIC - ARKANSAS
> My Commission Expires April 10, 2032
> Commission No. 12387603

**EXHIBIT 2**