## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

LLOYD MCKINNEY                                                    PLAINTIFF

v.                              Case No. 4:24-cv-00880-KGB

AMMUNITION OPERATIONS, LLC d/b/a
REMINGTON                                                        DEFENDANT

### OPINION AND ORDER

Before the Court is defendant Ammunition Operations, LLC d/b/a Remington's ("Remington") motion for summary judgment (Dkt. No. 12).  Plaintiff Lloyd McKinney brings this action against Remington for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.*, and the Arkansas Civil Rights Act ("ACRA"), Ark. Code. Ann. § 16-123-101 *et seq.* (Dkt. No. 1, ¶ 1).  McKinney alleges that Remington subjected him to inequitable treatment based on race, adverse employment action, and retaliation for complaining about the alleged discrimination (*Id.*, ¶¶ 2–3).

McKinney seeks damages for lost wages or salary, benefits, and other compensation denied or lost to him by reason of Remington's alleged violations of Title VII and the ACRA; he also seeks any interest he is entitled to for these causes (*Id.*, ¶¶ 55, 68).  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and venue is proper pursuant to 28 U.S.C. § 1391.

In its motion for summary judgment, Remington contends that no genuine dispute of material fact exists and that Remington is entitled to judgment on each of McKinney's claims as a matter of law (Dkt. No. 12).  McKinney responded in opposition to Remington's motion (Dkt. Nos. 18–21), and Remington replied (Dkt. No. 26).  For the following reasons, the Court grants Remington's motion for summary judgment (Dkt. No. 12).

## I.      Factual Background

Remington filed a statement of undisputed material facts (Dkt. No. 14), and McKinney filed a response to those facts (Dkt. No. 19).[1]  The Court draws the following undisputed facts from these filings, the pleadings, and, where necessary to clarify, the record evidence.

Remington produces a wide array of sporting and hunting ammunition at its facility in Lonoke, Arkansas (Dkt. No. 19, ¶ 1).  McKinney was hired at Remington's Lonoke facility in February 2012 (*Id.*, ¶ 2).  McKinney remains employed at Remington's Lonoke facility, and his job title is Manufacturing Support Associate (*Id.*, ¶ 3).  McKinney works in the shells division of the centerfire department at the Lonoke facility (*Id.*, ¶ 4).  His job duties include ensuring machines in production lines remain fully supplied with metal cups, a component used to manufacture bullet casings (*Id.*).

On March 29, 2024, McKinney used a bathroom at the Lonoke facility that shares a wall with the area where certain Remington administrative personnel work (*Id.*, ¶ 7).  McKinney acknowledges that he regularly took breaks in this bathroom while he was on the clock and that he would often call his wife and read the newspaper during these breaks (*Id.*, ¶ 8).  While McKinney was in the bathroom, an individual whose identity McKinney did not know at the time, entered the bathroom and called out to McKinney (*Id.*, ¶ 9).[2]  McKinney testified that the individual said,

---

[1]  McKinney filed a statement of undisputed material facts in support of his response to the motion for summary judgment (Dkt. No. 20), but McKinney filed no motion for summary judgment himself.  As a result, no response from Remington is required to this filing.  The Court has considered the filing in its review of the pending motion for summary judgment.

[2]  As required by Federal Rule of Civil Procedure 56(c), any denial of fact must be supported by citations to particular parts of materials in the record.  Because McKinney failed to support certain of his denials of material facts with citations to particular parts of materials in the record (*see* Dkt. No. 19, ¶¶ 9, 10, 14, 23–26, 30, 39–43), the Court considers these facts undisputed for the purposes of resolving this motion.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

"What you doing? What you doing? Are you all right?" (Dkt. Nos. 18, at 29; 19 ¶ 10).[3] McKinney did not respond, the individual left the bathroom, and McKinney left the bathroom shortly thereafter (Dkt. No. 19, ¶ 11).

After McKinney left the bathroom, McKinney walked to the breakroom and sat down (*Id.*, ¶ 12). Then, McKinney alleges that Coy Snider, a supervisor in a different department at the Lonoke facility, approached McKinney and asked to speak with him (*Id.*). Snider told McKinney that an administrative employee had complained that McKinney was being loud in the bathroom (*Id.*, ¶ 13). McKinney alleges that Snider told McKinney that, in the future, McKinney should not use the bathroom near where the administrative personnel worked (Dkt. Nos. 18, at 35–36; 19, ¶ 14).[4] McKinney alleges that Snider used aggressive hand motions during this interaction but testified that Snider did not touch him (Dkt. No. 19, ¶ 16).

Hours later, McKinney reported this interaction with Snider to Craig Thomas, the plant manager at the Lonoke facility (*Id.*, ¶ 17). McKinney stated that Thomas advised McKinney that he could use any bathroom he wanted other than those designated for women (*Id.*, ¶ 18).

McKinney also discussed his interaction with Snider in meetings with the facility's management and human resources personnel on March 29, 2024, and during the following week. (*Id.*, ¶ 19). McKinney told human resources personnel that he believed Snider's interactions with him and Snider's initial instruction not to use the bathroom near the administrative offices had something to do with McKinney's race (*Id.*).

---

[3] McKinney raises argument, with no citation to record evidence, in response to the factual statement. The factual statement is deemed admitted.

[4] McKinney purports to deny this factual statement "as written," with no citation to record evidence. The factual statement is deemed admitted.

McKinney testified that there were no meaningful problems between himself and Snider prior to the bathroom incident (*Id.,* ¶ 41).  When asked why McKinney believed the bathroom incident was connected to his race, McKinney testified that Snider had called another employee the n-word prior to 2023 and previously had been "aggressive" with two other black employees (*Id.,* ¶ 40).  McKinney testified that he did not hear Snider call another employee the n-word but that McKinney learned through "hearsay" that the employee reported the interaction to human resources (*Id.,* ¶ 41).  McKinney further testified that he did not witness Snider acting aggressively toward another black employee—McKinney's supervisor—and stated that his supervisor did not tell McKinney that Snider had been aggressive toward him, only that the two had "had words" (*Id.*).  McKinney likewise testified that he did not witness Snider acting aggressively toward a second black employee and that his belief that this occurred was based on "hearsay" (*Id.*).  McKinney testified that the bathroom incident was isolated and promptly remedied to his satisfaction (*Id.*, ¶ 42).

Following this incident, McKinney alleged that Snider prevented him from working overtime, changed his hourly schedule,[5] and moved McKinney to the night shift[6] (*Id.*, ¶¶ 21, 29, 33).

---

[5] McKinney alleges in his complaint and in his response brief that he was moved from ten-hour days to eight-hour days (Dkt. Nos. 1, ¶ 32)  However, McKinney elsewhere agrees that his hours were changed from eight-hour days to ten-hour days (Dkt. No. 19, ¶¶ 30, 33).  Therefore, the Court interprets this pleading to allege that McKinney was moved to ten-hour days.

[6] McKinney alleges in his complaint that he was moved from the night shift to the day shift (Dkt. No. 1, ¶ 34).  However, McKinney elsewhere states that after these events, "Defendant also moved [McKinney] back to the day shift," (*Id.*, ¶ 38) and that McKinney "has been working 5:00 am – 3:00 pm for the last two years" (Dkt. No. 20, ¶ 6).  Therefore, the Court interprets this pleading to allege that McKinney was moved from the day shift to the night shift.

McKinney typically worked from 5:00 a.m. to 7:00 a.m. as an overtime shift and from 7:00 a.m. to 3:00 p.m. as his regular shift (*Id.*, ¶ 22).[7]   Around that time, Remington laid off the employee who performed McKinney's job duties on the overnight shift, leaving Remington without coverage for the overnight shift (*Id.*, ¶ 23).[8]   As a result, Remington needed to ensure that there was regularly scheduled overtime coverage on the overnight shift (*Id.*, ¶ 24).[9]   Either McKinney or Mike Hawkins, a Caucasian male on McKinney's shift who had the same job functions as McKinney, could work a full four hours of overtime to help cover work on the overnight shift (*Id.*).

On April 16, 2024, the production specialist—who McKinney reported to—began requiring McKinney and Hawkins to sign up in advance for overtime to ensure adequate staffing as to the role performed by McKinney and Hawkins and to allow the supervisors on McKinney's team to have advanced notice of who would be covering the overtime hours (*Id.*, ¶ 25).[10] McKinney also acknowledged that he was permitted to work overtime starting at 3:00 a.m., rather than 5:00 a.m., but McKinney claims that he was not able to do so because of personal obligations (Dkt. Nos. 18, at 55–57; 21, at 4, 6).

As to McKinney's schedule change, on or about August 13, 2024, the shift structure for the centerfire department was modified from three eight-hour shifts five days per week to two ten-hour shifts four days per week (Dkt. No. 19, ¶ 30).  McKinney acknowledged that all employees

---

[7]  The Court determines that this statement is supported by record evidence cited by the parties.

[8]  McKinney raises argument, with no citation to record evidence, in response to the factual statement.  The factual statement is deemed admitted.

[9]  McKinney raises argument, with no citation to record evidence, in response to the factual statement.  The factual statement is deemed admitted.

[10]  McKinney raises argument, with no citation to record evidence, in response to the factual statement.  The factual statement is deemed admitted.

who worked in McKinney's department experienced a change from five-day week schedules to four-day week schedules, working 10 hours per day (*Id.*, ¶ 31).

McKinney asserts that he was told that his position was being eliminated or was eliminated and (Dkt. Nos. 1, ¶¶ 33, 35; 19, ¶ 36).  However, McKinney admits that his position was not eliminated (Dkt. No. 19, ¶ 36).

McKinney alleges that "the terms and conditions of his employment were changed" (Dkt. Nos. 1, ¶ 35) and in his deposition stated that his job title was changed (Dkt. Nos. 18, at 11; 19, ¶ 36).  McKinney stated that he has been "doing the same job for the last 14 years" (Dkt. Nos. 18, at 8; 19, ¶ 36).  McKinney stated that his title was "cup dumper" (Dkt. No. 18, at 8) or "floor coordinator" (*Id.*, at 11) prior to the bathroom incident, and that "months after that event happened," his title was changed to "manufacturing support associate" (*Id.*, at 10).  When McKinney's title was changed, McKinney stated that he received additional responsibilities (Dkt. Nos. 18, at 11; 19 ¶ 36).  McKinney stated that Tony Jackson also had his title changed from floor coordinator to manufacturing support associate (Dkt. No. 18, at 13–14).  McKinney alleges that after he filed a charge with the EEOC, Remington "reinstated him to the [m]anufacturing [s]upport [a]ssociate position" (Dkt. No. 1, ¶ 37)

## II.    Summary Of Arguments

In his complaint, McKinney alleges that on March 29, 2024, after he entered a bathroom, a supervisor entered the bathroom and called to him (Dkt. No. 1, ¶¶ 22, 24).  After leaving the bathroom, McKinney alleges that the supervisor confronted him, yelled at him, and told him not to use that bathroom again (*Id.*, ¶¶ 26–27).  Following this event, McKinney alleges that several actions were taken against him, including changing his schedule. (*Id.*, ¶¶ 30–35).  McKinney subsequently filed a charge with the Equal Employment Opportunity Commission ("EEOC") and

alleges that since that filing, he has not been allowed to work overtime (*Id.*, ¶ 39). McKinney alleges that Remington's white employees were not subject to the same treatment as McKinney and that McKinney was therefore treated disparately from Remington's white employees (*Id.*, ¶¶ 46–49).

In support of its motion for summary judgment, Remington advances several arguments. With respect to McKinney's racial discrimination claims, Remington argues that McKinney failed to identify an adverse employment action, failed to identify similarly situated employees who were treated more favorably, and failed to rebut Remington's legitimate business reasons for the changes to its overtime and other policies (Dkt. No. 13, at 3).

First, Remington argues that McKinney admitted in his deposition that he was never denied the opportunity to work overtime, was not treated differently than coworkers regarding overtime policies, was never required to and did not work the night shift, and was not treated differently with regard to a department wide shift scheduling modification (*Id.*, at 5–8). Therefore, Remington argues, there was no adverse employment action (*Id.*).

Next, Remington argues that McKinney failed to identify similarly-situated employees who were treated differently because McKinney testified that McKinney's white coworker with the same job functions were both temporarily required to sign up for overtime in advance and because McKinney testified that the modification to his shift schedule applied to his entire department (*Id.*, at 8).

Finally, Remington argues that, even if McKinney could raise a factual issue as to a *prima facie* case of discrimination, Remington had legitimate business reasons for the neutral employment policy changes: ensuring adequate shift coverage following the layoff of an employee who had previously staffed the overnight shift (*Id.*, at 9–10). Remington argues that McKinney

has no evidence to support his assertions that Remington's justification is pretextual because: (1) McKinney has no evidence to link his race to the alleged request that he not use that particular restroom; (2) McKinney's speculation that the individual involved with the bathroom incident was involved in changing his hours is based on multiple levels of hearsay; and (3) McKinney was never actually denied the opportunity to work overtime (*Id.*, at 11).

With respect to McKinney's hostile work environment claim, Remington argues that McKinney cannot point to evidence suggesting that his interaction with a supervisor had anything to do with his race (*Id.*, at 1415). Remington further argues that the single incident in which a supervisor called out to McKinney while in the bathroom, told him that he could not use a particular bathroom, used "aggressive hand gestures," and yelled at him during their communication does not rise to the level of actionable racial harassment (*Id.*, at 13). Remington argues that McKinney's claim, which alleges only one isolated incident and was promptly remedied to his satisfaction, did not alter a term, condition, or privilege of McKinney's employment and therefore falls short of the standard required for actionable hostile environment racial harassment (*Id.*, at 15–16).

Remington argues that McKinney does not separately identify a claim for "retaliation," but to the extent McKinney alleges such a claim, McKinney's claim fails for the same reasons as McKinney's discrimination claim (*Id*., at 11, n.6).

In his response in opposition to the motion for summary judgment, McKinney argues that he suffered an adverse employment action when the rules for overtime work were changed, making it more difficult for McKinney to work overtime after March 29, 2024 (Dkt. No. 21, at 4). As to similarly-situated employees being treated more favorably, McKinney asserts that his white coworker, Mike Hawkins, was not told that he had to come in at 3:00 a.m. for overtime, which

8

was a specific requirement for McKinney to work overtime (*Id.*).  McKinney argues that he has shown that Remington's legitimate business reasons were pretextual because "[o]therwise, why would [Remington] tell [McKinney] he had to come in at 3:00 a.m. if [McKinney] wanted to work overtime" (*Id.* at 5).

As to McKinney's hostile work environment claim, McKinney argues that he is a member of a protected class and that "the alleged harassment has poisoned [McKinney's] working conditions" (*Id.*).  McKinney argues that his hostile work environment claim includes continuous and ongoing hostile actions starting with the complaint by a white supervisor, yelling at McKinney to not use a certain bathroom, complaining about McKinney listening to loud music, and changing McKinney's work schedule (*Id.*).  McKinney also argues that he was "disrespected, talked down to, yelled at," that he was "ordered by Snider to walk out of the break room," and that "Snider attempted to provoke [McKinney] into a physical altercation" (*Id.*).  McKinney asserts that his job description was changed, that he was not allowed to work two hours of overtime each day, and that he was required to work four hours of overtime if he wished to work overtime (*Id.*, at 5–6).

In its reply in support of its motion for summary judgment, Remington first argues that McKinney has not cited any evidence that McKinney was "treated differently," and that the evidence shows Yolanda Solee and Earnest Terry, not Snider, required McKinney and Hawkins to sign up for four hours of overtime if they desired to work overtime (Dkt. No. 26, at 3).  Remington also argues that McKinney has not rebutted Remington's legitimate, nondiscriminatory, nonretaliatory reasons for its employment actions with any record evidence (*Id.*, at 3–4).  As to McKinney's hostile work environment claim, Remington argues that:  (1) there is nothing in the record to support McKinney's assertion that a white supervisor complained about McKinney; (2) the alleged bathroom incident was isolated and promptly remedied to McKinney's satisfaction;

and (3) any evidence of an employee complaint about McKinney listening to loud music amounts to nothing other than "ordinary tribulation of the workplace" (*Id.,* at 5).

### III.    Summary Judgment Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56 and noting that summary judgment is proper if there is no genuine issue of material fact in dispute for trial).

"In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Loc. 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (quoting *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987)).

## IV.    Analysis

### A.    Racial Discrimination Claims

#### 1.    Legal Standard

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.[11]  Title VII, however "does not protect employees 'from those petty slights or minor annoyances that often take place at work and that all employees experience.'"  *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 918 (8th Cir. 2007)  (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).

To prove discrimination, a plaintiff may present direct evidence of discrimination.  If a plaintiff has no direct evidence, a plaintiff may establish a *prima facie* case of discrimination through indirect evidence pursuant to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973) ("*McDonnell Douglas* framework").  *See Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023); *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1196 (8th Cir. 2006).  Under this framework for indirect evidence, to establish a *prima facie* racial discrimination claim under Title VII, a plaintiff must show that he:  "(1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) suffered under circumstances permitting an inference of discrimination." *Warren v. Nucor Corp.*, 150 F.4th 990 (8th Cir. 2025) (quoting *Moody v. Vozel*, 771 F.3d 1093, 1097 (8th Cir. 2014)).

---

[11]  Racial discrimination claims are evaluated identically under Title VII and the ACRA. *Schaffhauser v. UPS*, 794 F.3d 899, 902 (8th Cir. 2015).  Therefore, the Court evaluates McKinney's discrimination claims under Title VII and the ACRA together.

Evidence of pretext "can satisfy the inference-of-discrimination element of the prima facie case." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).  Pretext can be shown, among other ways, by showing that an employer:  (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision. *Id.*  To establish that a similarly-situated employee received more favorable treatment, the evidence must show that the similarly-situated employee dealt with the same supervisor, was subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances. *Jones v. Forrest City Grocery, Inc.*, Case No. 4:06-cv-00944-BSM, 2008 WL 2539851, at 4 (E.D. Ark. June 23, 2008) (citing *E.E.O.C. v. Trans-State Airlines*, 462 F.3d 987, 993–94 (8th Cir. 2006)).

Under this framework for indirect evidence, once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show a nondiscriminatory reason for the adverse employment action. *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012) (quoting *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011)).  This burden is "not onerous." *Hilde v. City of Eveleth*, 777 F.3d 998, 1004 (8th Cir. 2015) (quoting T*orgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*)).

The plaintiff may then rebut the defendant's proffered nondiscriminatory reason by showing that it "was merely pretext for discrimination." *Gibson,* 670 F.3d at 854 (quoting *Jackson*, 643 F.3d at 1086).  This may be done in a variety of ways including:  "show[ing]  that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact'" or "by persuading the court that a [prohibited] reason more likely motivated the employer."*Torgerson,* 643 F.3d at 1047 (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006) (second alteration in original).  A "reason cannot be proved to be 'a pretext *for discrimination*'

unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in original).

## 2.    Analysis

McKinney has not presented any competent direct record evidence of racial discrimination by Remington against McKinney.  McKinney's allegations that Snider called another employee the n-word prior to 2023 and that Snider had been aggressive with two other black employees were incidents not directed at McKinney and are incidents that McKinney had heard about, not what McKinney witnessed himself (Dkt. No. 19, ¶¶ 40–41).  These types of allegations are not sufficient to overcome a properly supported motion for summary judgment.  *See* Fed. R. Civ. P. 56.  Therefore, to prove racial discrimination, McKinney must establish a *prima facie* case of discrimination through indirect evidence.  *McDonell*, 411 U.S. at 802–03.

The parties do not dispute that McKinney is part of a protected group or that he met the legitimate expectations of his employer (Dkt. No. 13, at 5).  Remington argues that McKinney neither suffered an adverse employment action, nor suffered under circumstances permitting an inference of discrimination (*Id.*).

McKinney alleges that:  (1) he was confronted, yelled at, and told not to use a certain bathroom; (2) his hourly schedule was changed; (3) he was moved to the night shift; (4) his rules for overtime work were changed; (5) he was told that his position was being eliminated or was eliminated; and (6) his job title and duties were changed (Dkt. Nos. 1, ¶¶ 33, 35, 46–49; 19, ¶¶ 21, 29, 33; 21, at 4–5).  He alleges that similarly situated white employees did not face such actions (Dkt. No. 1, ¶ 46).

First, McKinney argues that he was confronted, yelled, at, and told not to use a certain bathroom.  Prior to the bathroom incident, there were no meaningful problems between McKinney

13

and Snider (Dkt. No. 19, ¶ 41).  During Snider's alleged confrontation with McKinney, Snider told McKinney that another employee had complained that McKinney was being loud in the bathroom and not to use that bathroom anymore (Dk. Nos. 19, ¶¶ 13; 18, 35–36).  McKinney alleges that Snider said this while using aggressive hand motions (Dkt. No. 19, ¶¶ 19).

McKinney provides no evidence that any other similarly-situated white employee—or any employee—attempted to use the bathroom at issue and was treated differently by Snider or any other Remington employee.  *Carter v. Atrium Hosp.*, 997 F.3d 803, 809 (8th Cir. 2021) (finding no inference of discrimination when an employee was fired for misconduct but provided no evidence that other employees outside his protected class were treated more favorably for similar conduct).  Therefore, McKinney fails to establish an inference of discrimination by showing that similarly-situated white employees were treated in a disparate manner or by otherwise providing sufficient probative evidence to permit a rational trier of fact to find an inference of discrimination based on the bathroom incident.

Even assuming that McKinney's allegations establish a *prima facie* case of discrimination, Remington has met its burden in showing a nondiscriminatory reason for its action:  Snider's stated reason for telling McKinney to not use the bathroom was because of a complaint from another employee that McKinney was being loud in the bathroom (Dkt. No. 19, ¶¶ 12, 13).

McKinney's only evidence to rebut Remington's assertion and to show that the reason was "merely pretext for discrimination" is his own feeling based on "hearsay" of Snider's past incidents with other employees (Dkt. No. 19, ¶¶ 13, 40, 41).  When McKinney brought up the interaction to the plant manager, McKinney was told that he could use any bathroom he wanted other than those designated for women, and McKinney admitted that the bathroom incident was isolated and promptly remedied to his satisfaction (*Id.*, ¶¶ 17, 18, 41).  McKinney's assertions fail to permit a

rational trier of fact to find that Remington's proffered explanation is merely pretextual by showing that the reason is false and that discrimination was the real reason for the change in overtime policy. *Hicks*, 509 U.S. at 515; *see also Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 798 (8th Cir. 2011) ("To succeed in showing pretext the employee 'must provide some evidence that other employees were not subject to the same level of investigation for similar conduct.'") (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 997–98 (8th Cir. 2011)).

Second, McKinney alleges that his hourly schedule was changed (Dkt. Nos. 1, ¶ 32; 19, ¶¶ 30, 33).[12]   However, McKinney admits that all employees who worked in his department experienced this change, including those who worked in bullets, packaging, shells, and loading, not just McKinney or other black employees (Dkt. No. 19, ¶ 31).  McKinney asserts no evidence that any similarly-situated white employee did not have his or her hourly schedule changed. Therefore, McKinney fails to establish an inference of discrimination by showing that similarly-situated white employees were treated in a disparate manner or by otherwise providing sufficient probative evidence to permit a rational trier of fact to find an inference of discrimination based on his hourly schedule changing.

Even assuming McKinney did establish a *prima facie* case of discrimination on this ground, Remington alleges a nondiscriminatory reason for the action:  that the change in shift structure was implemented for the entire centerfire department (*Id.*, ¶ 30, 31).

McKinney admits that the change happened to everyone in his department (*Id.*). McKinney's assertions fail to establish any dispute of material fact which would permit a rational

---

[12]   McKinney alleges in his complaint and in his response brief that he was moved from ten-hour days to eight-hour days (Dkt. Nos. 1, ¶ 32; 26, at 4).  However, McKinney elsewhere agrees that his hours were changed from eight-hour days to ten-hour days (Dkt. No. 19, ¶¶ 30, 33).

trier of fact to find that Remington's proffered explanation is merely pretextual by showing that the reason is false and that discrimination was the real reason for the change in overtime policy. *Hicks*, 509 U.S. at 515.

Third, McKinney alleges that he was moved from the day shift to the night shift (Dkt. No. 1, ¶ 34).[13] McKinney provides no evidence to support this allegation (*See* Dkt. No. 19, ¶ 32). The only evidence before the Court is:  (1) McKinney's statement that he did not work the night shift between March 29, 2024, and May 13, 2024 (Dkt. No. 18, at 64); and (2) an undated time log showing McKinney's name in the 10:30 p.m. to 6:45 a.m. shift, of which McKinney stated that "[he] never had to do it" (*Id.* at 66, 176).  Therefore, McKinney fails to establish a genuine dispute of material fact as to whether he suffered an adverse employment action on this ground.

Fourth, McKinney argues that his overtime rules were changed by requiring him to:  (1) sign up on a written sheet rather than signing up verbally; and (2) report at 3:00 a.m. for a four-hour overtime shift rather than at 5:00 a.m. for a two-hour overtime shift (Dkt. Nos. 19, ¶ 22, 28; 21, at 4).  Although McKinney alleges that Hawkins—his white coworker—was not subject to the same overtime requirements, McKinney provides no support for this statement (Dkt. No. 19, ¶ 26). The only evidence before the Court regarding Hawkins's overtime is a document provided by McKinney showing Hawkins's name on an overtime sheet, appearing to indicate that Hawkins was, in fact, subject to the same written overtime procedure that McKinney complains applied only to him (Dkt. No. 18, at 176).  Thus, McKinney fails to establish an inference of discrimination by showing that similarly-situated white employees were treated in a disparate manner or by

---

[13] McKinney alleges in his complaint that he was moved from the night shift to the day shift (Dkt. No. 1, ¶ 34).  However, McKinney elsewhere states that after these events, "Defendant also moved [McKinney] back to the day shift," (*Id.*, ¶ 38) and that McKinney "has been working 5:00 am—3:00 pm for the last two years" (Dkt. No. 20, ¶ 6).  Therefore, the Court interprets this pleading to allege that McKinney was moved from the day shift to the night shift.

otherwise providing sufficient probative evidence to permit a rational trier of fact to find an inference of discrimination based on his overtime rules changing. *Warren*, 150 F.4th at 997 (finding no inference of discrimination when an employee failed to present evidence of white employees being treated more leniently and failed to prove pretext); *Woods v. Collins*, 150 F.4th 967 (8th Cir. 2025) (finding no inference of discrimination when an employee provided no evidence that another worker was permitted to do the behavior that the employee complained he was not allowed to do).

Even if McKinney established a *prima facie* case of discrimination on this ground, Remington established a nondiscriminatory reason for its action—the need for advanced notice and adequate staffing for overtime following Remington laying off another employee (Dkt. Nos. 19, ¶ 23; 13, at 6)—and McKinney fails show that the proffered reason was merely pretext for discrimination by showing that the reason is false and that discrimination was the real reason for the change in overtime policy. *Hicks*, 509 U.S. at 515.

Fifth, McKinney alleges that his job was being eliminated or was eliminated (Dkt. No. 1, ¶¶ 33, 35). However, McKinney admits that his position was never eliminated (Dkt. No. 19, ¶ 36). McKinney therefore fails to raise a genuine dispute of a material fact as to whether McKinney suffered an adverse employment action on this ground.

Finally, McKinney alleges that his job title and duties changed (Dkt. No 1, ¶ 35; 18, at 8–12). McKinney provides no evidence that any other similarly-situated white employee was treated differently than McKinney. McKinney provided evidence of only one employee—Tony Jackson—who was similarly-situated in relation to his changes in job title and duties, but McKinney failed to identify Jackson's race (Dkt. No. 18, at 10–14). Even assuming that Jackson falls outside of McKinney's protected class, McKinney testified that Jackson also had his job title

17

changed from floor coordinator to manufacturing support associate and that the two perform similar jobs (*Id.*). Further, the allegation that McKinney's job duties changed is undermined by the fact that McKinney admits that he has been doing the "same job" for about 14 years and started working for Remington in February 2012 (Dkt. No. 19, ¶¶ 2, 36).

Therefore, McKinney fails to establish an inference of discrimination by showing that similarly-situated white employees were treated in a disparate manner or otherwise provide sufficient probative evidence to permit a rational trier of fact to find an inference of discrimination based on his overtime rules changing. *Warren*, 150 F.4th at 997 (finding no inference of discrimination when an employee failed to present evidence of white employees being treated more leniently and failed to prove pretext); *Woods*, 150 F.4th 967 (finding no inference of discrimination when an employee provided no evidence that another worker was permitted to do the behavior that the employee complained he was not allowed to do).

Even when viewing these facts together and in a light most favorable to McKinney, McKinney is unable to show that there is a genuine issue of material fact as to whether there are circumstances permitting an inference of discrimination or that Remington's proffered nondiscriminatory reasons for any adverse actions were merely a pretext for discrimination based on race.

Therefore, Remington's motion for summary judgment as to McKinney's racial discrimination claims is granted (Dkt. No. 12).

### B.    Hostile Work Environment

#### 1.    Legal Standard

To establish a claim for hostile work environment based on race, an employee must prove that: "(1) he is a member of a protected group; (2) he was subject to unwelcome race-based

harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment." *Clay v. Credit Bureau Enters.*, 754 F.3d 535, 540 (8th Cir. 2014) (quoting *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011) (alterations omitted)).  Harassment must be "both objectively hostile as perceived by a reasonable person and subjectively abusive as actually viewed by" the plaintiff. *Warren*, 150 F.4th at 998–99 (8th Cir. 2025) (quoting *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010).  To determine whether harassment was objectively hostile, "we look to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether the conduct unreasonably interfered with the employee's work performance." *Id.* (quoting *Anderson*, at 518–19).  This is a "demanding" standard and "does not encompass 'ordinary tribulations of the workplace.'"  *Id.* (quoting *Anderson*, at 519.)  The workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (quoting *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005)).  Allegations of "a few isolated or sporadic incidents of harassment will not suffice unless those incidents are extremely serious." *Hairston v. Wormuth*, 6 F.4th 834, 841 (8th Cir. 2021) (internal citations omitted).

### 2. Analysis

The parties do not dispute that McKinney is part of a protected group (Dkt. No. 13, at 5). McKinney argues that he was subject to continuous and ongoing harassment consisting of McKinney's and Snider's interaction about the bathroom and McKinney's alleged changes to his schedule and overtime policy.  Specifically, McKinney argues that his hostile work environment claim does not fail as a matter of law because he suffered actionable harassment in the form of "a

19

complaint by a white supervisor, yelling at [McKinney] to not use a certain bathroom, complaining about [McKinney] listening to loud music, and changing [McKinney's] work schedule" (Dkt. No. 21, at 5). Further, McKinney alleges that he was "disrespected, talked down to, yelled at, [and] ordered by Snider to walk out of the break room," that "Snider attempted to provoke [McKinney] into a physical altercation" and that McKinney's overtime requirements were changed (*Id.*, at 5–6).

On March 29, 2024, McKinney entered the bathroom, was called out to while in the bathroom, left the bathroom, was confronted by Snider, and told to not use that bathroom (Dkt. Nos. 1, ¶¶ 22–29; 19, ¶¶ 9–14). McKinney alleges that Snider "attempted to provoke [McKinney] into a physical altercation" while telling Snider to not use the bathroom (Dkt. No. 21, at 5; *see also* Dkt. No. 18, at 34), but McKinney does not allege that any physical altercation occurred. Later that same day, when McKinney reported the incident, McKinney was told that he could use any restroom other than the women's restroom and McKinney was satisfied with that answer (Dkt. No. 19, ¶¶ 17, 18).

Several months later, McKinney's hourly schedule was changed (Dkt. No 1, ¶¶ 29–32; 19, ¶¶29, 30). McKinney admits that the change occurred to everyone in his department (*Id.*, ¶ 31).

McKinney alleges that he was moved to the night shift (Dkt. No. 1, ¶¶ 34, 38). However, as previously discussed, McKinney has provided no evidence that this occurred, and the evidence in the record suggests otherwise (Dkt. No. 18, at 64, 66, 176).

McKinney's overtime requirements were changed, requiring him to sign up on a written sheet rather than verbally and report at 3:00 a.m. for a four-hour overtime shift rather than at 5:00 a.m. for a two-hour overtime shift (Dkt. Nos. 1, ¶ 39; 19, ¶ 22; 21, at 4). Remington instituted the

changes in overtime policies to ensure that there was regularly scheduled overtime coverage on the overnight shift after an employee was laid off (Dkt. No. 19, ¶¶ 23, 24).

McKinney's job title and duties were changed several months after the bathroom incident at a similar time to his similarly situated coworker's job title changing (Dkt. Nos. 18, at 10–114; 19, ¶ 36).  McKinney admits that he started working at Remington in 2012 and that he has been doing "the same job" for about 14 years (Dkt. No. 19, ¶¶ 2, 36).

These facts, taken together and construed in a light most favorably to McKinney, do not raise a genuine issue of material fact as to whether McKinney's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Warren*, 150 F.4th at 999.  The isolated bathroom incident, coupled with the changes in McKinney's schedule, overtime policy, job title, and duties do not meet the "demanding" standard to establish objectively hostile harassment.  *Id.*; *see also Clay v. Credit Bureau Enters.*, 754 F.3d 535, 540 (8th Cir. 2014) (finding 12 incidents of alleged harassment to not be sufficiently severe or pervasive when they were infrequent and involved low levels of severity); *Kamal Al-Zubaidy v. TEK Indus.*, 406 F.3d 1030, 1039 (8th Cir. 2005) (finding comments that were isolated, had a tenuous connection to race, were not severe, and not physically threatening to be more akin to mere offensive utterances than harassment).

Further, McKinney has not raised a genuine issue of material fact as to whether any alleged harassment was "because of" his membership in a protected group.  *See Parker v. United States*, 129 F.4th 1104, 1113 (8th Cir. 2025) (plaintiff must establish "the required causal nexus between the complained of harassment and [her] protected status") (quoting *Palesch v. Mo. Comm'n on Hum. Rts.*, 233 F.3d 560, 566 (8th Cir. 2000) (alteration in original); *Woods,* 150 F.4th at 973

21

(finding that miscellaneous grievances about a work environment, supervisors' alleged failures to train and provide office supplies, wrongfully charging the employee as absent without leave, and yelling at or disrespecting the employee and other black employees "offer[] little more than speculation and conjecture that the incidents had anything to do with [the employee's] race.");

Therefore, Remington's motion for summary judgment as to McKinney's hostile work environment claims is granted (Dkt. No. 12).

## V.    Retaliation

### A.    Legal Framework

"Title VII prohibits an employer from discriminating against an employee who 'has opposed any practice made an unlawful employment practice by this subchapter' or who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Barker v. Missouri Dep't of Corr.*, 513 F.3d 831,834 (8th Cir. 2008) (quoting 42 U.S.C. § 2000e-3(a)).    A plaintiff may avoid summary judgment on his retaliation claim by either offering direct evidence of retaliation or using the *McDonnell Douglas* framework to create an inference of retaliation.    *Donathan*, 861 F.3d at 739.

Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of establishing a *prima facie* case of retaliation by showing that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) the adverse employment action was causally linked to the protected activity.    *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011).    To show that an action is causally linked to protected activity, a plaintiff "must thus show that her conduct was a 'determinative—not merely motivating—factor'" *Robinson v. Am. Red Cross*, 753 F.3d 749, 756 (8th Cir. 2014) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352

(2013)).  Nonetheless, "[t]he burden to show a *prima facie* case is not difficult."  *Donathan*, 861 F.3d at 739.

If a plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to proffer "a legitimate, non-retaliatory reason for its action."  *Pye*, 641 F.3d at 1021 (*quoting Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1078 (8th Cir. 2010)).  If the employer meets this burden, the plaintiff must offer evidence that the proffered reason is pretext for discrimination.  *Id*.  The plaintiff at all times retains the ultimate burden of proving that an impermissible retaliatory motive was the "but-for cause" of the adverse employment action.  *Donathan*, 861 F.3d at 739–40 (quoting *Nassar*, 570 U.S. at 352).

###     B.     Analysis

McKinney alleges that his hourly schedule was changed and that he was not permitted to work overtime as a result of filing a charge with the EEOC (Dkt. No. 1, ¶ 39; 19, ¶ 30).[14]

McKinney has not produced any direct evidence of retaliation.  Thus, McKinney must establish a *prima facie* case through the *McDonnell Douglas* framework.  Filing charges with the EEOC is a protected activity.  *Robinson v. Am. Red Cross*, 753 F.3d 749, 756 (8th Cir. 2014).

As to the change in McKinney's hourly schedule, McKinney has not raised a genuine issue of material fact as to whether the filing of the EEOC charge was a "determinative—not merely motivating—factor" in the decision to change McKinney's hourly schedule.  *Robinson*, 753 F.3d at 756.  First, Remington appears to allege that his schedule was changed before the EEOC charge was filed (*see* Dkt. No. 1, ¶¶ 32, 36 (stating that McKinney's hours were changed before he filed

---

[14]  To the extent McKinney alleges that he suffered retaliation in the form of having his position "eliminated" because of the EEOC charge (Dkt. No. 1, ¶¶ 35, 48, 51, 61, 64), McKinney admits that his "position was never eliminated" (Dkt. No. 19, ¶ 36).  Therefore, McKinney fails to establish that he suffered retaliation on this ground as he fails to raise a genuine dispute of material fact as to whether he suffered an adverse employment action.

an EEOC charge; Dkt. No. 18, 178 (EEOC charge discussing change in hours)).  Second, even setting aside whether McKinney filed his EEOC charge after the hourly schedule change occurred, McKinney admits that Remington changed McKinney's entire department's schedule, and McKinney has provided no evidence that the EEOC charge was the determinative factor in making this decision (Dkt. No. 19, ¶¶ 30, 31).

Even if McKinney makes out a *prima facie* case of retaliation on this ground, Remington has articulated a legitimate, non-retaliatory reason for its action, and McKinney has failed to show that an impermissible retaliatory motive was the "but-for cause" of the adverse employment action. *Donathan*, 861 F.3d at 739–40.  Therefore, McKinney has not raised a genuine issue of material fact as to whether changing his hourly schedule was casually linked to his filing of an EEOC charge or that Remington's proffered explanation is merely pretextual.  *Pye*, 641 F.3d at 1021.

As to McKinney's overtime policy changes, the overtime policy changes were made on or about April 16, 2024 (Dkt. No 19, ¶ 25).  McKinney stated that he filed his EEOC charge sometime in or before May 2024, although McKinney was not sure of the exact date (Dkt. No. 18, at 69).  The form that McKinney submitted to the EEOC is undated, but lists May 8, 2024, as the latest date discrimination took place (*Id.* ¶ 178).

Even assuming that McKinney filed his EEOC charge before the overtime policies were made, McKinney has not raised a genuine issue of material fact as to whether the filing of the EEOC charge was a "determinative—not merely motivating—factor" in the decision to change the overtime policy.  *Robinson*, 753 F.3d at 756.  The changes in overtime were made to ensure adequate staffing for roles performed by McKinney and Hawkins and to allow supervisors on McKinney's team to have advance notice of who would be covering overtime hours (Dkt. No. 19,

24

¶ 25).  McKinney has provided no evidence that the EEOC charge was the determinative factor in making this decision.

Even if McKinney makes out a *prima facie* case of retaliation on this ground, Remington has articulated a legitimate, non-retaliatory reason for its action, and McKinney has failed to show that an impermissible retaliatory motive was the "but-for cause" of the adverse employment action. *Donathan*, 861 F.3d at 739–40.  Therefore, McKinney has not raised a genuine issue of material fact as to whether changing his overtime policy was casually linked to his filing of an EEOC charge or that Remington's proffered explanation is merely pretextual.  *Pye*, 641 F.3d at 1021.

McKinney also alleges that he suffered retaliation as a result of reporting Snider for the bathroom incident (Dkt. No. 1, ¶¶ 25, 26, 29).  McKinney alleges that he suffered retaliation in the form of changes to his hourly schedule (Dkt. No. 1, ¶ 32), having his position eliminated (*Id.*, ¶ 33), being moved to the night shift (*Id.*, ¶ 34), and having his title and job duties changed (Dkt. Nos. 1, ¶ 35; 18, at 8–12).

As previously discussed, McKinney has admitted that his position was not eliminated (Dkt. No. 19, ¶ 36), and the record before the Court indicates that McKinney never worked the night shift (Dkt. No. 18, at 64, 66, 176).  As to changes in his hourly schedule, for the same reasons previously discussed, McKinney has not raised a genuine issue of material fact as to whether the bathroom incident was a "determinative—not merely motivating—factor" in the decision to change McKinney's schedule along with his entire department.  *Robinson*, 753 F.3d at 756.  Even if McKinney makes out a *prima facie* case of retaliation on this ground, Remington has articulated a legitimate, non-retaliatory reason for its action, and McKinney has failed to show that an impermissible retaliatory motive was the "but-for cause" of the adverse employment action. *Donathan*, 861 F.3d at 739–40.

As to McKinney's change in job title and responsibilities, McKinney raises no genuine issue of material fact as to whether such a change was causally linked to his reporting of the bathroom incident. McKinney testified that the bathroom incident was isolated and promptly remedied to his satisfaction (Dkt. No. 19, ¶ 42). McKinney also stated that the changes came "months after that event happened" (Dkt. No. 18, at 8). *See ADA Martinez-Medina v. Rollins*, 144 F.4th 1091, 1099 (8th Cir. 2025) (acts occurring "at least several months after" protected activity was insufficient to show causation); *Weger v. City of Ladue*, 500 F.3d 710, 727 (8th Cir. 2007) ("an interval as brief as two months did not show causation for purposes of establishing a retaliation claim, . . . and that a two-week interval was sufficient, but barely so . . . .") (quoting *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006)). Thus, McKinney has not raised a genuine issue of material fact as to whether the alleged adverse employment actions were casually linked to his reporting of the bathroom incident or that Remington's proffered explanations are merely pretextual. *Pye*, 641 F.3d at 1021.

Therefore, Remington's motion for summary judgment as to McKinney's retaliation claims is granted (Dkt. No. 12).

## VI.    Conclusion

For the foregoing reasons, the Court grants Remington's motion for summary judgment (Dkt. No. 12). McKinney's claims are dismissed with prejudice. The request for relief is denied. A separate Judgment will be entered in favor of Remington.

It is so ordered this 31st day of March, 2026.

_____
Kristine G. Baker
Chief United States District Judge

26